1

2              **UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF NEW JERSEY**

3     _____

4    HELSINN HEALTHCARE, S.A. and
     ROCHE PALO ALTO, LLC,

5                                    CIVIL ACTION NUMBER:
              Plaintiffs,

6                                       11-3962(MLC)
              -vs-

7                                    MARKMAN HEARING
     DR. REDDY'S LABORATORIES, LTD.,

8    et al.,

9             Defendants.
     _____

10        Clarkson S. Fisher United States Courthouse
          402 East State Street

11        Trenton, New Jersey 08608
          September 23, 2014

12

     **B E F O R E**:       THE HONORABLE MARY L. COOPER

13                          UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

     Certified as True and Correct as required by Title 28, U.S.C.,

24   Section 753

25   /S/ Regina A. Berenato-Tell, RMR, CRR, CCR

```
 1  A P P E A R A N C E S:

 2  PAUL HASTINGS
    BY:  ANGELA C. NI, ESQUIRE
 3       ERIC W. DITTMANN, ESQUIRE
    SAUL EWING
 4  BY:  WILLIAM C. BATON, ESQUIRE
         CHARLES M. LIZZA, ESQUIRE
 5  Attorneys for the Plaintiffs

 6  WINSTON & STRAWN
    BY:  JOVIAL WONG, ESQUIRE
 7  Attorney for Defendant, Teva

 8  LITE DePALMA, GREENBERG, LLC
    BY:  MAYRA V. TARANTINO, ESQUIRE
 9  Attorney for Defendant, Teva

10  MORRISON FOERSTER
    BY:  MATTHEW M. D'AMORE, ESQURIE
11  Attorney for Defendant, Sandoz

12  HILL WALLACK
    BY:  ERIC I. ABRAHAM, ESQUIRE
13  Attorney for Defendant, Sandoz

14  BUDD LARNER
    BY:  STUART D. SENDER, ESQUIRE
15       MICHAEL H. IMBACUAN, ESQUIRE
    Attorneys for the Defendant, Dr. Reddy
16
    ALSO PRESENT:  JOSEPHINE LIU
17

18

19

20

21

22

23

24

25
```

───────── Markman Hearing - 9/23/14 ─────────

1   TRENTON, NEW JERSEY, TUESDAY, SEPTEMBER 23, 2014, 1:30 P.M.

2           (In open court.)

3           THE COURT:  Good afternoon, everyone.  Welcome.

4       Here we are in Helsinn versus Dr. Reddy, Sandoz, and

5   Teva with the lead action number 11-3962.  And I'll take your

6   appearances in the order of the caption.  Everyone else may be

7   seated.

8           MR. LIZZA:  Good afternoon, your Honor.  Charles M.

9   Lizza of the Saul Ewing firm, and with me is my partner

10  William C. Baton.  And I'll have the Paul Hastings colleagues

11  identify themselves.

12          MR. DITTMANN:  Good afternoon, your Honor.  Eric

13  Dittmann from Paul Hastings on behalf of Helsinn.

14          MS. NI:  Good afternoon, your Honor.  Angela Ni from

15  Paul Hastings on behalf of Helsinn.

16          THE COURT:  Fine.  Thank you.

17          MR. WONG:  Good afternoon, your Honor.  Jovial Wong

18  from Winston and Strawn on behalf of the Teva defendants.

19          MS. TARANTINO:  Good afternoon, your Honor.  Mayra

20  Tarantino from Lite, DePalma, Greenberg, also on behalf of

21  Teva.

22          MR. SENDER:  Good afternoon, your Honor.  Stewart

23  Sender from Budd Larner on behalf of Dr. Reddy.

24          MR. IMBACUAN:  Good afternoon.  Michael Imbacuan from

25  Budd Larner on behalf of the DRL defendants.

1    MR. D'AMORE:  Good afternoon, your Honor.  Matthew
2  D'Amore from Morrison and Foerster for Sandoz.
3    MR. ABRAHAM:  Hello, Judge.  Eric Abraham from Hill
4  Wallack, also on behalf of Sandoz.  And I would like to
5  introduce to the Court Ms. Josephine Liu, who is in-house
6  patent counsel for Sandoz, also present in the courtroom.
7    THE COURT:  Welcome.  Welcome one and all.  Good.
8    Okay.  I have briefs.  It looks as if defendants
9  consolidated your briefing for this claim construction
10  hearing; is that right?
11    MR. WONG:  That's correct, Your Honor.
12    THE COURT:  And the one issue that I have been told
13  we have to take up this afternoon is whether this preamble
14  language after the word "formulation" in Claim 1 of the '219
15  patent is limiting or not, right?
16    MR. DITTMANN:  Correct.
17    THE COURT:  Okay.  It looks like, Mr. Dittmann,
18  you're poised to present.
19    MR. DITTMANN:  Yes, I am, Your Honor.
20    THE COURT:  Go right ahead.
21    MR. DITTMANN:  May I approach, Your Honor?  I have
22  copies of slides.
23    THE COURT:  Oh, sure.  Thanks.
24    MR. DITTMANN:  Good afternoon, again, Your Honor.  My
25  plan for this afternoon is to provide a very brief background

1   discussion on some relevant items concerning this claim

2   construction dispute and then to jump right into the issue, as

3   you just mentioned, whether or not this disputed preamble

4   language limits the claims.  And from a high level perspective

5   there's really two fundamental reasons why this language is

6   limiting, and one is that it provides antecedent basis for the

7   words "said formulation" in the body of the claims.

8       THE COURT:  Now hold on.  I don't mean to stop you so

9   fast, but the other side agrees that up to the word

10  "formulation" in the preamble everybody's fine with it to be

11  limiting, and, so, the disputed preamble language comes after

12  the word "formulation" in the preamble.

13      MR. DITTMANN:  Yes, and I'm going to go through that

14  specifically to show you where there's agreement and where

15  there's disagreement, and I'll explain to you hopefully why we

16  think the language should be found limiting.

17      THE COURT:  I'm following you.

18      MR. DITTMANN:  Great.  And the second independent

19  basis is that there was -- the intrinsic evidence makes clear,

20  including through clear reliance during prosecution, that this

21  language serves as a limitation of the claims.

22      So, very briefly, Your Honor may recall from our last

23  Markman hearing that this case -- these patents are directed

24  to what are known as setrons.  They are used to treat emesis,

25  otherwise known as nausea and vomiting.  And palonosetron is

 1  the specific setron that is used in the formulations of the

 2  patents-in-suit.

 3       Palonosetron is marketed in the United States as a

 4  formulation for intravenous administration under the name

 5  Aloxi®.  And Aloxi® in the U.S. is specifically used to treat

 6  chemotherapy-induced nausea and vomiting, which as we've

 7  explained previously, can be a critical aspect of cancer

 8  treatment in ensuring that patients can continue to take what

 9  can be very hard medicines in the form of chemotherapy and

10  withstand them.

11       The patents-in-suit in this case -- there are four of

12  them -- we're focusing only on one today, the '219 patent in

13  red.  All four of these patents are related.  They stem from

14  the same priority application.  They have nearly identical

15  specifications, and for purposes of today's discussion there's

16  no differences that are relevant.  And all of them cover the

17  Aloxi® intravenous formulation.

18       THE COURT:  All of them cover intravenous, all four

19  of these patents?

20       MR. DITTMANN:  Yes.

21       THE COURT:  Okay.

22       MR. DITTMANN:  Now, I want to talk a little bit about

23  this disclosure of the '219 patent.  Defendants have some

24  statements in their papers about the meaning of some of the

25  efficacy-relating statements in the '219 patent, and while the

─── Markman Hearing - 9/23/14 ───

1   precise meaning of these statements are not necessary to

2   resolve today's claim construction dispute, they're helpful,

3   we think, to understand and provide support for why some of

4   the language is limiting.

5           So, to start with, the patents make clear that the

6   formulations serve two objectives.  One, pharmaceutically

7   stable.  We talked about that at length two years ago at the

8   last Markman hearing.  That's not for today.

9           The second aspect that is relevant today is that they

10  can be used to treat emesis, including what I'll refer to as

11  CINV, chemotherapy-induced nausea and vomiting.  As we can see

12  from the abstract, the present invention relates to shelf

13  stable liquid formulations of palonosetron for reducing

14  chemotherapy- and radiotherapy-induced emesis.

15          So, as we'll continue to go through the patent

16  disclosures I wanted to keep this in mind that there's really

17  two aspects to what's being discussed here, that these

18  formulations are both shelf stable and they're able to treat

19  this condition, CINV.  And, in fact, one of the objects of the

20  invention is to provide a formulation of palonosetron with

21  increased pharmaceutical stability for preventing and/or

22  reducing emesis.

23          THE COURT:  And the word "for" there modifies the

24  word "formulation."  It is not modifying "stability."

25          MR. DITTMANN:  Correct.  That's what a formulation, a

Markman Hearing - 9/23/14

1   medicament is for; it is to treat a condition.  It is not

2   to -- should not sit on a shelf and remain stable.

3          THE COURT:  Right.  Exactly.

4          MR. DITTMANN:  So the summary of the invention -- in

5   fact, the very first aspect of the invention that's discussed

6   is a series of discoveries that support a surprisingly

7   effective treatment for prevention of emesis using

8   palonosetron.  And it continues, "The inventors have

9   discovered that...only 1/10th of the amount of other

10  previously known compounds," other setrons that are mentioned

11  in the patent, but do not contain palonosetron, you can use

12  much lower amounts of palonosetron to treat emesis.  And

13  that's one aspect of this invention.

14        And that's made clear...

15        THE COURT:  Can I just stop you there for a second?

16        MR. DITTMANN:  Sure.

17        THE COURT:  In one aspect the inventor -- I'm just

18  reading from what is in the summary on the board.  "The

19  inventors have discovered that formulations, which include the

20  active ingredient palonosetron require in some instances only

21  1/10th of the amount of other previously known compounds."

22  So, this invention doesn't say, Oh, we came up with the

23  surprising discovery that we can use one-tenth as much

24  palonosetron if we formulate it this way and we can still

25  succeed with this treatment, no.

1         MR. DITTMANN:  What they're saying is we're using
2    very low amounts, much smaller than the amounts used in other
3    setron products, you're correct, that known in the prior art.
4    And what they're saying is it is surprising that this molecule
5    palonosetron can be used at such low amounts relative to the
6    other setrons, and, again, it is important for treating
7    emesis, and we're talking about the amounts of palonosetron.
8    There's no discussion here of stability.  That comes later.
9    That's another aspect of it.
10        It turns out, Your Honor, that low amounts of
11   palonosetron are both beneficial for stability, and they also
12   are able to treat emesis.  And you'll hear about this more as
13   this case progresses, but that is really the fundamental
14   aspect is that it was surprising the stability that was seen,
15   but it was also surprising that there was efficacy at all,
16   given the prior art disclosures about palonosetron.  We don't
17   need to get into the details of the prior art disclosures
18   regarding the amounts of palonosetron, but all I wanted to
19   illustrate was this invention is clearly talking about
20   efficacy aspects on the one hand and stability on the other.
21        Further on in the body of the specification, which was
22   cited in our briefs, there's some more disclosure, again,
23   focused on the efficacy aspects of this invention, and here,
24   again, we see the comments about the lower amounts of
25   palonosetron to treat emesis, and then it continues and talks

—— Markman Hearing - 9/23/14 ——

1    about these lower dosages that can be used and administered

2    intravenously.  And an example that's provided is 0.25

3    milligrams of palonosetron, and that example is exactly what

4    is specified in the claims-in-suit and, so, here, once again,

5    we're clearly disclosing in this patent that 0.25 milligrams

6    of palonosetron is effective or can be used to treat emesis,

7    including CINV.

8           Now, here what we have is the claim setting forth the

9    disputed preamble language, and what I have done here is the

10   highlighted language is what the parties are currently

11   disputing.  There is no dispute, as I'll get to in a minute,

12   about this language, and the reason that I'm highlighting

13   these two terms, as I'm sure Your Honor is familiar with by

14   now, is that plaintiffs contend that one basis -- not the only

15   basis but one basis -- for saying that the disputed preamble

16   language is limiting is that this preamble language should be

17   taken as a whole.  It is clearly describing and modifying the

18   word "formulation."  Just because some words come before and

19   some come after, it doesn't change the fact that they're

20   describing the formulation.

21           THE COURT:  That's what you're saying?

22           MR. DITTMANN:  That's what we're saying.

23           THE COURT:  Yes.

24           MR. DITTMANN:  But I'm saying that's one basis.

25   There are other bases that I'll cover as to why this language

——— Markman Hearing - 9/23/14 ———

1   is limiting.  And, again, this is very briefly setting forth

2   the parties's positions that the highlighting language we just

3   saw plaintiffs say it is limiting; defendants say it is not.

4           THE COURT:  Go back to that slide, would you?

5           MR. DITTMANN:  Sure.

6           THE COURT:  Okay.  If the Court finds that the

7   disputed term is a limitation in whole or in part and should

8   be construed then they still don't need to be construed --

9           MR. DITTMANN:  Right.

10          THE COURT:  -- because they have their ordinary

11  meaning?

12          MR. DITTMANN:  Everybody agrees they have their plain

13  meaning.

14          THE COURT:  Okay.

15          MR. DITTMANN:  Now, before we get into the merits of

16  whether this language is limiting or not, I did want to pause

17  and posit that we're still scratching our heads over why this

18  dispute is being raised by defendants.  We're now in the

19  middle of expert reports.  We have received the second round

20  from both parties submitted last week, and nothing -- and I

21  have reviewed the reports very carefully -- nothing I see sets

22  forth any argument that depends on defendants prevailing in

23  their position here.  In fact, the only thing I can see is the

24  defendants are stating in their brief that they will assert a

25  written description defense if plaintiffs's position is

──────── Markman Hearing - 9/23/14 ────────

1   adopted.

2         THE COURT:  An enablement, I think, isn't that what

3   they said?

4         MR. DITTMANN:  It is a written description argument.

5   There is a footnote at the bottom of the slide.

6         THE COURT:  Lack of written description.  Yes.  Page

7   13, Footnote 12 of their reply brief.

8         MR. DITTMANN:  In all honesty, Your Honor, we don't

9   expect to see this defense at trial, but, nevertheless, it has

10  been stated to be dependent on plaintiffs's construction being

11  adopted, not their own.  But more than that, we don't -- we

12  have put in our briefs a number of times we don't see how this

13  dispute matters.  The parties's experts don't seem to think

14  that matters.  Defendants, nevertheless, raised this issue.

15  We believe that it is clear that this language is limiting,

16  and we're, frankly, concerned about the mischief of, well, all

17  of a sudden now there's a Markman ruling, and they're going to

18  make new arguments, even though we think they would be

19  untimely at this late stage, there's no reason for us to agree

20  that this language is not limiting when it is very clear that

21  it is.  And I'll review that.

22         THE COURT:  I don't think I ever heard of that kind

23  of scenario before.  Every time I come out for a Markman

24  hearing it is because the parties have some notion of how

25  that's going to play into the strategy of the rest of the

──────── Markman Hearing - 9/23/14 ────────

1   case.  They don't tell me what it is usually.  At least they

2   tacitly agree this matters, it matters or else they wouldn't

3   be putting us through this exercise of claim construction on

4   it.

5        Go ahead.  It is your presentation.

6         MR. DITTMANN:  So to begin with, defendants place a

7   lot of reliance in their briefs on legal principles, and

8   including this as an example of one that generally the

9   preamble does not limit the claims.  And we see variance of

10  that throughout their brief.

11       But I want to start off with the notion to correct any

12  misunderstanding that that does not apply in this case.

13  Initially defendants took the position during the meet and

14  confer process that the entire preamble was not limiting, and

15  they said every part of it is not limiting.  After the meet

16  and confer process was concluding on the day that we were

17  submitting joint claim construction charts they came in and

18  changed their position and said, Oh, wait, no, this language,

19  "pharmaceutical single-use unit-dose formulation" is limiting,

20  but the rest is not.

21       So, we have a situation where the preamble is limiting

22  by defendants's own admission, so this is not -- this is a

23  case where the preamble is limiting.  So resort to general

24  principles is really not helpful to defendants.  And we have

25  to look at the facts.  And I'll also explain, if it becomes

───────── Markman Hearing - 9/23/14 ─────────

 1   necessary that, in fact, the "single-use unit-dose" language

 2   that defendants claim to be the structural aspects of this

 3   preamble, in fact, is not.  You can just see by the word

 4   "single-use" it is referring to how you use these

 5   formulations.  "Single-use" refers to the fact that it is

 6   administered once to a patient and discarded.

 7         And, so, putting that aside, though, the fundamental

 8   point that I want to make is these sort of general principles

 9   about preambles generally not limiting do not apply in this

10   case because we have already all agreed that this preamble

11   does at least limit in part.

12         So, then getting to the specifics, again, as I

13   mentioned earlier, plaintiff's position is the preamble is one

14   limitation.  And it describes the formulation.  And we don't

15   think it is proper to break it up into parts, but that is what

16   defendants have done.  They have sort of carved out the front

17   part of the preamble and said it is limiting, so that is not

18   in the case any longer.  And they have made arguments about

19   two other parts of that preamble phrase, so I'm going to deal

20   with them...

21           THE COURT:  But you don't have any authority for the

22   notion that a long run-on clause consisting of several phrases

23   has to be interpreted as a single limitation.

24           MR. DITTMANN:  I agree it doesn't have to be, Your

25   Honor.  Certainly, if there is a long list of phrases that

─────── Markman Hearing - 9/23/14 ───────

1   don't relate to the formulation, but here everything, as I'll

2   explain, relates back to the formulation and describes the

3   formulation.

4        And, certainly, with respect to this first phrase "for

5   intravenous administration to a human," frankly, we don't see

6   much of a dispute here.  I'll go through the reasons for that.

7   And the first one is that defendants's responsive brief, they

8   concede that intravenous preamble language from the original

9   patents-in-suit, the '724, '725, and '424 patent they admit

10  that those are limiting.  And as I'll explain to you that

11  phrase "intravenous" in the preamble of the other patents has

12  the same meaning as "for intravenous administration."  There's

13  no distinction between those two phrases.  And, in fact, the

14  defendants's experts have provided testimony admitting this.

15       The second point is that "for intravenous

16  administration" provides structural antecedent basis for "said

17  formulation" in the body of the claims.  And I'll explain

18  that, but it is sort of common sense; when you're putting

19  something directly into your blood, there are special

20  requirements to make sure that patients aren't harmed, there

21  aren't irritations, there are special considerations for

22  intravenous administration formulations, and, therefore, that

23  has an effect.

24          THE COURT:  Also, I notice that the specification,

25  which I don't know how common it is to how many other patents,

─────── Markman Hearing - 9/23/14 ───────

1   mentions both "intravenous" and "oral," but when we get to the

2   claims we only have two independent claims here in this

3   patent, and they're both clearly for intravenous.

4           MR. DITTMANN:  Yes.  And, your Honor may recall in

5   our opening brief you went through a very long summary of the

6   prosecution where some oral prior art formulations were

7   distinguished because the claims of these patents are focusing

8   on the I.V. aspect.  This is about I.V.

9           And the last independent basis is there is some

10  relevant prosecution history that I'll discuss that makes

11  clear that intravenous is a limitation of these claims.

12          So, again, the first point here is that, again, we had

13  a summary of prosecution histories from four separate

14  applications, all of them the family that led to this patent,

15  the '219 patent, and over and over again the patentees

16  distinguished oral prior art solutions as not being

17  intravenous.

18          And now defendants don't contest this clear reliance.

19  They say we agree.  "Intravenous solution," "intravenous

20  isotonic solution" and the like from these various patents are

21  all limitations, and those are preamble -- those are in the

22  preamble.  And they say it is because it affirmatively recites

23  essential structure, and we agree, "intravenous" does convey

24  essential structure, as I just mentioned.

25          But the issue here is that when you look at what

───────── Markman Hearing - 9/23/14 ─────────

 1  defendants, for example, Claim 1 of the '724 patent, what they

 2  concede to be limiting is indistinguishable from what we have

 3  in our claim of the '219 patent.  That is because

 4  "intravenous" is Latin for inside the vein.  It is talking

 5  about what you do with a formulation.  You're putting the

 6  formulation inside the vein of a human.  And it is a

 7  prepositional -- the prepositional phrase "for intravenous

 8  administration" is the same thing as the use of "intravenous"

 9  as an adjective.  There's no difference.

10       And, frankly, defendants's experts wouldn't get up here

11  and tell you anything differently, and we know that because we

12  have their testimony, and I can walk you through that.  For

13  example, Dr. DeLuca, one of defendants's experts in one of his

14  expert reports states that "intravenous solution is a

15  parenteral liquid solution dosage form that is administered

16  through injection into a vein of the human body."  That is

17  essentially saying what I'm saying, that they're the same.  An

18  intravenous solution is administering the solution through a

19  vein intravenously.

20       THE COURT:  Nobody really disputes that we're talking

21  about medicine for a human being, right?

22       MR. DITTMANN:  We certainly don't, Your Honor.

23       THE COURT:  I mean, you can have an intravenous

24  veterinary solution, I'm sure?

25       MR. DITTMANN:  That may be, but we think it is very

───────── Markman Hearing - 9/23/14 ─────────

1   clear, again, from the claims that we're talking about

2   administering to a human, and that's the subject that needs

3   chemotherapy-induced nausea and vomiting treatment.  I'm not

4   aware of any animals that undergo chemotherapy.

5          THE COURT:  Yes, they do.

6          MR. DITTMANN:  Do they?

7          THE COURT:  They absolutely do.

8          MR. DITTMANN:  I'm not aware of at least antiemetics

9   and these sort of palonosetron solutions being used, but,

10  nevertheless, points well taken.

11         Now, we have Dr. DeLuca separately stating and

12  summarizing one of the prior art articles, the Tang reference,

13  he says, "The Tang discloses the use of an intravenous

14  solution of palonosetron to treat PONV."  "In particular, Tang

15  disclosed that each dose of medication used was an isotonic

16  sodium chloride solution of palonosetron administered

17  intravenously."  This is not debatable.  These are the same --

18  this means the same thing, these two sets of words.

19         Dr. Frame made a similar admission.  I won't belabor

20  the point with respect to another prior art reference, and Dr.

21  Kirsch, another one of defendants's experts, he equates

22  "administered through intravenous administration" to "an

23  intravenous formulation."

24         What we have is over and over again, and if anything

25  more was necessary, even last month defendants's expert Dr.

──────── Markman Hearing - 9/23/14 ────────

1    DeLuca sets forth Claim 1 of the '219 patent, and he

2    summarizes his opinions that saying, "it would have been

3    obvious to develop an intravenous solution with common

4    components in the prior art."  Again, "intravenous solution"

5    is no different than "for intravenous administration."

6         So, that's we think -- number one, we think

7    defendants's admission puts this issue to bed.  But even if

8    there was some argument to say that these words had any slight

9    difference in meaning defendants say that, Well, you can't use

10   the prosecution for a word like "intravenous" and then apply

11   it to a different term like "for intravenous administration."

12   They have to be the same claim language is what defendants

13   say, but that's not the law.  The Federal Circuit has made

14   clear that the proper inquiry in such a circumstance is

15   whether the scope of the claim limitation is substantially the

16   same in the subsequent application as it is, for example, in

17   the parent application.

18        And the Masco case we cited in our opening brief

19   provides one example; in this case the parent application had

20   the term "positively driving" as part of a means plus

21   function, and statements regarding that claim term was used to

22   construe the phrase "to drive."  Just one example.  They don't

23   have to be exactly the same language.  They have to be either

24   the same or substantially the same.

25        Now, bringing us back to our point about antecedent

Markman Hearing - 9/23/14

1  basis, defendants provide a test where they say, Well, the

2  antecedent basis in this case is if it's the structural part

3  of the preamble they say that's what comes in through this

4  antecedent basis.  But, again, there really can't be a

5  legitimate dispute that when a person of skill in the art sees

6  "for intravenous administration to a human" that conveys

7  certain structural requirements for the formulation.  Not only

8  that it be isotonic and sterile like the claims already

9  require, but that it be free of pyrogens, these substances

10 that can raise body temperature and cause fever.  It also has

11 to be free of particulate matter.  This is very different than

12 if you're taking something and ingesting it orally and you

13 have the benefit of your low pH of your intestinal system in

14 your stomach to handle these formulations.  So we think even

15 if that's the test, that's readily met here.

16      Now one last point, your Honor, and this one is

17 important to keep in mind, as well; the word "isotonic"

18 everyone agrees is a limitation of these claims.  No one

19 disputes that "isotonic" is not limiting.  And I'm going to

20 show you that in the parent application for this patent that

21 "isotonic," that claim term was described to mean to refer to

22 intravenous formulations, and I'll show you that now.  In an

23 appeal brief in the parent application in distinguishing, once

24 again, oral formulations --

25      THE COURT:  This is appealing to the Patent Office

─────── Markman Hearing - 9/23/14 ───────

1   Board of Appeals or something?

2           MR. DITTMANN:  Correct.

3           THE COURT:  Go ahead.

4           MR. DITTMANN:  So in that appeal brief -- and we'll

5   come back to this brief later for a different reason -- but in

6   that brief we're distinguishing oral formulations, and in

7   making that argument the applicants say that, "this ignores

8   the requirements of the claims for isotonicity," which is,

9   again, a claim requirement to the '219 patent, "which is a

10  requirement only for intravenous formulations."

11         So, the point is this:  We think it is crystal clear

12  that the preamble phrase "for intravenous administration" is

13  limiting, but even if we're wrong it still is a requirement

14  through the word "isotonicity" in the body of the claim, so

15  even if the defendants prevailed on the preamble point it is

16  still a limitation of the claims either way.

17         THE COURT:  You mean to be intravenous is necessarily

18  implied by this word "isotonic."

19         MR. DITTMANN:  And that's exactly what the applicants

20  are saying in this prosecution document.  They tell the Patent

21  Office our claims require isotonicity; that distinguishes us

22  from oral because isotonicity is a requirement for intravenous

23  formulations.  If this were a case, your Honor, where we were

24  alleging the defendants's oral formulations somehow were

25  infringing this would be the sort of thing where it would

─────── Markman Hearing - 9/23/14 ───────

1   become frivolous for us to say that "intravenous" is not a

2   requirement of the claims.  I submit for at least that reason

3   it has to be a limitation here.

4        "To reduce the likelihood of CINV," that's the last

5   part of this preamble phrase.  And there are two basic points

6   here, as well.  Like what we just saw with "intravenous" this

7   phrase was clearly relied upon during prosecution, including

8   to distinguish the prior art.  And the phrase is also a

9   fundamental characteristic of "said formulation" in the body

10  of the claims.

11        Now, very quickly, again, going back to the point about

12  you can't rely on broad general principles, the defendants's

13  statement about generally limiting -- not limiting when it's

14  in the preamble, there's an exception that unless there's

15  reliance in the prosecution.  We have cited the Catalina point

16  just as defendants did for this, and it makes clear that clear

17  reliance during prosecution can render preamble language

18  limiting.  And in this case they mentioned the example of

19  distinguishing prior art, but as I'll get to in a moment, you

20  can also distinguish -- or you can also rely on preamble

21  language to get over a 112 rejection, as well, and that causes

22  the language to be limiting.

23        THE COURT:  I get tired of remembering those

24  subsections.

25        MR. DITTMANN:  112 is the disclosure requirements

─── Markman Hearing - 9/23/14 ───

1  that the claims have to provide a written description of the

2  invention and enabling disclosure, amongst some other

3  requirements, but for purposes of today we can talk about

4  enablement since that is what happened in the parent

5  applications.

6          So, I'll try and go through this relatively quickly

7  because we have set this forth in our papers, your Honor, but

8  to boil it down --

9          THE COURT:  I think the new version of 112 actually

10  gives us subparagraphs.

11          MR. DITTMANN:  Which is nicer.  A little bit more

12  convenient.

13          The parent application, the '724 patent, again, this is

14  the original parent application that ultimately led to the

15  '219 patent, this claims that were originally filed were

16  rejected because they had this language "preventing emesis."

17  The examiner didn't like that and said, you know, while you're

18  enabling for reducing, I don't like "preventing."

19          First of all, there's no point in the examiner

20  rejecting those claims, unless they mean something and they

21  limit them, but putting that aside, what the applicants did is

22  they removed that language that the examiner didn't like and

23  they put in a virtually identical preamble language to what

24  we're talking about today, "reducing the likelihood of

25  emesis."

Markman Hearing - 9/23/14

```
 1          THE COURT:  And they put it in the preamble?

 2          MR. DITTMANN:  They put it in the preamble.  Right.

 3          THE COURT:  So, the examiner was quibbling about the

 4  preamble?

 5          MR. DITTMANN:  The examiner is making clear that the

 6  examiner considered the preamble to limit, otherwise there

 7  would be no reason to reject those claims.  If it is not a

 8  limiting preamble it doesn't matter for purposes of 112.  But

 9  even as importantly, the applicants come and put this language

10  in the claims, which, again, is nearly identical to the

11  language we're talking about in the '219 patent, and they say

12  the claims are directed towards reducing emesis or reducing

13  the likelihood of emesis.  And, so, this claim amendment and

14  argument to overcome a 112 rejection, we submit, is one reason

15  to find the nearly identical language "to reduce the

16  likelihood of CINV" to be limiting under the Fantasy Sports

17  case that we cited.

18      This same exact amendment and arguments were made in

19  two other related applications.  Exact same language was made,

20  you know, was submitted.  The amendments were made.  The

21  arguments were made multiple times, and the examiner relented,

22  and the 112 argument was overcome for those reasons.

23      Now, the defendants they really don't quibble with the

24  principle that if you overcome 112 using the preamble language

25  an argument that it can be limiting; they say, oh, we miscite
```

———— Markman Hearing - 9/23/14 ————

1    the <u>Fantasy Sports</u> case because in <u>Fantasy Sports</u> only the

2    word "computer" was found limiting.  The rest of it "for

3    playing football based upon actual football games" was not.

4         Well, first we'll put aside that they seem to be trying

5    to make an argument that only structural limitations can be

6    limiting when you overcome a 112 rejection, but let's put that

7    aside and imagine that defendants are correct about that

8    point, which we don't agree with.  <u>Fantasy Sports</u> made it

9    crystal clear that the entire phrase "a computer for playing

10   football based upon actual football games," that phrase

11   constitutes a limitation.  Defendants cite to different parts

12   of the opinion referring to the, quote, "computer limitation."

13   It is clear that's shorthand for the entire preamble phrase

14   that the Court -- Federal Circuit expressly found limiting.

15   But, again, that's just point number one.

16        The more important point is that even if you applied

17   defendant's test that, well, they said only the "computer"

18   language was amended.  That's the only part they say was

19   amended, and that's important for purposes of what's limiting.

20   If you apply that test to our claims, again, what was amended

21   is "reducing the likelihood of emesis," exactly what we're

22   talking about except for, of course, emesis in our case is a

23   specific type of CINV.  So, defendants make the argument that,

24   well, when you get a 112 rejection over preamble language you

25   can just delete the preamble language, and you can obviate it

Markman Hearing - 9/23/14

1  that way, and that may be true, but the fact that the

2  applicants didn't do that and they amended the language to

3  overcome the rejection shows, proves that it is a limitation.

4       Defendants make a separate argument relating to these

5  parent applications, and, by the way, I just want to pause for

6  a moment on this that defendants when it comes to intravenous

7  preamble language they say it has to be the exact term in

8  order for the parent prosecution to matter.  But when we get

9  to the "reducing the likelihood of emesis" language they have

10 no trouble with equating "reducing the likelihood of emesis"

11 with "reducing the likelihood of CINV."  I think that's

12 inconsistent.  But putting that aside, they rely on this

13 appeal brief, and their argument is that, well, that because

14 "reducing the likelihood of emesis" doesn't appear --

15          THE COURT:  You lost me.  Actually, you're talking a

16 little bit fast for purposes of an on the record session.

17          MR. DITTMANN:  My apologies.  I'll slow down.

18          THE COURT:  We have the world's best court reporter

19 here taking down every single word perfectly, but sometimes I

20 get a little lost.

21          MR. DITTMANN:  Please feel free to slow me down any

22 time.

23          THE COURT:  Okay.

24          MR. DITTMANN:  So I want to just first make the point

25 that remember earlier defendants's argument about intravenous.

Markman Hearing - 9/23/14

1  They say the word "intravenous" is different than "for

2  intravenous administration," and because of that difference

3  they say you can't rely on prosecution statements relating to

4  "intravenous" to apply to a different claim language "for

5  intravenous administration."  They make that argument.  I have

6  explained why that argument is not correct under the law.  But

7  I simply want to point out that when it comes to the separate

8  preamble language "reducing the likelihood of emesis" they're

9  attempting to use prosecution statements relating to that

10  claim language, that preamble language that is different from

11  the preamble language in the '219, they're using it

12  affirmatively now to say, well, this proves that this is not a

13  limitation.  So there is inconsistency in their positions.

14  Either the parent prosecution is relevant if it is similar

15  claim language or it is not.

16      But, more importantly, defendants's reliance on this

17  appeal brief lists -- and I want to explain what their

18  argument is just to make sure we're all clear on this.  They

19  say that because the applicants did not include in this list

20  here, did not include "reducing the likelihood of emesis" as

21  one of the claim formulation features that that proves that

22  "reducing the likelihood of emesis" is not a limitation.

23          THE COURT:  Of the '219?

24          MR. DITTMANN:  Of the '219, even though this is a

25  statement from a previous application, but, again, putting

Markman Hearing - 9/23/14

1  that aside, the M.P.E.P. is very clear that this summary of

2  claimed subject matter that has to be provided, it only

3  relates to subject matter of the claims involved in the

4  appeal.  It doesn't say every single claimed subject matter

5  has to be summarized.  It is what's involved in the appeal,

6  and this part was not quoted in defendant's briefs, and we

7  wanted to make sure this was clear that it has to be involved

8  in appeal, and we just went through that the "reducing"

9  preamble language, "reducing the likelihood of emesis" that

10  was no longer at issue because they had overcome the

11  examiner's rejection.  There's no need to talk about that

12  limitation when it wasn't relevant to an objection that was

13  being discussed in this particular appeal.

14      And, frankly, defendants's Markman arguments from

15  earlier in this case we think was correct.  They said, "The

16  claims of the asserted patents," these original '724, '725,

17  and '424 patents "are directed to pharmaceutically stable

18  intravenous palonosetron formulations that can be used for

19  reducing or reducing the likelihood of emesis."  We think

20  that's correct.

21      Now, there's an independent basis for finding this

22  language in the '219 patent limiting, which I think is very

23  clear.  This is from the '219 prosecution itself, the

24  application that issued as a '219 patent.  It is in examiner

25  interview summary, so it is the examiner writing what was

─────── Markman Hearing - 9/23/14 ───────

 1  discussed with the applicants, and it identifies --

 2          THE COURT:  Is this the last thing that happens in

 3  this prosecution history before the patent is approved or is

 4  there more?

 5          MR. DITTMANN:  I believe this was -- yes, it was.

 6          THE COURT:  Frequently the interview is the last

 7  exchange between the parties before the issuance notice is

 8  sent.  Would that be the case here?

 9          MR. DITTMANN:  It can be.

10          THE COURT:  No, here.

11          MR. DITTMANN:  In this case, yes, this was at the end

12  of the prosecution.  But, also --

13          THE COURT:  See, I have been given only portions of

14  the file history, and that always leaves me a little bit --

15          MR. DITTMANN:  Right.  How much is this in the volume

16  of paper?

17          THE COURT:  That always leaves me just a little bit

18  unsure of at what stage what was being discussed.  But go

19  ahead.  I rely on these parties, you and your adversaries, to

20  give me the pertinent portions of any of these histories, and

21  I don't ask you to give me the whole file wrapper.

22          MR. DITTMANN:  Some of them can be so huge.  I don't

23  think you would want them.

24          THE COURT:  I know.

25          MR. DITTMANN:  But, again, this prior art being

─────── Markman Hearing - 9/23/14 ───────

1   discussed, this is -- it includes Tang, and, by the way, the

2   '219 prosecution was relatively small because there was a lot

3   of prosecution activity in the original patents.  So, you

4   know, this again is a more different way of claiming this

5   Aloxi® formulation, so --

6        THE COURT:  Could I just stop you there and ask:  It

7   never is clear to me how so many patents get issued for,

8   basically, you know, very, very similar facets of

9   pharmaceutical formulations or uses.  And here in this case

10  we're going to be at trial, we're probably still going to be

11  hearing about four patents, the ones that we have listed and

12  you tell me they're all for intravenous forms of the same

13  drug, Aloxi®, palonosetron.  So, you know, in what way these

14  patents differ and are similar I don't know.

15       MR. DITTMANN:  This patent-at-issue today has a

16  specific recitation of a very particular dose 0.25 milligrams

17  in a 5 milliliter solution, whereas some of the previous

18  claims referred to a concentration of palonosetron of 0.05

19  milligrams per milliliter, and we think that conveys a fairly

20  limited amount of dosages and volumes, but this patent that

21  we're talking about today is very specific 0.25 exactly, 5

22  milliliter solution.

23       THE COURT:  Okay.  Thank you.

24       MR. DITTMANN:  During this examiner interview the

25  examiner summarizes what was discussed, and, again, it is

───── Markman Hearing - 9/23/14 ─────

1   prior art being discussed, Tang, and she says that

2   Mr. Sullivan, who was the prosecuting attorney for plaintiffs

3   in response to these prior art assertions being made he

4   highlighted the limitations that were in the claims,

5   including, so these are not all of them, but he is including

6   "limitations of the claims relevant to this prior art," and

7   one of them is "cancer chemotherapy-induced nausea and

8   vomiting" amongst others.  The examiner goes on and talks

9   about Tang, describing a dose-ranging trial in PONV.  PONV, as

10  your Honor may recall, is post-operative nausea and vomiting,

11  a related, but different form of emesis than CINV.

12        THE COURT:  And it gets a higher dosage, I think,

13  generally?

14        MR. DITTMANN:  Generally the CINV gets the higher

15  dosage than the PONV.  The PONV is less.  Yes.

16        THE COURT:  I misread that.

17        MR. DITTMANN:  And, so, here we have a situation in

18  the prosecution of the patent-at-issue defendant said there's

19  no evidence that we relied upon the CINV language.  Well, here

20  we are.  The examiner stating this a summary of what was

21  argued by the applicants relying upon chemotherapy-induced

22  nausea and vomiting language to distinguish the prior art.

23        THE COURT:  Okay.  So, Tang had to do with this other

24  use, which is post-op, post-operative, whereas this

25  application that resulted in the '219 is for cancer

 1   chemotherapy-induced emesis, right?

 2           MR. DITTMANN:  These PONV and CINV conditions are

 3   related, but, again, they're different.  They're different,

 4   but they are related, and, again, I think your Honor was

 5   accurate that there's a dosage relation that one takes more

 6   dose than the other.  But what we can't deny is that the

 7   applicants state very clearly when they identify the

 8   limitations in the claim the examiner expressly writes this

 9   language, which was based on arguments from Mr. Sullivan.

10           THE COURT:  So, in other words he is trying to

11   distinguish prior art in the form of this Tang patent that

12   addresses PONV, whereas the current application is addressing

13   CINV?

14           MR. DITTMANN:  CINV.  And, if I can give you a little

15   context of what's happening here is this Tang reference

16   discloses that you need at least 2 milligrams to have partial

17   efficacy in PONV, and what we are arguing to the Patent Office

18   is, well, look, if you need at least 2 milligrams for PONV and

19   only get partial efficacy, there's no way 0.25 milligrams for

20   CINV, which typically requires more dose could be obvious.  So

21   we're using Tang to suggest that 0.25 milligrams for CINV

22   couldn't possibly be obvious based on the disclosure of Tang.

23           THE COURT:  So, it is not just the wooden distinction

24   between a patent directed at a PONV therapy and another patent

25   directed at CINV.  It is more than that.  It is that the

──────── Markman Hearing - 9/23/14 ────────

1   dosage --

2          MR. DITTMANN:  Yes.

3          THE COURT:  -- comparison produced some surprises.

4          MR. DITTMANN:  Yes.  The Tang study we think was --

5   suppose it would have found the results of Helsinn's clinical

6   study showing a very low-dose of palonosetron being effective

7   for CINV to be very surprising in terms of what Tang taught in

8   the prior art.  Tang suggested you need a much higher dose.

9          THE COURT:  Well, we will get there, but your

10  adversaries say, so, good; why aren't the clinical -- or at

11  least the lab results of this therapeutic effect then

12  contained in the specification for the '219 patent?  But I'm

13  sure you'll get there.

14         MR. DITTMANN:  Yes.  To be clear, your Honor, that is

15  the written description defense.  It is not a claim

16  construction dispute.  But just to quickly preview that

17  defendants have a fundamental misunderstanding of the law with

18  respect to the written description defense that we'll make

19  very clear to your Honor at the appropriate time, but I can

20  tell you that no matter how you view the specification there

21  cannot be any doubt that it provides written description

22  support for what's claimed, the formulation that's claimed as

23  being capable of treating CINV a person of skill in the art

24  reading that specification wouldn't have any doubt.  That is

25  the case based on that disclosure, but we'll address that at

─────── Markman Hearing - 9/23/14 ───────

1    the appropriate time if it ever comes.

2         And, so, basically, I want to make sure that we're

3    clear on --

4         THE COURT:  Incidentally, while we're switching

5    slides, we will take like a five-minute recess before your

6    adversaries have to get up and speak just so everybody is not

7    starting to get uneasy in the room.

8         MR. DITTMANN:  It was going to slow me down, your

9    Honor.

10        THE COURT:  And you have all the time you need, both

11   sides.

12        MR. DITTMANN:  Thank you.  The Vizio case we cited we

13   think is instructive.  It is an analogous situation where it

14   is an apparatus claim, and it is talking about in the preamble

15   this function or whatever you want to call it, intended use or

16   function of providing decoded program data.  And here the

17   Federal Circuit found that this language requires that the

18   apparatus must be actually capable of doing this decoding.

19   And I want to be clear, defendants in their briefs have

20   suggested that we're arguing that this CINV language means

21   that the formulations have to be actually used in order to

22   infringe.  That's not what the claims require.  That's not

23   what we're saying.  We're just saying it has to be capable of

24   doing that.  Whatever the formulation is, if we're going to

25   allege infringement of that formulation, that formulation has

 1    to be capable of being used to treat CINV in humans.

 2           THE COURT:  I dimly recall that you had the -- if you

 3    try to put the actual use of it into the patent then the users

 4    wind up being sued for patent infringement because they're

 5    practicing the patent, and, so, that's why the patent drafter

 6    stops short of saying, "and you use it."

 7           MR. DITTMANN:  Right.

 8           THE COURT:  So, they say it has to be capable of

 9    being used that way.

10           MR. DITTMANN:  So to be clear, these are formulation

11    claims that have this capability.  You know, formulations, of

12    course, can be used for many different things, different

13    medical purposes.  Here we're being very particular that it

14    has to have the capability of treating CINV.  And this is

15    analogous, again, to this Vizio case where this

16    capability-type language in the preamble because it was a

17    fundamental characteristic of the invention, which we think is

18    the case here based on the prosecution's statements alone, we

19    think it is analogous, and, again, to briefly refer back to

20    the specification we went through a number of disclosures

21    showing, again, that this idea of reducing chemotherapy form

22    of emesis is a fundamental characteristic of what this

23    invention is all about.  These are medicines for a particular

24    purpose.

25           THE COURT:  Now, palonosetron has other potential

─────────── Markman Hearing - 9/23/14 ───────────

 1  uses, as well, such as the post-surgical, post-op application,

 2  right?

 3       MR. DITTMANN:  There's certainly that.  Medicines can

 4  be used for a whole host of reasons.  I know setrons were

 5  investigated in the 1990s for anxiety and depression.  So,

 6  again, a formulation can be used for different purposes, and,

 7  again, the inquiry -- we're not saying that in every case, you

 8  know, the formulation claims have to have some sort of a

 9  capable use characteristic, but in this case under these

10  facts -- forget about general principles; apply the facts, and

11  under these facts the limitation is clearly serving to

12  circumscribe the claim.

13       And that's all I had at least for now.  I would like to

14  save some time for rebuttal, and I appreciate your patience,

15  your Honor.

16       THE COURT:  Fine.  Let's take our five-minute recess

17  now.  Thank you, Mr. Dittmann.

18       MR. DITTMANN:  Thank you.

19                 (Brief Recess.)

20       THE COURT:  And Mr. Wong.

21       MR. WONG:  Your Honor.  May it please the Court.

22  Good afternoon, Your Honor.  It is good to see you again.  My

23  name is Jovial Wong from Winston and Strawn, and I am counsel

24  for the Teva defendants.  I'll also be making this argument on

25  behalf of Sandoz and DRL.

—————— Markman Hearing - 9/23/14 ——————

1     Your Honor, this is just a preview of what I'll be

2  addressing today, but, certainly, if you have any questions

3  along the way feel free to ask them, and I'll answer them as

4  they come up.

5     By now I think you know where the parties stand, so on

6  the background issues I'll try to be brief.  The preamble

7  language that is disputed by the parties is not a limitation

8  of a claimed palonosetron formulation.  And the analysis in

9  our view is really quite simple.  As I will explain, the law

10 of the Federal Circuit is that in general preamble terms are

11 not limiting.  And more specifically, for terms of intended

12 use like we have here, preambles are not limiting.  That is

13 the starting point that we have here, and plaintiffs have an

14 uphill battle to show otherwise.

15     Now, this general rule that preambles aren't limiting

16 is not a blanket rule that applies to every preamble term,

17 and, certainly, we're not arguing that.  We agree that the

18 rule is applied on a case-by-case basis, and that's what we

19 have done here.  And after considering all the evidence it is

20 clear that plaintiffs's reliance on two exceptions don't meet

21 the requirements that transforms the disputed preamble

22 language into a limitation.

23     I just want to take a minute to set the proper context

24 that we have here for the '219 patent.  And, Your Honor, I

25 think this will help you in your understanding of the disputed

——————— Markman Hearing - 9/23/14 ———————

1  preamble language.  As counsel explained, this is Claim 1 from

2  the '219 patent.  It starts with the preamble, and it says, "a

3  pharmaceutical single-use unit-dose formulation."  The

4  preamble then has the intended use, which is at issue here.

5  "For intravenous administration to a human to reduce the

6  likelihood of cancer chemotherapy-induced nausea and vomiting;

7  i.e., CINV."  We have highlighted this intended use, the

8  disputed preamble language in red.  It doesn't show up too

9  well, but, certainly, in the slides I think it is more

10  apparent.

11      Now, to take a step back, the '219 patent is all about

12  palonosetron formulations.  More specifically, as you recall,

13  the alleged discovery was that the inventors came up with a

14  way to make a palonosetron formulation more stable than what

15  was already known in the prior art for intravenous

16  palonosetron formulations.  So, this is reflected here in

17  Claim 1.  As you see, the claim is a pharmaceutical single-use

18  unit-dose formulation.  It lists out several formulation

19  specifics in the body, including a 5 milliliter solution, 0.25

20  milligrams of palonosetron and, also, various concentrations

21  of excipients like EDTA and mannitol.  And at the end the

22  result of all of this is that the formulation is stable for 24

23  months when stored at room temperature.  That is the essence

24  or central aspect of the alleged invention of the '219 patent.

25  Using it to treat emesis or CINV is not the central aspect,

1   and because the use of palonosetron as an antiemetic was

2   already known in the prior art.

3        Your Honor, I hope all of this sounds familiar because

4   this is exactly what we discussed the last time we were here

5   for claim construction.  As you recall from those Markman

6   proceedings, the disputed issue was the plain and ordinary

7   meaning of the term "pharmaceutically stable."  As you can see

8   here in Claim 1 of the '724 patent it recites a

9   "pharmaceutically stable intravenous solution."  And the

10  parties, both plaintiffs and defendants, we went on and on in

11  argument in our papers as to why this improved stability was

12  so important to the formulation and why it was a core aspect

13  of the invention, the core invention.  Well, your Honor, here

14  we have the two claims, the '219 patent and the '724 patent.

15          THE COURT:  Not so fast.

16          MR. WONG:  The core invention of the previous

17  patents, such as the '724, the '725, and the '424 patents is

18  the same as the core invention in the '219 patent.  It is

19  improved stability formulations.  And this makes sense because

20  all the patents at issue here, all four, they share the nearly

21  identical specifications, nearly identical set of inventors,

22  and they all claim priority back to the same provisional

23  application.

24          THE COURT:  But I see a tonicifying effective amount

25  of mannitol in your Claim 1 of the '724 patent.

─────────────── Markman Hearing - 9/23/14 ───────────────

1          MR. WONG:  Right.  And in --

2          THE COURT:  And in the preamble it says

3   "intravenous."

4          MR. WONG:  Right.  Right.  So, in general, they all

5   relate to palonosetron formulations and solutions, and as

6   counsel explained there are different iterations of what is

7   claimed, but, again, it is all formulations that have improved

8   stability over the prior art as the point there.

9          And if you compare the claims specifically, you're

10  right, they are very similar.  Claim 1 of the '219 patent goes

11  to a formulation.  Same with Claim 1 of the '724 patent; it's

12  a solution, a formulation.  They both list out formulation

13  specifics like excipients, concentrations, and they all have a

14  stability aspect to it.  In the claims of the '219 patent it

15  is expressly listed out that the formulation is stable at 24

16  months at room temperature, and in Claim 1 of the '724 patent

17  they have the term "pharmaceutically stable."

18         Now, each --

19         THE COURT:  But, you know, "pharmaceutically stable"

20  was a claim limitation, even though it was in the preamble of

21  that '724 Claim 1, right?

22         MR. WONG:  Right.  Right.  And plaintiffs have

23  alleged that we have been inconsistent in our preamble and

24  treatment of preamble language.  I have a slide on that to

25  address it.  Basically, terms of structure, terms that add

—— Markman Hearing - 9/23/14 ——

1   essential structure and modify the solution, such as

2   "pharmaceutically stable," such as "intravenous" in the '724

3   patent, we readily agree that those are limitations on the

4   claim because they provide structure to the claim.

5         Similarly, in the '219 patent you have "pharmaceutical

6   single-use unit-dose formulation," and the parties don't

7   dispute that that adds essential structure to the formulation

8   that renders it a limitation.

9         Each claim also has a '724 patent, and in the '219

10  patent they also have an intended use in the preamble.  We

11  know what the intended use is for the '219 patent; that's what

12  we're disputing.  The '724 patent claims, along with those of

13  the other patents, recite "for reducing emesis" or "reducing

14  the likelihood of emesis."  It is another intended use in the

15  preamble, and we have been consistent the whole time through.

16  We say it is that intended use is not limiting here, and it is

17  also not limiting for the previous patents.  We have always

18  been consistent, and our experts have taken that same

19  position.

20        And I'll explain why the fact that both claims have an

21  intended use is important.  But moving on, so, as you know,

22  what we had before you is whether the intended use language of

23  the preamble is a limitation of the '219 claims.  We say that

24  it is not per the general rule of the Federal Circuit.

25  Plaintiffs say that it is, and they rely on only two

──────── Markman Hearing - 9/23/14 ────────

1   exceptions to that general rule.

2        And you asked this question, plaintiffs addressed it.

3   But why does the disputed preamble language matter?  Your

4   Honor, you asked this question with regard to

5   "pharmaceutically stable."  We thought you might be wondering

6   the same about this term after reading the briefs.  The answer

7   is the same as last time.  Plaintiffs are taking the

8   opportunity here at Markman to add in another limitation to

9   try to save their claims from being invalidated.  Before they

10  took a narrow interpretation of the term "pharmaceutically

11  stable," and they said it had to mean 24 months at room

12  temperature, again, to save -- to protect their claims from an

13  obviousness or anticipation attack.

14       Here they're trying to say that the intended use, which

15  is disputed here, is another limitation of the claims, and,

16  your Honor, it matters.  If these terms are limiting, as

17  plaintiffs contend, and we think that's contrary to the law,

18  it adds another limitation that we as defendants have to deal

19  with with respect to our defenses of obviousness and

20  anticipation.  And, you know, we have had our experts take

21  alternate positions with the prior expert discovery session

22  and now in this current expert discovery phase.  And, so, they

23  interpret the claims as invalid whether or not the preamble is

24  a limitation waiting for further instruction from the Court.

25       So, plaintiffs's reference to --

──────────── Markman Hearing - 9/23/14 ────────────

1        THE COURT:  Wait a minute.  So, plaintiffs to say

2   today they don't know why you think this Markman dispute has

3   to be decided, you're saying it goes to our defenses of

4   obviousness and anticipation?

5        MR. WONG:  Correct.  That's exactly right.  And we're

6   surprised that plaintiffs contend that they're confused about

7   our positions.  We have been clear the whole time.  In all of

8   our expert reports our experts have said the claims are

9   invalid, even assuming that the limitation at issue, the

10  intended uses, are limitations.  They have taken both

11  positions.  It is not a limitation, it is a limitation, and in

12  either case they said it is not obvious -- it is obvious or

13  anticipated.  We don't think that it is a limitation, and at

14  trial we don't think we should have to address that limitation

15  in our defenses.

16       But I was going to say plaintiffs flashed some excerpts

17  from our expert reports, and to be honest, your Honor, those

18  are taken out of context.  Those are from portions of our

19  expert reports where they did assume it's a limitation.  So,

20  that's why they had to address it in their experts's reports.

21       THE COURT:  Or they did assume that it would be

22  construed to be a limitation.

23       MR. WONG:  Correct, because we want to cover our

24  bases just in case the Court decides it in plaintiffs's favor.

25       So, now let's take a look at how the Federal Circuit

1   actually treats the preamble of a claim.  Your Honor,

2   generally the preamble does not limit the claim.  That's right

3   from the Federal Circuit's case in Allen Engineering.  All the

4   way since 2002 this has been the way the Federal Circuit deals

5   with preambles.  And specifically, the Federal Circuit has

6   said, "a preamble limits the invention if it recites essential

7   structure or steps, or if it is necessary to give life,

8   meaning, and vitality to the claim."

9        If a preamble term doesn't do any of this then it is

10  not limiting per the Federal Circuit's general rule.  And this

11  is the general rule that the Federal Circuit has used since

12  2002 when it handed down its Catalina Marketing V Coolsavings

13  case.  Your Honor, that is a seminal case on preamble

14  interpretation.  It is cited by all the Federal Circuit cases

15  since 2002, and what it is telling you, your Honor, is that

16  plaintiffs's briefs never affirmatively rely on Catalina

17  Marketing to support their position because it doesn't.  And

18  the logic behind the rule that preambles are not limiting

19  makes sense.  A preamble, as the name suggests, is just the

20  introductory part of the claim, right?  It provides a general

21  gist of what the claimed invention is, whether it is a

22  compound, a formulation, a process, a method.

23       In contrast, the body of the claim, which is what

24  follows a preamble, is really where the Patent Office wants

25  the inventor to define the metes and bounds of the invention

──────── Markman Hearing - 9/23/14 ────────

1    they claimed.  Here the body of the claim has all the specific

2    ingredients that make the palonosetron formulation stable.

3          So, how do you determine whether the preamble recites

4    essential structure or gives meaning to the claim?  The

5    Federal Circuit says look at the body of the claim.  Here

6    again it is Claim 1.  In Catalina Marketing at 809 the Federal

7    Circuit says, "The preamble is generally not limiting when the

8    claim body describes a structurally complete invention, such

9    that deletion of the preamble phrase does not affect the

10   structure or steps of the claimed invention."  Your Honor,

11   that is exactly what we have here in Claim 1 of the '219

12   patent.

13         Again, the preamble starts with "a pharmaceutical

14   single-use unit-dose formulation," and then it continues with

15   the intended use.  The body of the claim that follows lists

16   all the formulation specifics.  So, the body of the claim,

17   plus these structural terms in the preamble "pharmaceutical

18   single-use unit-dose formulation," which everyone agrees is

19   limiting, together they define a structurally complete

20   invention.  "A stable palonosetron formulation that is a core

21   invention."  And we know it is structurally complete, your

22   Honor, because look what happens when you remove the intended

23   use.  When you remove the disputed preamble language, which is

24   shown in this next Slide 10, you end up with the same thing.

25   "A stable palonosetron formulation that is a core invention."

──────────── Markman Hearing - 9/23/14 ────────────

1   Nothing changes.  You still have everything you need to define

2   a formulation that is stable at 24 months when stored at room

3   temperature.

4        Your Honor, the point here is that the intended use

5   that is in the preamble is unnecessary.  It is not essential

6   to the claims, and if that is the case, the Federal Circuit

7   says it is not limiting.

8           THE COURT:  What about the intravenous aspect?

9           MR. WONG:  Right.  Right.  And I'll get to that.

10          THE COURT:  I mean, I really see this as two phrases,

11  I must say.  "For intravenous administration to a human" is

12  one phrase.

13          MR. WONG:  Right.

14          THE COURT:  And then "to reduce the likelihood of

15  cancer chemotherapy-induced nausea and vomiting" is a second

16  phrase.

17          MR. WONG:  Right.

18          THE COURT:  I think that each of you are addressing

19  your arguments to each phrase.  You're not just lumping them

20  together.  Mr. Dittmann certainly did.  So I'm trying to hear

21  it that way.

22          MR. WONG:  Right.  And I will address both of these

23  phrases of the disputed preamble individually, but our

24  position is that both phrases, all of the disputed preamble

25  language is not limiting, and I'll show you why.

─────────── Markman Hearing - 9/23/14 ───────────

1    So, here the point is that the claims without the

2  intended use provides a structurally complete invention.  That

3  shows that the intended use is not necessary.  And

4  specifically with respect to intended uses terms, intended use

5  terms in the preamble that we have here, the Federal Circuit

6  is very clear that they are generally not limiting.  This is

7  from the Catalina Marketing case, again, and there the

8  preamble term at issue was an intended use.  The phrase -- and

9  I'll show you later -- the phrase was "a system for

10  controlling the selection and dispensing of product

11  coupons..." and it goes on.  So, it had a structure part, and

12  it had an intended use.

13    And it is a very narrow limitation that the Federal

14  Circuit has a very narrow exception that the Federal Circuit

15  has allowed for intended use specifically.  And in all of

16  their briefing plaintiffs cite only two cases, and including

17  our cases that we have cited there are only two cases that

18  have been cited to the Court that have found intended uses

19  limiting.  That's the In Re: Stencil case and the GEV Nintendo

20  case.

21    THE COURT:  What was first one?

22    MR. WONG:  In Re: Stencil.  While the preambles, they

23  were intended uses, and they were found limiting in those

24  cases, there was a clear antecedent basis exception that made

25  it limiting, and, Your Honor, as I'll explain, that just isn't

──────── Markman Hearing - 9/23/14 ────────

1    the case here.  There is no such --

2           THE COURT:  You're going too fast.  I'm not getting

3    it.

4           MR. WONG:  Right.  So...

5           THE COURT:  I'm your audience.

6           MR. WONG:  My point here is that intended uses are --

7           THE COURT:  There was a clear and what?

8           MR. WONG:  Antecedent basis exception.  It was a

9    clear exception in those two cases.  That is not here.  And,

10   so, that is why our intended use position here is that it is

11   not limiting because the same exception doesn't apply here to

12   make it limiting.

13          THE COURT:  And you just cited the two cases where

14   you saw that uses or benefits in the preamble?

15          MR. WONG:  Right.  And those are the only two cases

16   among all the cases on preamble limitations where intended

17   uses -- or the issue of intended uses in preambles was up for

18   determination whether or not it is limiting or not.

19          THE COURT:  Would that be without resort to the

20   prosecution history, those two cases?

21          MR. WONG:  Exactly.  I think including the

22   prosecution history, all the cases for the most part say that

23   intended uses are not limiting.  These are the only two cases

24   that say it was limiting, and there was a clear antecedent

25   basis exception in both of those two cases.

1          So, in addition to looking to see whether the disputed

2     preamble language adds essential structure, the inventors's

3     own statements during the prosecution are dispositive on this

4     issue, your Honor, despite what plaintiffs's counsel has

5     suggested.

6          Plaintiffs rely heavily on the prosecution history of

7     the '724 patent, '725 patent, the '424 patents in their

8     briefing, and the Federal Circuit certainly allows this when

9     interpreting the claims of the '219 patent.  But, your Honor,

10    they failed to address and take on what are the most important

11    statements.  And, again, before we get there I'll go back to

12    the similarities between the claims.  Both the claims of the

13    '724 patent and the claims of the '219 patent have this

14    intended use in the preamble.

15             THE COURT:  Roughly.

16             MR. WONG:  Roughly.  And according to -- they're both

17    intended uses; that's not disputed.

18             THE COURT:  Right.

19             MR. WONG:  And according to plaintiffs in their

20    briefing they said these are virtually identical intended

21    uses.  That's right from both their opening brief and their

22    reply brief.  And, so, how did the inventors treat the

23    intended use that was in the preambles of the '724 patent

24    before?  They admitted that the intended use was not, was not

25    one of the limitations of the claimed palonosetron

1   formulations, and they did this multiple times for each of the

2   claims of the '724, '725, and '424 patents that had the same

3   intended use in the preamble.  And, so, here's a prosecution

4   history, all three of the patents went up to appeal at the

5   Patent Office, and here is what is required by the Patent

6   Office rules when you file your appeal brief.  "Summary of

7   claimed subject matter:" should include, has to include, "a

8   concise explanation of the subject matter defined in each of

9   the independent claims involved in the appeal."

10          Now, plaintiffs suggest that, well, the preamble was

11   not at issue anymore by the time the cases got to appeal, but,

12   your Honor, we think that's a red herring.

13          THE COURT:  Involved in the appeal.

14          MR. WONG:  Right.  Because bottom line is that the

15   Patent Office requires an explanation of what the claims are.

16   That's the bottom line.  That comes right from --

17          THE COURT:  So, you would say any claim that's

18   involved in the appeal, not just any claim term --

19          MR. WONG:  Exactly.  Exactly.

20          THE COURT:  -- that's involved in the appeal.

21          MR. WONG:  Here's the excerpt from the '724 patent

22   appeal brief.  And it is the same thing for each of the '725

23   and '424 patents.  Summary of the -- the subject matter --

24   again, it is the entire claim, not just the limitations.  It

25   is entitled, "Summary of the claimed subject matter," which is

──────── Markman Hearing - 9/23/14 ────────

1  the entire claim, not just specific limitations that are

2  involved in the appeal.  And in this section the inventors

3  describe Claim 32, which eventually became Claim 1 of the '724

4  patent, the inventor said that "the claimed subject matter was

5  a formulation of palonosetron characterized by a combination

6  of ingredients, ingredient concentrations, and physical

7  characteristics."  That's it.  Those are all limitations in

8  the body of the claim.  And to be even more clear, they said,

9  "The claimed formulation is limited by the following

10  features:"

11       Your Honor, none of the features -- they go on to list

12  one through six -- is the intended use for reducing emesis or

13  the likelihood of emesis.  So, each time they went up on

14  appeal the inventors -- and it is the same inventors of the

15  '219 patent -- they admitted that the intended use in the

16  preamble of these claims are not limitations of the claims,

17  are not features of the claims.  For the same reason here,

18  your Honor, the virtually identical intended use --

19            THE COURT:  I still see the word "intravenous" there

20  because it is right in the listing of the '724 ingredients.

21            MR. WONG:  Exactly.  So, the claims of the '724

22  patent and the '219 patents are worded differently, and it is

23  not just semantics, which plaintiffs try to suggest.  It is

24  actually claim drafting, and it makes a difference.  But the

25  point here is that --

 1         THE COURT:  One never knows.

 2         MR. WONG:  The virtually identical intended uses of

 3    the disputed preamble language can't be a limitation because

 4    they weren't before.  We think that's dispositive, and

 5    plaintiffs still haven't credibly shown why that shouldn't be

 6    the case.

 7         So, to address your point that these claims of the '724

 8    patent embodied in an intravenous solution, that's absolutely

 9    correct.  That's right there in Claim 1 and point one, and

10    that's what the inventors rightfully said to the Patent

11    Office.  But going back just two slides to compare it, that

12    has no bearing on the '219 patent claims, Your Honor.  And in

13    the '724 patent the inventors affirmatively claimed an

14    intravenous solution, right?  Intravenous was not part of the

15    intended use for reducing emesis or reducing the likelihood of

16    emesis.

17         THE COURT:  What?

18         MR. WONG:  If you see in Claim 1 it says, "a

19    pharmaceutically stable intravenous solution" and then the

20    intended use "for reducing emesis or reducing the likelihood

21    of emesis."  So, they affirmatively claimed that their

22    solution there in Claim 1 of the '724 patent was an

23    intravenous solution.  Here if you look at Claim 1 of the '219

24    patent, it is different.  It claims "a pharmaceutical

25    single-use unit-dose formulation for intravenous

1  administration," but "for intravenous administration" is not

2  affirmatively claimed; it is part of the intended use.  And,

3  Your Honor, it makes a difference because the Federal Circuit

4  treats structural claims -- structural terms differently than

5  intended uses, as I reviewed.

6      THE COURT:  I honestly don't think that the word "for

7  intravenous administration" is distinguishable from

8  "intravenous solution."  It adds nothing.  I mean, in that one

9  respect I probably don't see a distinction.  If it is an

10  intravenous solution it connotes that you have to have a

11  certain structure parameter, but it also connotes that it is

12  going to go in a vein.  So, maybe it is both.

13      MR. WONG:  We don't dispute that, but for technical

14  patent claim drafting it does make a difference because it is

15  part of the intended use.  Now, they could have drafted the

16  '219 claims to say "an intravenous formulation," and if they

17  did that, we wouldn't argue that that provides a central

18  structure to the formulation and that would be limiting, but,

19  your Honor, respectfully, our position here is that because

20  "for administration" is part of the intended use, the Federal

21  Circuit case law treats that differently and treats that not

22  as a limitation.

23      THE COURT:  You mean the minute you have got the

24  preposition F-O-R everything after it is wiped out, unless an

25  exception applies?

─────────── Markman Hearing - 9/23/14 ───────────

1            MR. WONG:  That's our position.

2            THE COURT:  Wipes it out from being a limitation?

3            MR. WONG:  Right.

4            THE COURT:  That sounds awfully literal to me, but go

5    ahead.

6            MR. WONG:  Right.  And it is a literal

7    interpretation, your Honor, but under the law that's how these

8    claims should be interpreted.

9            Now, so just wrapping up on the Federal Circuit law,

10   the fact that the claimed formulation without the intended use

11   is structurally complete, and, number two, the fact that the

12   inventors pretty much admitted this to the Patent Office we

13   think that that shows that the preamble language that's in

14   dispute is not limiting.  It is consistent with the Federal

15   Circuit law, the general rule that these kind of intended use

16   terms are not limiting.

17           THE COURT:  How about the fact that there was

18   actually an amendment to the part of the preamble '219

19   language that took out the word "prevent" this CINV and

20   replaced it with "to reduce the likelihood."  That featured in

21   the prosecution history of this '219 patent, right?

22           MR. WONG:  That was made in the prosecution history

23   not of the '219 patent, but of the parent patents, and we have

24   slides on that.  We'll address that.  Your Honor, under

25   <u>Catalina Marketing</u>, which requires that the term be

─────── Markman Hearing - 9/23/14 ───────

1   distinguished from the prior art, not just to overcome a 112

2   rejection, we think that is not enough under the current

3   controlling case law to apply.

4        But just to kind of address your point on the two parts

5   of the disputed preamble language, one part is "for

6   intravenous administration," the other part is "to reduce the

7   likelihood of CINV."  Again, our position is that both parts

8   of the disputed preamble are not limiting, but, certainly, if

9   your Honor thinks that plaintiffs have shown enough evidence

10  to say that the "for administration" part is limiting their

11  evidence on the latter part "for reducing CINV," certainly, we

12  think that is not limiting, and I'll show you why that is the

13  case.

14        THE COURT:  I'll follow you.

15        MR. WONG:  So with respect to the two exceptions,

16  and, again, the burden is on plaintiffs to show that these two

17  exceptions apply, neither of them apply in our case.  That's

18  because the exceptions are very limited according to the

19  Federal Circuit, and they require specific and unmistakable

20  reliance to show that the intended uses are limiting.  Your

21  Honor, we think it is a high burden and plaintiffs's evidence

22  is insufficient.

23        First --

24        THE COURT:  I wonder what the reason is behind that

25  general rule, but I'll have to study Catalina Marketing.

1        Go ahead.

2        MR. WONG:  Actually, Catalina Marketing does make

3   some comments -- the Federal Circuit does explain why in

4   general preamble phrases that have intended uses aren't

5   limiting, and I have a slide on that.  I'll get to that later.

6   It is because patentability in general is based on the

7   structure of the claims, not the intended use.  That's why

8   intended use is especially for composition claims like we have

9   here are not limiting.

10        THE COURT:  Okay.

11        MR. WONG:  So, first, the antecedent basis exception.

12   From Catalina Marketing this exception requires reliance on

13   both a preamble and the claim body to the defined invention.

14   And here is a simple example of how this exception is applied

15   in all the Federal Circuit cases.  So, take -- this is going

16   to be a hypothetical -- take the claim of a car for driving on

17   a highway, the car comprising A, B, and C.  Okay.  "A car for

18   driving on a highway."  That's the preamble.  Okay.  "For

19   driving on a highway" is the intended use of the claimed car,

20   and that is generally not limiting; it is not a limitation of

21   the claims.  It will be a limitation of the claims if there is

22   something else in the body of the claims, such as, "wherein

23   the highway is 20 miles long."  That kind of statement, that

24   statement in the body, thus, makes the reference of "a

25   highway" in the preamble a limitation because that shows that

1    the inventors used both the preamble and the claim body to

2    define their invention.  That's how it works.  That's the kind

3    of clear antecedent basis that all the Federal Circuit cases

4    require.  And, Your Honor, that just isn't met here, and I'll

5    show you why for Claim 1.

6         So, here's Claim 1...

7         THE COURT:  For driving on a highway at speeds

8    between 50 and 75 miles an hour.  Where do you break it up?

9         MR. WONG:  Unless there's something in the body of

10   the claim that references a term in the preamble, the case law

11   is clear that it is not limiting.  Okay.

12        So, in my example --

13        THE COURT:  None of it?

14        MR. WONG:  -- the highway was 20 miles long, that

15   makes the highway a limitation of the claims.

16        THE COURT:  Okay.

17        MR. WONG:  So let's apply that analysis to Claim 1 of

18   the '219 patent.  And I'm going to step through the disputed

19   preamble language step-by-step to show why this is not the

20   case.

21        So, the first part of the intended use is "for

22   intravenous administration."  Okay?  Your Honor, if you look

23   down to the rest of the claim, there is no reference to said

24   "intravenous administration" or anything like it.

25        THE COURT:  That's true.

─────────── Markman Hearing - 9/23/14 ───────────

1        MR. WONG:  That's just absolutely not there.  In

2   other words, "for intravenous administration" does not provide

3   antecedent basis for anything in the claim.

4        I'm going to keep going.

5        The next part of the disputed preamble language is "to

6   a human."  Again, there's no reference, there's nothing in the

7   rest of the claim "to a human."  And, finally, "to reduce the

8   likelihood of CINV."  There's nothing in the rest of the claim

9   that references CINV, reduction of the likelihood, nothing

10  like that.  And that's what the antecedent basis exception

11  requires.  And it is not surprising because the body of the

12  claim are all stability terms.  They're all what is required

13  to make the palonosetron formulation stable.

14        THE COURT:  Well, there's also a therapeutic dosage.

15        MR. WONG:  Right.  That's just the amount of

16  palonosetron in the formulation.  And, your Honor, with

17  respect to the specification they said that low

18  concentrations, low doses of palonosetron was important to

19  make it stable because it is all about stability.  It

20  certainly doesn't say 0.25 milligrams to reduce the likelihood

21  of CINV.  And, in fact, as you read the specification, there's

22  nothing in the specification regarding clinical trials or

23  showing that 0.25 milligrams is the effective dose for CINV.

24        THE COURT:  Well, they assert it in the

25  specification.  They say, surprisingly, we found that these

1    low doses are still effective for this therapeutic purpose.

2           MR. WONG:  Right.

3           THE COURT:  But then there's no lab tests.

4           MR. WONG:  It is unsupported, your Honor.  And more

5    specifically, it was already known in the prior art that

6    palonosetron was an effective antiemetic, so although they say

7    that one statement, the rest of the specification is all about

8    stability, they supplied no data to show that they actually

9    discovered that, and that is the basis of our written

10   description requirement -- our defense for written description

11   for these claims.  Because there was no disclosure in the

12   specification to support that -- to support this intended use,

13   to be frank.

14          THE COURT:  So, even if you had this intended use as

15   a claim limitation you would still have your written

16   description defenses, which you have said?

17          MR. WONG:  Exactly.  Specifically because it is a

18   limitation, we think there's no support.  If you find that it

19   is a limitation we think there's no support on it.  That's an

20   additional defense that we'll have at trial.

21          So, again, because there's no antecedent basis provided

22   by anything in the disputed preamble language we think that

23   the intended use language is not a limitation of the claims.

24          Now, plaintiffs make the argument that we parsed the

25   preamble arbitrarily and without rational basis, and some

─── Markman Hearing - 9/23/14 ───

 1  cases agree that preamble terms are limiting and other cases

 2  are saying that they are not limiting.

 3       Your Honor, this is not the case at all.  Our reading

 4  of the preamble is grounded in a rational basis, grounded in

 5  Federal Circuit precedence.  The preamble can be divided as

 6  follows:  You first have the structural terms, which is --

 7  that's in green.  "A pharmaceutical single-use, unit-dose

 8  formulation."  We know the formulation is a limitation because

 9  it provides direct antecedent basis for "said formulation"

10  later in the claims.  There's no dispute there.

11       The terms "pharmaceutical single-use unit-dose" are

12  structural terms that add essential structures to what the

13  formulation is.

14            THE COURT:  Well, your adversary points out

15  "single-use."

16            MR. WONG:  Right.

17            THE COURT:  Says you're only going to use it once.

18            MR. WONG:  Right.  And, Your Honor, to address that

19  point, this is the first time we have been hearing about this

20  in their briefs for plaintiffs to come up with a reason why it

21  involves a use.  The fact of the matter is --

22            THE COURT:  The word "use" is right there.

23            MR. WONG:  The fact of the matter is "pharmaceutical

24  single-use unit-dose" doesn't relate to how it is used.  It

25  relates to the formulation -- how the formulation is packaged

─────── Markman Hearing - 9/23/14 ───────

1    and supplied.  Our experts put in expert reports on this

2    limitation giving that exact same definition.  Their experts

3    came back with expert reports that didn't even address it.

4    Didn't even dispute it.  So, the definition that "single-use

5    unit-dose formulation" adds use is wrong.  Our experts have

6    said it is the packaging -- it is how the formulation is

7    packaged and supplied.  That's unrebutted in expert discovery.

8             THE COURT:  Who are you going to dose this unit to?

9             MR. WONG:  You certainly give --

10            THE COURT:  A human.

11            MR. WONG:  Right.  You certainly give it to patients.

12            THE COURT:  Not a cat.

13            MR. WONG:  That's right.  For all intents and

14   purposes the specification is about giving it to humans.  But

15   the fact is the claims don't require that.  The claims say

16   only in the intended use.  There's no "human" limitation in

17   the claims.  The "pharmaceutical single-use unit-dose" portion

18   is structural.  It is not use.  And their experts have not

19   contested that.

20            THE COURT:  You know, it is odd.  You seek to erase

21   this language, and then having erased it, you're going to

22   attack the patent as not being specific enough.  I don't get

23   it.

24         But go ahead.

25            MR. WONG:  We're only attacking the patent because it

Markman Hearing - 9/23/14

1  is not specific enough if this is -- if the intended use is a

2  claim limitation.

3        THE COURT:  Precisely.  It is a catch-22.  Judge,

4  erase it, and then once it is erased it is not there, so the

5  patent isn't sufficiently specific on these points.

6        MR. WONG:  Right.  That's one reason why we say it

7  shouldn't be a limitation because it is not supported.

8        THE COURT:  Well, that's a different argument.  Right

9  now you're using a technical one, which is if it says "for"

10 then it is out.  Read it out, unless some exception applies.

11       MR. WONG:  Exactly.  That's what our position is.

12       THE COURT:  Okay.

13       MR. WONG:  And plaintiffs have alleged that we have

14 been inconsistent in our way of treating preamble limitations.

15 They have referred to our agreeing that limitations

16 "pharmaceutically stable," "intravenous," "isotonic" in the

17 '724 patent claims are limitations, and here we say that -- we

18 definitely agree they're limitations because they provide

19 essential structure.  They were affirmatively claimed.  Here

20 all we're saying is that the intended use does not provide

21 essential structure, as I have shown.  It is a structurally

22 complete intention even without the intended use.  And even if

23 that is what the formulation that is claimed is used for the

24 Federal Circuit says that is not enough to make it a

25 limitation.  This is from the Marrin case that we cited in our

─────────────── Markman Hearing - 9/23/14 ───────────────

1    brief.

2         THE COURT:  So, if it modifies a noun, if it modifies

3    a subject in the sentence then it is structural.  But if it

4    modifies --

5         MR. WONG:  It is actually just being capable of

6    performing that function.  It is an intended use.  It doesn't

7    directly modify formulation, which is our point.

8         THE COURT:  "Administration" is a functional word,

9    and "to reduce" is the form of a verb, whereas "formulation"

10   is just a subject noun.  If you're saying that grammar rules

11   here I'm going to be surprised, but that's, basically, what

12   you're saying.

13        Go ahead.

14        MR. WONG:  According to the Federal Circuit that's

15   how you treat intended uses when they are in the preamble.

16        Here the Federal Circuit said the same thing.  "The

17   mere fact that a structural term in the preamble," for

18   example, "formulation," the subject, the noun, "is part of the

19   claim does not mean that the preamble's statement of purpose;

20   i.e., the intended use or other description is also part of

21   the claim."  So, structural terms like "formulation," "a

22   pharmaceutical single-use unit-dose formulation," which we

23   agree is the claim, the Federal Circuit says that's fine, but

24   for intended uses those are limitations.

25        At the end of the day the Federal Circuit treats

───────────── Markman Hearing - 9/23/14 ─────────────

1    structural terms differently from intended uses.

2         THE COURT:  Does it matter what kind of a patent it

3    is?  I mean, we have what we call "product patents" and then

4    we have "method patents."  Some other kinds of patents.

5         MR. WONG:  Right.  And it does matter.  Here we have

6    product patents, composition claims, intended uses aren't

7    limiting.  For methods of using it, certainly, they can be

8    limiting.

9         Another argument in here is the argument that you

10   brought up is a difference between "for intravenous

11   administration" and it is providing antecedent basis for the

12   term "isotonic."  And here we have "for intravenous

13   administration" in the preamble and "isotonic" in the body of

14   the claim.

15        Respectfully, your Honor, this is just not how the

16   antecedent basis exception works under Federal Circuit cases.

17   This is an apples-to-oranges comparison.  You need something

18   specific.  You need a reference to said "intravenous

19   administration."  You need the term like "the isotonic

20   solution" in the preamble in order for it to match up.  That

21   doesn't do it here, nor does "isotonic" need clarification, as

22   the plaintiffs suggested in their briefs.  The parties

23   agreed -- we agreed during the last round that "isotonic" has

24   a plain stand-alone meaning.  That's not disputed.  And during

25   discovery experts have not disputed the meaning of "isotonic."

Markman Hearing - 9/23/14

1          THE COURT:  Which means it is associated inexorably

2   with an intravenous use.

3          MR. WONG:  That might be how the specification in its

4   full disclosure describes different kinds of formulations,

5   but, your Honor, in the claims the only limitation that you

6   need is that it be isotonic.  It doesn't need to be an

7   intravenous solution literally under the claims.  And it is

8   for intravenous administration, but it is not an intravenous

9   formulation when looking at the claims.  And you might subsume

10   the same thing with the term "isotonic," but with regard to

11   the question does it have to be intravenous, under the claims

12   of the '219 patent, it doesn't have to be.

13          The American Medical Systems case cited by the Federal

14   Circuit says the same thing.  "No antecedent basis where the

15   preamble term did not provide context essential to

16   understanding the meaning of the term in the body of the

17   claim."  "Isotonic" or "for intravenous administration" does

18   not provide essential context for "isotonic" because none is

19   needed.  "Isotonic" is a stand-alone term that is well

20   understood.

21          So, again, for the antecedent basis exception all the

22   plaintiffs's evidence we think is insufficient to transform

23   the disputed preamble language into a limitation, including

24   both parts, the "for administration" part, as well as the

25   "CINV" part.  And as your Honor acknowledged, while "for

1  intravenous" -- if you decide that "for intravenous

2  administration" is limiting we, of course, disagree, but as

3  far as the antecedent basis exception plaintiffs have not

4  brought forth any evidence to show that the reducing the

5  likelihood of CINV has antecedent basis for anything in the

6  claims.  That shouldn't be a limitation.

7      THE COURT:  I follow your argument.  I just follow in

8  the sense that you can understand that there might be

9  distinctions between these phrases that could be made, which

10  you don't agree with.  Right?

11      MR. WONG:  Your Honor, the second exception is the

12  prosecution history exception.

13      THE COURT:  Right.

14      MR. WONG:  We think that their evidence doesn't meet

15  the requirements, and this is the requirement, again, from

16  Catalina Marketing.  The Federal Circuit required two things.

17  Clear reliance on a preamble during prosecution and

18  specifically to distinguish the claimed invention from the

19  prior art.  That's clear.  Plaintiffs --

20      THE COURT:  So, not just that you had to give up

21  something during prosecution history in order to get your

22  patent, it is not like prosecution estoppel.

23      MR. WONG:  Precisely.  It matters whether it is to

24  distinguish prior art or whether it is just to overcome a

25  rejection like a 112 rejection.  Under Catalina Marketing,

1  which we think is controlling, you need to distinguish prior

2  art.  That was never done for any reference in the prosecution

3  history for any patent.

4       So, let's start with what was discussed in the '219

5  patent, okay?  As plaintiffs's counsel suggested, it was very

6  brief.  Only two references were raised by the examiner.  The

7  CDER reference and the Baroni reference.  But neither

8  reference was distinguished from the claimed invention and

9  certainly not by relying on the CINV part or any part of the

10  disputed preamble language.  Instead, the inventors overcame

11  the art based on a technicality.  They said that it came too

12  late in time, and it was published only after the filing date,

13  and that is what is shown here in the prosecution history.

14  The CDER publication does not qualify as prior art.  It made

15  the same representation with regard to the Baroni publication.

16       Now, plaintiffs in their argument they raise the

17  examiner -- the interview summary with the examiner.  And they

18  suggest that statements made by patent counsel, Mr. Sullivan,

19  suggest that the CINV part of the '219 claims is a limitation.

20  But, again, your Honor, closer examination of the prosecution

21  history shows that's not the case.  Here's the entire examiner

22  interview.  I think plaintiffs just showed you the top

23  portion.  And in the entire interview they talk about three

24  topics, okay?  Plaintiffs just discuss the first topic.

25       So, first the examiner discussed the claims themselves,

Markman Hearing - 9/23/14

1    not the prior art, and found it strange that there was no pH

2    limitation in the current claims because there was a pH

3    limitation in the preceding claims.  And you see that right

4    here in the beginning.  "The examiner discussed with

5    Mr. Sullivan the lack of a pH limitation in the claims."

6    Okay?  In response Mr. Sullivan highlighted, and, actually,

7    made kind of a self-serving statement to say here are the

8    limitations, including CINV at the bottom.

9            THE COURT:  I don't understand what the lack of pH

10   limitation would present as a problem, but go ahead.

11           MR. WONG:  I actually don't either.  It is a very

12   sparse interview summary.  We certainly don't think it meets

13   the clear and unmistakable reliance that is necessary.

14         But what is telling is Mr. Sullivan's arguments were

15   not to distinguish the prior art, and even if it was, it

16   wasn't -- there was no clear and unmistakable reliance on the

17   CINV part specifically to distinguish the claimed invention.

18   That is what the Federal Circuit requires, and that is just

19   blatantly absent here.

20         Moreover, in the second and third topics that were

21   discussed that is where Mr. Sullivan distinguishes the claims

22   over the prior art, like Tang and the Berger reference.  And

23   in each case Mr. Sullivan, as you see here, he doesn't rely on

24   the intended use of treating CINV as a point of distinction.

25   Instead, he distinguishes the prior art based on the

─── Markman Hearing - 9/23/14 ───

1   formulation ingredients and concentrations like inventors have

2   done throughout the prosecution history.

3           THE COURT:  Well, I mean in the middle of it here is

4   the applicant's attorney pointing out that Tang's data

5   indicated that only a pretty high-dose of this active

6   ingredient palonosetron significantly decreased the incidence

7   of vomiting, and the requirement for rescue antiemetics, and,

8   so, they're talking about comparing the necessary dosage for

9   that use in comparing the current pending application and the

10  Tang reference.

11          MR. WONG:  Correct.  And that's because there was, as

12  you know from the body of the claim, there's a specific dosage

13  requirement of 0.25 milligrams, and the discussion there is

14  just to say that they are different; the claims are different

15  in that respect.  It doesn't say that the intended use for

16  treating CINV is a point that is different from the prior art.

17          THE COURT:  Well, they're talking, though, about how

18  the 0.25 milligram dose described in these claims is much

19  lower -- in other words, Tang's dose to get some results is

20  much higher.  They are talking about the use of this claimed

21  drug, aren't they?

22          MR. WONG:  We think they're talking about the dose

23  because it is a specific limitation of what makes -- of what

24  the formulation is.  They are not talking about using it --

25  the differences between using it to treat CINV or PONV.  And

Markman Hearing - 9/23/14

1    the Federal Circuit, respectfully, your Honor, they require

2    clear reliance, clear and unmistakable reliance on the

3    prosecution history to distinguish the claimed invention.  We

4    just don't think that is here.

5              THE COURT:  What if your preamble that you were

6    attacking has the capability of being antiemetic, rather than

7    being specific to CINV?

8              MR. WONG:  We still think that is not -- that would

9    not be supported here.  Your Honor, what would be supportive,

10   just to put out a hypothetical, is if Mr. Sullivan said our

11   claims go to treating -- using palonosetron formulations to

12   treat CINV or to treat antiemetics.  The prior art is not used

13   for this use.  That would be a clear and unmistakable reliance

14   on the prior art to distinguish their invention.

15             THE COURT:  I don't necessarily agree.  I'm trying to

16   make sense out of this, and I don't have a preconceived notion

17   about where I'm going, so this is a dialogue.

18             MR. WONG:  Sure.

19             THE COURT:  But they're not just talking about

20   dosages in the abstract.  They are talking about antiemetic

21   usage and how the prior art, while it is an antiemetic, and so

22   is this claimed invention, they're distinguishable, the prior

23   art is distinguishable because of the significant difference

24   in dosage.  You know, maybe they're all wrong about the prior

25   art, but that's what they're focusing on, and that discussion

——— Markman Hearing - 9/23/14 ———

1  is, okay, you have got the prior art that uses all this huge

2  amount of stuff to get some antiemetic effect, and here is our

3  new claim that just claims a very minuscule amount of the

4  active ingredient, and we're getting -- we're talking about

5  antiemetic use.

6      MR. WONG:  Right.  I think what you said as far as

7  our claims claiming a minuscule amount a specific 0.25 dose

8  that is what Mr. Sullivan used to distinguish the claims.

9      Now the context might be in the sense of CINV or at

10  least Tang was talking about PONV and the claims are in CINV,

11  but that really wasn't the critical reliance that Mr. Sullivan

12  was relying on.  He just said our dose is 0.25.  The dose in

13  Tang is higher.  And that is a distinction that they relied on

14  to overcome the prior art.  It wasn't the fact that Tang

15  talked about PONV or -- and the present claims talk about CINV

16  as far as intended uses.

17      THE COURT:  No, but I asked you the question:  Well,

18  what if our claim language at issue said "antiemetic" rather

19  than "CINV," and you said your argument would be the same,

20  that it is not enough of a clear prosecution history

21  indication that the use -- that is in the preamble of the

22  disputed claim language is limiting, but I see this word

23  "antiemetics" right here in their discussion.  So, it seems to

24  me they're not discussing dosage in a vacuum; they're

25  discussing dosage as it relates to being an antiemetic agent.

─────────── Markman Hearing - 9/23/14 ───────────

 1          MR. WONG:  And, again, I think that is a context

 2    certainly because that is -- you know that is what dosages

 3    apply to, but the specific dosage that they claim in the

 4    pending claims at the time of the '219 patent was

 5    0.25 milligrams.  They used that limitation to distinguish the

 6    prior art.  And, again, that is not one of the disputed

 7    preamble terms, and that's why we're saying it is not

 8    relevant.  It doesn't meet what the Federal Circuit requires

 9    as a clear and unmistakable reliance on the disputed preamble

10    language because that's not one of the terms.

11          THE COURT:  Well, we also agree, don't we, that claim

12    limitations don't all have to be novel.  You know, claim

13    limitations can have lots that's in the prior art just so long

14    as the patent examiner finds that the invention as a whole is

15    novel.

16          MR. WONG:  Right.  Certainly.

17          THE COURT:  Okay.  Go ahead with your argument.

18          MR. WONG:  Okay.  So, instead of relying on clear

19    statements in the prosecution history plaintiffs's reliance on

20    the prosecution history really amounts to an apples-to-oranges

21    comparison.  Again, it is the difference between "intravenous"

22    and "for intravenous administration."  I won't belabor this

23    point, but, your Honor, we think that none of the cases that

24    plaintiffs cite allow the narrow prosecution history exception

25    to apply one as an apples-to-oranges comparison of the claim

─── Markman Hearing - 9/23/14 ───

1    terms.  Here the claim is "intravenous" in the previous

2    prosecution, and the claim that we have here, the claim term

3    here is "for intravenous administration."

4          THE COURT:  Okay.  Magic word being "for."

5          MR. WONG:  Exactly.  And the next slide I think is

6    instructive because it really clarifies what was going on at

7    the time they made the amendment to introduce "intravenous"

8    into the solution.

9          Plaintiffs are correct that they amended Claim 32 --

10   again, that's Claim 1 of the '724 patent -- to narrow it to

11   say "intravenous solutions," and they made the argument to the

12   Patent Office that that distinguishes the formulation from

13   oral formulations that were in the prior art.  Again, that's

14   "intravenous," it is not "for intravenous administration."

15   But in the same amendment look at what they did to Claim 40.

16   Claim 40 had adapted "for intravenous administration," and

17   they deleted it.  They couldn't argue that this limitation was

18   sufficient to overcome the prior art for oral formulations.

19   We think that's significant.  They never used "for intravenous

20   administration" to distinguish the prior art.  They couldn't.

21   They had to delete it and replace it with something

22   affirmative, like "intravenous solution."

23         For this reason, your Honor, this doesn't meet the

24   clear and unmistakable reliance that is required for the

25   prosecution history exception.

─────────── Markman Hearing - 9/23/14 ───────────

 1       Now, you brought this up earlier, your Honor.

 2   Plaintiffs rely on the fact that "preventing" was deleted from

 3   the preamble in the prosecution for the previous patents, such

 4   as the '724 patent.  Your Honor, we think that this is not

 5   enough either.

 6       First, it is important to put this in the right

 7   context, Your Honor.  Claims with absolute terms like

 8   "preventing" or "curing" are routinely, as a matter of course,

 9   rejected by the Patent Office, and they're rejected under

10   Section 112 because even with the best clinical data it is

11   virtually impossible to show that something works 100 percent

12   of the time in 100 percent of the people.  The Patent Office

13   is more amenable to phrases like "reducing" or "treating,"

14   which is why they replaced "preventing" with "reducing the

15   likelihood of emesis."

16       So, the fact that the examiner made the plaintiffs

17   remove "preventing" in the preamble doesn't demonstrate at all

18   that this is a limitation.  In fact, there was no argument

19   either way by the examiner or the applicant that this preamble

20   language was limiting.  It was really only --

21       THE COURT:  They would never talk about that, though,

22   unfortunately.

23       MR. WONG:  Well, if there really was an issue of

24   whether or not the preamble is limiting, you would expect they

25   would have raised it.  They didn't raise it at all.  It was

─────── Markman Hearing - 9/23/14 ───────

1  actually a form rejection; it comes down to being basically a

2  form rejection that the examiner made, and they would make in

3  any claim that had the word "prevent" in it.

4        THE COURT:  Well, this distinction between whether

5  preamble language is or is not limiting, I don't think it is

6  something that the patent examiner or even the Patent Board of

7  Appeals gets into.

8        MR. WONG:  I think --

9        THE COURT:  I think it is case law borne, right?

10       MR. WONG:  I think that is correct, Your Honor.  I

11  think when we read the prosecution history there is certainly

12  nothing that says it is a limitation, and that's what the

13  prosecution history exception requires.  Affirmative reliance

14  on the preamble during prosecution to show that it is

15  limiting, that's not the case here.  Whether or not the Patent

16  Office generally treats it as limiting or not limiting we say

17  we think they generally treat it as non-limiting.  It is just

18  not clear from prosecution history.  There's no evidence that

19  anyone in the Patent Office treated it as limiting.

20       THE COURT:  Is there anything in that handbook, you

21  know, the patent Examiner's Handbook that talks about

22  preambles and whether language in there is limiting or not?

23       MR. WONG:  You know, I'm not sure.

24       THE COURT:  This is just idle curiosity.  You don't

25  have to answer.

─────────── Markman Hearing - 9/23/14 ───────────

1          MR. WONG:  I'm not sure.  We didn't cite it in our

2     briefs.  Plaintiffs didn't cite anything to the contrary.

3          Second, your Honor, to put this amendment in

4     perspective, the enablement rejection and the deletion of

5     "preventing" was made very early on in the prosecution

6     history.  It was actually made in the first office action that

7     the examiner issued, and there they objected to the word

8     "preventing."  That is in 2006, which, again, really shows

9     it's a form rejection that the examiner made.

10          THE COURT:  And it is Section 112, as you say?

11          MR. WONG:  That's right.

12          THE COURT:  It is not an obviousness rejection?

13          MR. WONG:  Correct.

14          THE COURT:  It has nothing to do with distinguishing

15     the prior art?

16          MR. WONG:  Precisely.  After this initial rejection

17     there was three years of substantive prosecution back and

18     forth between the examiner and the inventors as to why the

19     claim should be patentable.  All of that discussion, your

20     Honor, had to do with prior art that dealt with formulation

21     specifics, whether it is the EDTA, the mannitol, the

22     palonosetron concentrations.  None of it had to do with the

23     preamble language.  And at the end, your Honor, in 2010 -- we

24     already talked about this -- the inventors submitted their

25     appeal briefs, and they actually admitted that the preamble is

—— Markman Hearing - 9/23/14 ——

1  not part -- was not part of the concise statement that they

2  needed to make when they described their claims.

3       Again, the last thing, your Honor --

4          THE COURT:  Where is that?

5          MR. WONG:  It is on the chart.  It is that last

6  point, May 2010 when they submitted their appeal brief.

7          THE COURT:  And what are they admitting there?

8          MR. WONG:  When they were required to list out what

9  their claim features are, they listed out features one through

10 six.  None of it included the intended use "for reducing

11 emesis."

12         THE COURT:  That's where you started your argument.

13         MR. WONG:  Exactly.  Exactly.

14      So considering that timeline as a whole really, your

15 Honor, the fact that there was a preventing amendment early on

16 in the prosecution it doesn't amount to the clear reliance,

17 the unmistakable reliance on the prosecution history to make

18 the intended use limited.  So, and that's what is required by

19 Catalina Marketing and all the rest of the cases that cite

20 that.

21      So, how do the plaintiffs side step the requirements of

22 Catalina Marketing?  They rely on a single case Fantasy Sports

23 that plaintiffs's counsel discussed, but that is irrelevant

24 and distinguishable for many reasons.  First, if not most

25 important, Fantasy Sports was issued by the Federal Circuit in

─────────── Markman Hearing - 9/23/14 ───────────

1    April of 2002.  Catalina Marketing issued in May 2002, and all

2    the cases since Catalina Marketing require for the prosecution

3    history exception that there is a clear reliance on the

4    preamble to distinguish the prior art.  Not just overcoming a

5    112 rejection.  That's our position there.

6         Second, even if Fantasy Sports was applicable, which we

7    don't think it is, plaintiffs's entire argument relies on a

8    single footnote, Footnote Number 3, which really is almost

9    passing dicta, and according to the footnote it says -- it

10   talks about the preamble, but focuses on the "computer"

11   limitation, and at the end of the day it is the "computer"

12   limitation that they found was a limiting part of the preamble

13   because it provided structure.  It said nothing about the

14   intended use of "playing football based on actual football

15   games. "

16        This is what the original claim was in Fantasy Sports:

17   "An apparatus for playing football based on actual football

18   games..."  The examiner put forth a 112 rejection saying

19   there's no support, there's no disclosure for apparatus, it is

20   too vague.  So what they did -- and they overcame the 112

21   rejection -- is they replaced "apparatus" with "computer."

22   They didn't touch the intended use, and they made no argument

23   to say that it was limiting.

24        So, your Honor, if anything, if it is even applicable,

25   Fantasy Sports is also distinguishable from our situation

— Markman Hearing - 9/23/14 —

1    because it doesn't stand for the proposition at all that the

2    intended use part of a preamble can be limiting.

3         At the end of the day applying what we think is the

4    appropriate controlling case law, it is clear that the

5    prosecution history exception does not apply.

6         Your Honor, just a couple final points to wrap up here.

7         Plaintiffs in the briefing suggested that our position

8    under the disputed preamble language is nonsensical.  We

9    obviously disagree.  The hypothetical example they posited is

10   a palonosetron formulation that had all the ingredients that

11   are in the body claims, all the formulation specifics, but

12   didn't have the intended use.  It didn't have the ability to

13   treat CINV.  Plaintiffs said that such a formulation would,

14   nonetheless, be covered by the claims under our reading of the

15   preamble language, and plaintiffs pointed out that that was

16   nonsensical.  But, your Honor, far from being nonsensical,

17   that is exactly what patent law requires.

18        Again, there is no dispute that all the claims here in

19   the '219 patent they are all composition claims, a formulation

20   of palonosetron.  And as composition claims Catalina Marketing

21   says, "...preambles describing the use of an invention

22   generally do not limit the claims because the patentability of

23   apparatus or composition claims depends on the claimed

24   structure not on the use or purpose of that structure."  They

25   go on to say, "this means that a patent grants the right to

──────── Markman Hearing - 9/23/14 ────────

1   exclude others from making...selling...the claimed apparatus

2   or composition for any use of that apparatus or composition."

3        THE COURT:  So, you're saying that this is really in

4   there to benefit actually the patent holder, rather than to

5   penalize the patent holder, the idea that if you claim a

6   composition whether somebody uses it to fry an egg --

7        MR. WONG:  Exactly.

8        THE COURT:  -- or to go to the moon, the composition

9   is infringed.

10       MR. WONG:  Exactly.  And in our briefing we made the

11  argument saying that if our palonosetron formulations were

12  used for treating, I think it is arthritis or Alzheimer's,

13  they could still literally infringe the claims because all the

14  formulation specifics in the body of the claims were met, even

15  though the intended use was not met because it is not treating

16  CINV, it is treating something else like Alzheimer's, and

17  that's what the Federal Circuit has said.  The bottom line is

18  that intended uses for composition claims don't really matter.

19  For method claims, yes.

20       THE COURT:  I have seen, you know, a method of

21  treating a, you know, human for diptheria and that now we

22  found out that it can also be used for some other use and then

23  you get a different patent for that.

24       MR. WONG:  Right.  Right.

25       THE COURT:  Because it is a method patent.

────────── Markman Hearing - 9/23/14 ──────────

 1        MR. WONG:  So for method claims the intended uses

 2   that are recited in the preamble those are limiting on the

 3   claims generally.  Those are limiting on the method claims.

 4        THE COURT:  Oh, in method claims.  Oh.  Even if it is

 5   just in the preamble?

 6        MR. WONG:  It is because it is essential to what the

 7   method is.  It is a general gist of what the method is, and it

 8   provides essential structure or I think another thing they

 9   said is that it provides essential steps, so it is a method

10   for treating something specifically.  We're not dealing with

11   method claims here, we're dealing with composition claims.  We

12   think the Federal Circuit intended uses for composition claims

13   aren't limitations based on what they say in Catalina

14   Marketing.

15        So, let's see how the Federal Circuit applied this to

16   Catalina Marketing claim specifically, and they're very

17   analogous to the '219 patent claims.  The preamble has both a

18   structure and an intended use.  Here in Catalina Marketing the

19   structure is "A system."  It is here in green.  The intended

20   use is "for controlling the selection and dispensing of the

21   product coupons..." and it goes on.  But the Federal Circuit

22   found this use not limiting, and here's the rationale in the

23   last quote.  "In this case the disputed preamble language does

24   not limit Claim 1 - an apparatus claim.  To hold otherwise

25   would effectively impose a method limitation on an apparatus

────── Markman Hearing - 9/23/14 ──────

1   claim without justification."

2        Your Honor, this is precisely what plaintiffs are

3   asking you to do.  Impose a method limitation on a formulation

4   claim without justification.  We think that's improper under

5   clear Federal Circuit precedence, therefore, defendants

6   respectfully ask this Court to find that disputed preamble

7   language is not limiting in the claims of the '219 patent.

8        Thank you.

9        THE COURT:  Okay.  Thank you.  If there's anything

10  that you absolutely must respond to I will let you briefly.

11       MR. DITTMANN:  Thank you, Your Honor.  I appreciate

12  it.  If you can just bring up that slide that you just used

13  that would be great.

14       Just to make very clear, your Honor, this may be part

15  of the defendant's misconception about this written

16  description issue.  We are not imposing a method limitation on

17  these claims.  Like the Vizio case, which is an example of

18  intended use-type limitations requiring a capability of

19  structure to be capable of doing something that's what we're

20  saying, capable of treating CINV.  We're not saying you have

21  to impose a method limitation, actually treat a patient for

22  CINV to satisfy the claims.  That's not our argument.  It has

23  to do with a capability of the accused structure.  Whatever

24  the ingredients are in that accused structure is it capable of

25  treating CINV.

─────── Markman Hearing - 9/23/14 ───────

1       More importantly, just briefly, I think that it seems

2   like we're pretty much mostly there on the I.V. language, as

3   your Honor correctly noted.  We're really talking about rules

4   of grammar and magic words at this point.  He made no attempt

5   to distinguish the meaning of these two phrases, which is

6   really what matters.

7       Moreover, the prosecution of the parent applications

8   that we went through, again, these terms, even if there was

9   some possible basis to say they're slightly different, which

10  we don't think there are, you still can rely on the parent

11  prosecution to find this limitation to apply.

12      And there was no response, your Honor, and I'll get to

13  the claim in a moment, you remember I showed you the body of

14  the claim has the word "isotonic."  That's clearly a claim

15  limitation, and I showed you the prosecution history of the

16  parent application where it said when you talked about

17  isotonic in these claims it requires an intravenous

18  formulation.  So, putting this preamble dispute aside about

19  grammar "for intravenous administration," if you look purely

20  at the word "isotonic" and you look at the prosecution

21  statements applying to that exact term an intravenous

22  formulation is required by these claims irrespective of the

23  preamble issue.

24          THE COURT:  I think he said that nobody is going to

25  dispute that this composition that's claimed is intended to be

─────── Markman Hearing - 9/23/14 ───────

1   an intravenous composition because of the word "isotonic" in

2   the precise enumerated listing of ingredients.

3          MR. DITTMANN:  Right.

4          THE COURT:  He said what we're objecting to is adding

5   the word "intravenous" as a limitation from the preamble

6   because it is not in the right phraseology because it is

7   phrased as a use there.

8          MR. DITTMANN:  If defendants are willing to stipulate

9   that "intravenous formulation" comes in through the word

10  "isotonic" we're fine with that.  There's no need for to us

11  belabor this dispute on preamble, so we're certainly fine with

12  that.

13         THE COURT:  Now, if it were to be intracellular or

14  intramuscular would "isotonic" introduce an ambiguity?  You

15  know, it might.  We don't know sitting here.

16         MR. DITTMANN:  I don't believe it would for purposes

17  of this case, your Honor, but, again, the prosecution history

18  answers that for us because it says when you use the word

19  "isotonic" we're talking about intravenous formulations.  It

20  is clear.  It takes that exact same language and says this is

21  what we mean, and you take the patentees at their word when

22  they make these sort of statements.

23         But I want to go back to this claim because, again, I

24  think one big fundamental understanding is there's an argument

25  about, well, unless the reference in the body of the claim

─── Markman Hearing - 9/23/14 ───

1   matches to what's in the preamble it doesn't limit.  Well,

2   defendants say that "single-use unit-dose" is a limitation of

3   this claim.

4           THE COURT:  Is a limitation because it is structural.

5           MR. DITTMANN:  I'm going to get to that in a minute.

6   But, first of all, I don't see that anywhere in this claim.

7   So their matching tests clearly can't be right.  It says,

8   "said formulation."  It doesn't say anything about single-use.

9   Doesn't say anything about unit-dose.  It simply refers back

10  to "said formulation," which, again, the only context for that

11  is in the preamble.  So we'll start from that premise.

12          But I do want to address, your Honor, the single-use

13  unit-dose argument, and I can provide you with these slides.

14  These are a couple slides I had just in case these issues came

15  up and you wanted to hear about them.  But, again, going to

16  these statements about general principles that it is a rare

17  case that an intended use could limit a claim.  Well, I want

18  to explain why this is such a case and defendants have

19  admitted that.

20          Again, the single-use unit-dose everyone agrees is a

21  limitation of the claims.  This is an expert report from Dr.

22  Spilker, one of defendant's experts, who submitted this just

23  last month.  So this is a report addressing this point we're

24  talking about today.  And he says, single-use is if it is only

25  used once and then discarded.  Use.  He says, unit-dose means

──────── Markman Hearing - 9/23/14 ────────

1    it has the amount of pharmaceutical ingredient customarily

2    used.  Now, in this case if we go back to the claims we

3    already know the amount.  The amount is 0.25 milligrams and --

4    0.25 milligrams and 5 milliliters, so it is a 5 milliliter

5    solution, and it is used once, and that's the amount that's

6    needed to treat the condition we're talking about.  So, if

7    anything, Dr. Spilker's discussion of unit-dose ties in this

8    customary use idea of what are you using it for.  We're using

9    it to treat cancer chemotherapy-induced nausea and vomiting.

10        So, again, point number one, defendants's matching test

11   fails for the claim language they admit is limiting.  There's

12   nothing in here that ties single-use or unit-dose to the

13   bodies of the claim.

14        And number two single-use unit-dose --

15        THE COURT:  What they're doing is they're looking at

16   it grammatically and saying the terms "single-use" and

17   "unit-dose" are used as adjectives to modify the noun

18   "formulation" as a subject, not an object of the sentence.  It

19   is not a sentence.  The whole thing is not a sentence.  The

20   whole preamble is not a sentence.

21        MR. DITTMANN:  The preamble is not a sentence, but

22   the preamble, we would submit, describes the formulation, and

23   let me explain why.

24        THE COURT:  But they're saying these two adjectives

25   in front of the noun "formulation" don't have to be stripped

––––––––Markman Hearing - 9/23/14––––––––

 1    off of the noun "formulation."  "Said formulation" should pick

 2    up the nouns that immediately previously modify them.  And

 3    you're saying, well, good, then why doesn't the word

 4    "formulation" in the preamble also pick up all of the

 5    dependent phrases that are attached at the other side of the

 6    word "formulation."

 7          MR. DITTMANN:  If you want to get into rules of

 8    grammar what this is, "for intravenous administration" is a

 9    prepositional phrase that functions as an adjective.  Look it

10    up in any grammar book.  And the same applies to the rest of

11    this.  So what we have here is a series of adjectives.  And

12    they could have written this as single-use unit-dose,

13    intravenous, cancer chemotherapy-inducing treating -- you

14    know, it gets cumbersome after a while, and sometimes people

15    use different ways to explain the same concept.  But, again,

16    we would submit that these are prepositional phrases that

17    function as adjectives, and it is made crystal clear through

18    the prosecution that these are time limitations.  And if I may

19    go to, again, the '219 patent prosecution history where the

20    examiner was summarizing what was discussed because I do think

21    that's important.  It doesn't get much clearer, your Honor,

22    than this.  "Highlighted the limitations that were in the

23    claims."  "Cancer chemotherapy-induced nausea and vomiting."

24          Your Honor, again, if we were attempting -- if a

25    patentee was attempting to say this is not a limitation of the

—— Markman Hearing - 9/23/14 ——

1   claim and this matter to infringement, for example, they would

2   be the saying this is a representation, a clear representation

3   of what's in the claims.  They couldn't be any clearer.

4        THE COURT:  I understand, but what your adversary was

5   arguing was that the highlighting would have to be to

6   distinguish prior art, not to highlight for purposes of being

7   sufficiently clear, and what's the word, Section 112.  I

8   always get "enablement" and "written description" mixed up

9   because to me they blend together.  Written description, where

10  is the pH in there is what the examiner is asking, and you

11  say, well, we have got all this other stuff in there that

12  makes it sufficiently definite.

13       MR. DITTMANN:  There's a couple things on that

14  because you raise a very good point that I wanted to address.

15  Catalina Marketing, if you read that decision, is just a

16  summary of previous decisions.  It isn't some watermark case

17  that established a new rule of law.  In that case they talked

18  about relying on the prosecution to distinguish the prior art

19  surely as a way that you can transform a preamble language

20  into a limitation.  Fantasy Sports came out the same time.  I

21  was the law clerk that worked on Fantasy Sports.  I know the

22  case very well.  Fantasy Sports, if you look at when the

23  petition for rehearing was denied, it was denied after

24  Catalina was issued, so if Catalina changed the law in any

25  respect the Federal Circuit would have addressed that.

────────────── Markman Hearing - 9/23/14 ──────────────

 1          Putting that aside, <u>Fantasy Sports</u> could not be clearer

 2     that it was reliance on preamble to overcome a 112 rejection.

 3          THE COURT:  A 112?

 4          MR. DITTMANN:  112.  Transform that into a claim

 5     limitation.  And, again, that's exactly what we have in our

 6     case, and going back to this point about being clear, your

 7     Honor, again, it doesn't get much clearer than the claims are

 8     directed towards reducing emesis and reducing the likelihood

 9     of emesis.

10          All defendants can point to is in some appeal brief

11     they didn't mention those words in the concise summary, which,

12     again, number one, doesn't have to address, as your Honor was

13     alluding to, doesn't have to address every single claim

14     element.  It was discussing what was involved in that appeal.

15     This is crystal clear.  Directed towards.  They did it again.

16          THE COURT:  And they're talking there about we're

17     going to talk about "reducing," rather than "preventing," and

18     we're watering down our language to "reducing" to satisfy your

19     overinclusiveness of, what is it, written description

20     objection.

21          MR. DITTMANN:  Right.  The applicants didn't agree

22     with the examiner, but they said let's -- we'll amend it to

23     make you happy to overcome this rejection.

24          Now, I also wanted to very briefly --

25          THE COURT:  Go on and talk about Tang because I got

Markman Hearing - 9/23/14

 1   quite focused on that --

 2            MR. DITTMANN:  Yes, I wanted to come back to that.

 3            THE COURT:  -- in that examiner interview.

 4            MR. DITTMANN:  So, again, it is an examiner

 5   interview, and, again, we don't think it could be any clearer

 6   that it is discussing prior art.  If there was a mention in

 7   the beginning of this summary record about what about the lack

 8   of pH, you know, that could be the examiner is wondering,

 9   well, wait a minute, how are you going to distinguish this

10   prior art if you don't have a pH limitation?

11            THE COURT:  So, it could have been obviousness or

12   written description?

13            MR. DITTMANN:  And, your Honor, when it says "prior

14   art discussed" that means they're talking about prior art, not

15   a written description or an enablement issue.

16            THE COURT:  Where is the word "prior art"?  Oh, okay

17   up there.  Right.

18            MR. DITTMANN:  So, very clear we're talking about

19   overcoming the prior art.  Number one.

20            Number two, again, the statement couldn't be clearer.

21   There's no test of what may be the potential intent of

22   Mr. Sullivan -- and the counsel for defendants said maybe this

23   was a self-serving statement.  That's irrelevant.  What he

24   said is what you're stuck to.  The patentee makes a

25   representation of what's in the claims.  They're bound by it.

──────── Markman Hearing - 9/23/14 ────────

1   And more to your point, your Honor, again, here they

2   highlighted this claim limitation "cancer chemotherapy-induced

3   nausea and vomiting" and discuss Tang in the context of PONV.

4          THE COURT:  In other words, look, we are coming out

5   with something that addresses the cancer chemotherapy-induced

6   condition at a very low dosage and distinguishing it from the

7   post-op condition that has hitherto under Tang prior art

8   required a much higher dosage.

9          MR. DITTMANN:  And, Your Honor, you'll hear a lot

10  about this when the parties are before you at trial.

11         THE COURT:  But is that what they're talking about?

12         MR. DITTMAN:  Yes, that is what they're saying.

13         THE COURT:  They are distinguishing prior art?

14         MR. DITTMANN:  They are distinguishing the Tang

15  reference on a number of grounds, one of which is this is a

16  PONV study, whereas we're talking about cancer chemotherapy

17  nausea and vomiting in our claims.

18         THE COURT:  So, you disagree with defendants that it

19  is just a discussion about relative dosage amounts comparing

20  the applicant's application with Tang's higher dosage?

21         MR. DITTMANN:  It certainly involved that discussion

22  of dosage amounts, but there is more than that reflected in

23  this interview summary record, but, again, I would submit that

24  this statement is enough.  "Limitations that were in the

25  claims."  It doesn't get any clearer than that.

─────────── Markman Hearing - 9/23/14 ───────────

 1          THE COURT:  And I suppose then that as the patent

 2   holder plaintiff in this case if somebody comes along and

 3   wants to use a pharmaceutical composition for something other

 4   than CINV you would agree that it is not covered by this '219

 5   patent, it is not infringing of the '219 patent.

 6          MR. DITTMANN:  Are you talking about an actual

 7   product that's being sold on the market?

 8          THE COURT:  I'm saying an FDA application.  In other

 9   words, let me turn it around.  Defendant's next to last

10   argument was, well, the reason -- and the reason that Catalina

11   Marketing says that these usage phrases in the preamble to a

12   composition or apparatus patent are not generally considered

13   to be limitations is that if you've got a composition or an

14   apparatus then the patent holder for that gets it on the

15   composition and the apparatus, not on the use of it.  And that

16   actually makes it a much broader patent territory covered by

17   that patent because regardless of how the would be infringer

18   would seek to use the thing they're still infringing because

19   they're infringing the composition without any use limitation

20   in the patent.

21          MR. DITTMANN:  Let me --

22          THE COURT:  So, you're willing to live with that,

23   right?

24          MR. DITTMANN:  This is not a use limitation.  Again,

25   this is a capability.  So, in your hypothetical if someone was

───── Markman Hearing - 9/23/14 ─────

1    saying I have this palonosetron formulation, and I'm selling

2    it for some other indication, if what they're selling has the

3    capability, the amounts, the dosage amount the way it is

4    delivered, if it can treat CINV it infringes.  It is a

5    capability.

6          THE COURT:  Even if they're advertising it for some

7    other use?

8          MR. DITTMANN:  Yes, because it is a composition

9    claim.

10          THE COURT:  Or getting it approved by the FDA for

11    another use?

12          MR. DITTMANN:  Again, there's no use limitation in

13    this patent.  It is only a capability.  It is capability.  The

14    formulation has to be capable.  Just like the Vizio case,

15    which I think is analogous that counsel didn't discuss, but it

16    is capable of being able to do something.  All the structure

17    in the formulation has to be capable of treating CINV.  If it

18    can't do that, it wouldn't be covered.  But, again, it is not

19    a use limitation.

20          THE COURT:  What if you have a method patent for a

21    pharmaceutical composition, and I have seen a lot of these

22    where the method says, the method of treating a patient

23    consisting of -- I never understand this.  Getting a hold of

24    the following five ingredients and baking them three times and

25    distilling them and formulating them into a tablet, period.

─────── Markman Hearing - 9/23/14 ───────

1    That's supposedly a method patent.  But it has got all the

2    steps and ingredients for making the finished product.  Could

3    a method patent such as that ever be claimed to infringe a

4    composition patent such as this '219 patent if the result of

5    practicing the method then would be capable of having this

6    therapeutic effect.  In other words, can somebody claiming a

7    method actually infringe a composition patent?

8          MR. DITTMANN:  Well, I think in your hypothetical,

9    your Honor, a method of manufacturing patent if in making the

10   composition that's covered by our claims if they followed

11   those steps that you laid out they would infringe both the

12   method of making it, which is one thing, and then there's also

13   they would then infringe the composition because what they

14   ended up with after they have copied the method of the

15   manufacturing is the same product that we claim in our patent.

16         THE COURT:  Okay.  Thank you.  Anything else?

17         MR. WONG:  Your Honor, can I make one point of

18   clarification?

19         THE COURT:  Yes.

20         MR. WONG:  It is just on the written description

21   issue.  I wanted to make sure we're all clear.  We are only --

22   the defendants are only asserting the written description as a

23   defense if you interpret the disputed preamble language of the

24   intended use as a limitation.  To the extent you say that it

25   is not a limitation, as we have argued, then we won't have a

—Markman Hearing – 9/23/14—

1  written description defense.  Just to be clear.

2          THE COURT:  I understand.

3          MR. WONG:  Thank you.

4          THE COURT:  Okay.  Great.  Okay.  I think we have

5  aired this.  Anybody else over there suffering?

6          MR. D'AMORE:  No.  Thank you, your Honor.

7          THE COURT:  Mr. Wong, you carried your side

8  completely.  Thank you all for coming.  I'm not going to rule

9  from the bench.

10          (Proceedings concluded at 3:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'219** [54] - 4:14, 6:12, 6:23, 6:25, 16:15, 17:3, 19:1, 21:9, 23:15, 24:11, 27:11, 27:23, 27:24, 28:22, 28:23, 28:24, 30:2, 31:25, 33:12, 37:24, 38:2, 38:11, 38:24, 39:14, 39:18, 40:10, 40:14, 41:5, 41:9, 41:11, 41:23, 45:11, 49:9, 49:13, 51:15, 51:22, 52:12, 52:23, 53:16, 54:18, 54:21, 54:23, 57:18, 65:12, 67:4, 67:19, 72:4, 79:19, 81:17, 82:7, 87:19, 92:4, 92:5, 94:4

**'424** [6] - 15:9, 28:17, 39:17, 49:7, 50:2, 50:23

**'724** [28] - 15:9, 17:1, 23:13, 28:16, 39:8, 39:14, 39:17, 39:25, 40:11, 40:16, 40:21, 41:2, 41:9, 41:12, 49:7, 49:13, 49:23, 50:2, 50:21, 51:3, 51:20, 51:21, 52:7, 52:13, 52:22, 62:17, 73:10, 74:4

**'725** [6] - 15:9, 28:16, 39:17, 49:7, 50:2, 50:22

**/**

**/S** [1] - 1:25

**0**

**0.05** [1] - 30:18
**0.25** [16] - 10:2, 10:5, 30:16, 30:21, 32:19, 32:21, 38:19, 58:20, 58:23, 69:13, 69:18, 71:7, 71:12, 72:5, 86:3, 86:4
**08608** [1] - 1:11

**1**

**1** [22] - 4:14, 17:1, 19:1, 38:1, 38:17, 39:8, 39:25, 40:10, 40:11, 40:16, 40:21, 45:6, 45:11, 51:3, 52:9, 52:18, 52:22, 52:23, 57:5, 57:17, 73:10, 81:24
**1..** [1] - 57:6
**1/10th** [2] - 8:9, 8:21
**10** [1] - 45:24
**100** [2] - 74:11, 74:12
**11-3962** [1] - 3:5
**11-3962(MLC** [1] - 1:6
**112** [20] - 22:21, 22:25, 23:9, 24:8, 24:14, 24:22, 24:24, 25:6, 25:24, 55:1, 66:25, 74:10, 76:10, 78:5,

78:18, 78:20, 88:7, 89:2, 89:3, 89:4
**12** [1] - 12:7
**13** [1] - 12:7
**1990s** [1] - 36:5
**1:30** [1] - 3:1

**2**

**2** [2] - 32:16, 32:18
**20** [2] - 56:23, 57:14
**2002** [5] - 44:4, 44:12, 44:15, 78:1
**2006** [1] - 76:8
**2010** [2] - 76:23, 77:6
**2014** [2] - 1:11, 3:1
**23** [2] - 1:11, 3:1
**24** [4] - 38:22, 40:15, 42:11, 46:2
**28** [1] - 1:23

**3**

**3** [1] - 78:8
**32** [2] - 51:3, 73:9
**3:40** [1] - 95:10

**4**

**40** [2] - 73:15, 73:16
**402** [1] - 1:10

**5**

**5** [5] - 30:17, 30:21, 38:19, 86:4
**50** [1] - 57:8

**7**

**75** [1] - 57:8
**753** [1] - 1:24

**8**

**809** [1] - 45:6

**A**

**ability** [1] - 79:12
**able** [3] - 7:18, 9:12, 93:16
**Abraham** [1] - 4:3
**ABRAHAM** [2] - 2:12, 4:3
**absent** [1] - 68:19
**absolute** [1] - 74:7
**absolutely** [4] - 18:7, 52:8, 58:1, 82:10
**abstract** [2] - 7:12, 70:20
**according** [5] - 49:16, 49:19, 55:18, 63:14, 78:9

**accurate** [1] - 32:5
**accused** [2] - 82:23, 82:24
**acknowledged** [1] - 65:25
**ACTION** [1] - 1:5
**action** [2] - 3:5, 76:6
**active** [3] - 8:20, 69:5, 71:4
**activity** [1] - 30:3
**actual** [6] - 25:3, 25:10, 35:3, 78:14, 78:17, 92:6
**adapted** [1] - 73:16
**add** [3] - 40:25, 42:8, 60:12
**adding** [1] - 84:4
**addition** [1] - 49:1
**additional** [1] - 59:20
**address** [15] - 33:25, 40:25, 43:14, 43:20, 46:22, 49:10, 52:7, 54:24, 55:4, 60:18, 61:3, 85:12, 88:14, 89:12, 89:13
**addressed** [2] - 42:2, 88:25
**addresses** [2] - 32:12, 91:5
**addressing** [4] - 32:12, 37:2, 46:18, 85:23
**adds** [5] - 41:7, 42:18, 49:2, 53:8, 61:5
**adjective** [2] - 17:9, 87:9
**adjectives** [4] - 86:17, 86:24, 87:11, 87:17
**administered** [5] - 10:1, 14:6, 17:15, 18:16, 18:22
**administering** [2] - 17:18, 18:2
**administration** [39] - 6:4, 15:5, 15:12, 15:16, 15:22, 17:8, 18:22, 19:5, 19:11, 20:6, 21:12, 27:2, 27:5, 38:5, 46:11, 53:1, 53:7, 53:20, 55:6, 55:10, 57:22, 57:24, 58:2, 63:8, 64:11, 64:13, 64:19, 65:8, 65:17, 65:24, 66:2, 72:22, 73:3, 73:14, 73:16, 73:20, 83:19, 87:8
**admission** [3] - 13:22, 18:19, 19:7
**admit** [2] - 15:9, 86:11
**admitted** [5] - 49:24, 51:15, 54:12, 76:25, 85:19
**admitting** [2] - 15:14, 77:7
**adopted** [2] - 12:1, 12:11
**adversaries** [3] - 29:19, 33:10, 34:6
**adversary** [2] - 60:14, 88:4
**advertising** [1] - 93:6
**affect** [1] - 45:9
**affirmatively** [7] - 16:22, 27:12, 44:16, 52:13, 52:21, 53:2, 62:19
**afternoon** [13] - 3:3, 3:8, 3:12, 3:14, 3:17, 3:19, 3:22, 3:24, 4:1, 4:13, 4:24, 4:25,

36:22
**agent** [1] - 71:25
**ago** [1] - 7:7
**agree** [16] - 12:19, 13:2, 14:24, 16:19, 16:23, 25:8, 37:17, 41:3, 60:1, 62:18, 63:23, 66:10, 70:15, 72:11, 89:21, 92:4
**agreed** [3] - 14:10, 64:23
**agreeing** [1] - 62:15
**agreement** [1] - 5:14
**agrees** [5] - 5:9, 11:12, 20:18, 45:18, 85:20
**ahead** [10] - 4:20, 13:5, 21:3, 29:19, 54:5, 56:1, 61:24, 63:13, 68:10, 72:17
**aired** [1] - 95:5
**al** [1] - 1:8
**allege** [1] - 34:25
**alleged** [4] - 38:13, 38:24, 40:23, 62:13
**alleging** [1] - 21:24
**Allen** [1] - 44:3
**allow** [1] - 72:24
**allowed** [1] - 47:15
**allows** [1] - 49:8
**alluding** [1] - 89:13
**almost** [1] - 78:8
**alone** [3] - 35:18, 64:24, 65:19
**Aloxi®** [5] - 6:5, 6:17, 30:5, 30:13
**ALSO** [1] - 2:16
**alternate** [1] - 42:21
**ALTO** [1] - 1:4
**Alzheimer's** [2] - 80:12, 80:16
**ambiguity** [1] - 84:14
**amenable** [1] - 74:13
**amend** [1] - 89:22
**amended** [5] - 25:18, 25:19, 25:20, 26:2, 73:9
**amendment** [7] - 24:13, 24:18, 54:18, 73:7, 73:15, 76:3, 77:15
**amendments** [1] - 24:20
**American** [1] - 65:13
**amount** [14] - 8:9, 8:21, 30:20, 39:24, 58:15, 71:2, 71:3, 71:7, 77:16, 86:1, 86:3, 86:5, 93:3
**amounts** [12] - 8:12, 9:2, 9:5, 9:7, 9:10, 9:18, 9:24, 72:20, 91:19, 91:22, 93:3
**analogous** [5] - 34:13, 35:15, 35:19, 81:17, 93:15
**analysis** [2] - 37:8, 57:17
**Angela** [1] - 3:14
**ANGELA** [1] - 2:2
**animals** [1] - 18:4

answer [3] - 37:3, 42:6, 75:25

answers [1] - 84:18

antecedent [20] - 5:6, 15:16, 19:25, 20:2, 20:4, 47:24, 48:8, 48:24, 56:11, 57:3, 58:3, 58:10, 59:21, 60:9, 64:11, 64:16, 65:14, 65:21, 66:3, 66:5

anticipated [1] - 43:13

anticipation [2] - 42:13, 42:20, 43:4

antiemetic [9] - 39:1, 59:6, 70:6, 70:20, 70:21, 71:2, 71:5, 71:18, 71:25

antiemetics [4] - 18:8, 69:7, 70:12, 71:23

anxiety [1] - 36:5

apologies [1] - 26:17

apparatus [13] - 34:14, 34:18, 78:17, 78:19, 78:21, 79:23, 80:1, 80:2, 81:24, 81:25, 92:12, 92:14, 92:15

apparent [1] - 38:10

appeal [22] - 20:23, 21:4, 26:13, 27:17, 28:4, 28:5, 28:8, 28:13, 50:4, 50:6, 50:9, 50:11, 50:13, 50:18, 50:20, 50:22, 51:2, 51:14, 76:25, 77:6, 89:10, 89:14

appealing [1] - 20:25

Appeals [2] - 21:1, 75:7

appear [1] - 26:14

appearances [1] - 3:6

apples [3] - 64:17, 72:20, 72:25

apples-to-oranges [3] - 64:17, 72:20, 72:25

applicable [2] - 78:6, 78:24

applicant [1] - 74:19

applicant's [2] - 69:4, 91:20

applicants [10] - 21:7, 21:19, 23:21, 24:9, 26:2, 27:19, 29:1, 31:21, 32:7, 89:21

application [18] - 6:14, 19:16, 19:17, 19:19, 20:20, 20:23, 23:13, 23:14, 27:25, 28:24, 31:25, 32:12, 36:1, 39:23, 69:9, 83:16, 91:20, 92:8

applications [5] - 16:14, 23:5, 24:19, 26:5, 83:7

applied [4] - 25:16, 37:18, 56:14, 81:15

applies [4] - 37:16, 53:25, 62:10, 87:10

apply [15] - 13:12, 14:9, 19:10, 25:20, 27:4, 36:10, 48:11, 55:3, 55:17, 57:17,

72:3, 72:25, 79:5, 83:11

applying [2] - 79:3, 83:21

appreciate [2] - 36:14, 82:11

approach [1] - 4:21

appropriate [3] - 33:19, 34:1, 79:4

approved [2] - 29:3, 93:10

April [1] - 78:1

arbitrarily [1] - 59:25

argue [2] - 53:17, 73:17

argued [2] - 31:21, 94:25

arguing [4] - 32:17, 34:20, 37:17, 88:5

argument [35] - 11:22, 12:4, 19:8, 21:7, 24:14, 24:22, 24:25, 25:5, 25:23, 26:4, 26:13, 26:25, 27:5, 27:6, 27:18, 36:24, 39:11, 59:24, 62:8, 64:9, 66:7, 67:16, 71:19, 72:17, 73:11, 74:18, 77:12, 78:7, 78:22, 80:11, 82:22, 84:24, 85:13, 92:10

arguments [8] - 12:18, 14:18, 24:18, 24:21, 28:14, 32:9, 46:19, 68:14

art [59] - 9:3, 9:16, 9:17, 16:6, 16:16, 18:12, 18:20, 19:4, 20:5, 22:8, 22:19, 29:25, 31:1, 31:3, 31:6, 31:22, 32:11, 33:8, 33:23, 38:15, 39:2, 40:8, 55:1, 59:5, 66:19, 66:24, 67:2, 67:11, 67:14, 68:1, 68:15, 68:22, 68:25, 69:16, 70:12, 70:14, 70:21, 70:23, 70:25, 71:1, 71:14, 72:6, 72:13, 73:13, 73:18, 73:20, 76:15, 76:20, 78:4, 88:6, 88:18, 90:6, 90:10, 90:14, 90:16, 90:19, 91:7, 91:13

arthritis [1] - 80:12

articles [1] - 18:12

aside [8] - 14:7, 23:21, 25:4, 25:7, 26:12, 28:1, 83:18, 89:1

aspect [13] - 6:7, 7:9, 8:5, 8:13, 8:17, 9:9, 9:14, 16:8, 38:24, 38:25, 39:12, 40:14, 46:8

aspects [4] - 7:17, 9:20, 9:23, 14:2

assert [2] - 11:24, 58:24

asserted [1] - 28:16

asserting [1] - 94:22

assertions [1] - 31:3

associated [1] - 65:1

assume [2] - 43:19, 43:21

assuming [1] - 43:9

attached [1] - 87:5

attack [2] - 42:13, 61:22

attacking [2] - 61:25, 70:6

attempt [1] - 83:4

attempting [3] - 27:9, 87:24, 87:25

Attorney [4] - 2:7, 2:9, 2:11, 2:13

attorney [2] - 31:2, 69:4

Attorneys [2] - 2:5, 2:15

audience [1] - 48:5

authority [1] - 14:21

aware [2] - 18:4, 18:8

awfully [1] - 54:4

## B

background [2] - 4:25, 37:6

baking [1] - 93:24

Baroni [2] - 67:7, 67:15

based [12] - 25:3, 25:10, 32:9, 32:22, 33:25, 35:18, 56:6, 67:11, 68:25, 78:14, 78:17, 81:13

bases [2] - 10:25, 43:24

basic [1] - 22:5

basis [32] - 5:6, 5:19, 10:14, 10:15, 10:24, 15:16, 16:9, 20:1, 20:2, 20:4, 28:21, 37:18, 47:24, 48:8, 48:25, 56:11, 57:3, 58:3, 58:10, 59:9, 59:21, 59:25, 60:4, 60:9, 64:11, 64:16, 65:14, 65:21, 66:3, 66:5, 83:9

BATON [1] - 2:4

Baton [1] - 3:10

battle [1] - 37:14

bearing [1] - 52:12

became [1] - 51:3

become [1] - 22:1

becomes [1] - 13:25

bed [1] - 19:7

begin [1] - 13:6

beginning [2] - 68:4, 90:7

behalf [8] - 3:13, 3:15, 3:18, 3:20, 3:23, 3:25, 4:4, 36:25

behind [2] - 44:18, 55:24

belabor [3] - 18:19, 72:22, 84:11

bench [1] - 95:9

beneficial [1] - 9:11

benefit [2] - 20:13, 80:4

benefits [1] - 48:14

Berenato [1] - 1:25

Berenato-Tell [1] - 1:25

Berger [1] - 68:22

best [2] - 26:18, 74:10

between [11] - 15:13, 29:7, 32:24, 49:12, 57:8, 64:10, 66:9, 69:25, 72:21, 75:4,

76:18

big [1] - 84:24

bit [5] - 6:22, 23:11, 26:16, 29:14, 29:17

blanket [1] - 37:16

blatantly [1] - 68:19

blend [1] - 88:9

blood [1] - 15:19

board [1] - 8:18

Board [2] - 21:1, 75:6

bodies [1] - 86:13

body [28] - 5:7, 9:21, 15:17, 17:16, 20:10, 21:14, 22:9, 38:19, 44:23, 45:1, 45:5, 45:8, 45:15, 45:16, 51:8, 56:13, 56:22, 56:24, 57:1, 57:9, 58:11, 64:13, 65:16, 69:12, 79:11, 80:14, 83:13, 84:25

boil [1] - 23:8

book [1] - 87:10

borne [1] - 75:9

bottom [5] - 12:5, 50:14, 50:16, 68:8, 80:17

bound [1] - 90:25

bounds [1] - 44:25

break [2] - 14:15, 57:8

brief [22] - 4:25, 11:24, 12:7, 13:10, 15:7, 16:5, 19:18, 20:23, 21:4, 21:5, 21:6, 26:13, 27:17, 37:6, 49:21, 49:22, 50:6, 50:22, 63:1, 67:6, 77:6, 89:10

Brief [1] - 36:19

briefing [6] - 4:9, 47:16, 49:8, 49:20, 79:7, 80:10

briefly [6] - 5:22, 11:1, 35:19, 82:10, 83:1, 89:24

briefs [12] - 4:8, 9:22, 12:12, 13:7, 28:6, 34:19, 42:6, 44:16, 60:20, 64:22, 76:2, 76:25

bring [1] - 82:12

bringing [1] - 19:25

broad [1] - 22:12

broader [1] - 92:16

brought [3] - 64:10, 66:4, 74:1

Budd [2] - 3:23, 3:25

BUDD [1] - 2:14

burden [2] - 55:16, 55:21

BY [7] - 2:2, 2:4, 2:6, 2:8, 2:10, 2:12, 2:14

## C

cancer [11] - 6:7, 31:7, 31:25, 38:6, 46:15, 86:9, 87:13, 87:23, 91:2, 91:5, 91:16

**cannot** [1] - 33:21
**capability** [11] - 35:11, 35:14, 35:16, 70:6, 82:18, 82:23, 92:25, 93:3, 93:5, 93:13
**capability-type** - 35:16
**capable** [14] - 33:23, 34:18, 34:23, 35:1, 35:8, 36:9, 63:5, 82:19, 82:20, 82:24, 93:14, 93:16, 93:17, 94:5
**caption** [1] - 3:6
**car** [4] - 56:16, 56:17, 56:19
**carefully** [1] - 11:21
**carried** [1] - 95:7
**carved** [1] - 14:16
**case** [67] - 5:23, 6:11, 9:13, 13:1, 13:12, 13:23, 14:10, 14:18, 19:18, 19:19, 20:2, 21:23, 22:18, 24:17, 25:1, 25:22, 28:15, 29:8, 29:11, 30:9, 33:25, 34:12, 35:15, 35:18, 36:7, 36:9, 37:18, 43:12, 43:24, 44:3, 44:13, 46:6, 47:7, 47:19, 47:20, 48:1, 52:6, 53:21, 55:3, 55:13, 55:17, 57:10, 57:20, 60:3, 62:25, 65:13, 67:21, 68:23, 75:9, 75:15, 77:22, 79:4, 81:23, 82:17, 84:17, 85:14, 85:17, 85:18, 86:2, 88:16, 88:17, 88:22, 89:6, 92:2, 93:14
**case-by-case** [1] - 37:18
**cases** [22] - 44:14, 47:16, 47:17, 47:24, 48:9, 48:13, 48:15, 48:16, 48:20, 48:22, 48:23, 48:25, 50:11, 56:15, 57:3, 60:1, 64:16, 72:23, 77:19, 78:2
**cat** [1] - 61:12
**Catalina** [23] - 22:15, 44:12, 44:16, 45:6, 47:7, 54:25, 55:25, 56:2, 56:12, 66:16, 66:25, 77:19, 77:22, 78:1, 78:2, 79:20, 81:13, 81:16, 81:18, 88:15, 88:24, 92:10
**catch-22** [1] - 62:3
**causes** [1] - 22:21
**CCR** [1] - 1:25
**CDER** [2] - 67:7, 67:14
**central** [3] - 38:24, 38:25, 53:17
**certain** [2] - 20:7, 53:11
**certainly** [22] - 14:25, 15:4, 17:22, 36:3, 37:2, 37:17, 38:9, 46:20, 49:8, 55:8, 55:11, 58:20, 61:9, 61:11, 64:7, 67:9, 68:12, 72:2, 72:16, 75:11, 84:11, 91:21
**Certified** [1] - 1:23

**change** [1] - 10:19
**changed** [2] - 13:18, 88:24
**changes** [1] - 46:1
**characteristic** [4] - 22:9, 35:17, 35:22, 36:9
**characteristics** [1] - 51:7
**characterized** [1] - 51:5
**Charles** [1] - 3:8
**CHARLES** [1] - 2:4
**chart** [1] - 77:5
**charts** [1] - 13:17
**chemotherapy** [18] - 6:6, 6:9, 7:11, 7:14, 18:3, 18:4, 31:7, 31:21, 32:1, 35:21, 38:6, 46:15, 86:9, 87:13, 87:23, 91:2, 91:5, 91:16
**chemotherapy-induced** [12] - 6:6, 7:11, 18:3, 31:7, 31:21, 32:1, 38:6, 46:15, 86:9, 87:23, 91:2, 91:5
**chemotherapy-inducing** - 87:13
**chloride** [1] - 18:16
**CINV** [53] - 7:11, 7:19, 10:7, 22:4, 24:16, 25:23, 26:11, 31:11, 31:14, 31:19, 32:2, 32:13, 32:14, 32:20, 32:21, 32:25, 33:7, 33:23, 34:20, 35:1, 35:14, 38:7, 38:25, 54:19, 55:7, 55:11, 58:8, 58:9, 58:21, 58:23, 65:25, 66:5, 67:9, 67:19, 68:8, 68:17, 68:24, 69:16, 69:25, 70:7, 70:12, 71:9, 71:10, 71:15, 71:19, 79:13, 80:16, 82:20, 82:22, 92:25, 92:4, 93:4, 93:17
**Circuit** [44] - 19:13, 25:14, 34:17, 37:10, 41:24, 43:25, 44:4, 44:5, 44:11, 44:14, 45:5, 45:7, 46:6, 47:5, 47:14, 49:8, 53:3, 53:21, 54:9, 54:15, 55:19, 56:3, 56:15, 57:3, 60:5, 62:24, 63:14, 63:16, 63:23, 63:25, 64:16, 65:14, 66:16, 68:18, 70:1, 72:8, 77:25, 80:17, 81:12, 81:15, 81:21, 82:5, 88:25
**Circuit's** [2] - 44:3, 44:10
**circumscribe** [1] - 36:12
**circumstance** [1] - 19:14
**cite** [6] - 25:11, 47:16, 72:24, 76:1, 76:2, 77:19
**cited** [11] - 9:22, 19:18, 22:15, 24:17, 34:12, 44:14, 47:17, 47:18, 48:13, 62:25, 65:13
**CIVIL** [1] - 1:5
**claim** [101] - 4:9, 5:1, 7:2, 10:8, 13:3, 13:17, 14:2, 17:3,

19:12, 19:15, 19:21, 20:21, 21:9, 21:14, 24:13, 27:4, 27:10, 27:15, 27:21, 32:8, 33:15, 34:14, 36:12, 38:17, 39:5, 39:22, 40:20, 41:4, 41:9, 44:1, 44:2, 44:8, 44:20, 44:23, 45:1, 45:4, 45:5, 45:8, 45:15, 45:16, 50:17, 50:18, 50:24, 51:1, 51:8, 51:24, 53:14, 56:13, 56:16, 57:1, 57:10, 57:23, 58:3, 58:7, 58:8, 58:12, 59:15, 62:2, 63:19, 63:21, 63:23, 64:14, 65:17, 69:12, 71:3, 71:18, 71:22, 72:3, 72:11, 72:12, 73:1, 73:2, 73:16, 75:3, 76:19, 77:9, 78:16, 80:5, 81:16, 81:24, 82:1, 82:4, 83:13, 83:14, 84:23, 84:25, 85:3, 85:6, 85:17, 86:11, 86:13, 88:1, 89:4, 89:13, 91:2, 93:9, 94:15
**Claim** [26] - 4:14, 17:1, 19:1, 38:1, 38:17, 39:8, 39:25, 40:10, 40:11, 40:16, 40:21, 45:6, 45:11, 51:3, 52:9, 52:18, 52:22, 52:23, 57:5, 57:6, 57:17, 73:9, 73:10, 73:15, 81:24
**claimed** [31] - 28:2, 28:4, 33:22, 37:8, 40:7, 44:21, 45:1, 45:10, 49:25, 50:7, 50:25, 51:4, 51:9, 52:13, 52:21, 53:2, 54:10, 56:19, 62:19, 62:23, 66:18, 67:8, 68:17, 69:20, 70:3, 70:22, 79:23, 80:1, 83:25, 94:3
**claiming** [3] - 30:4, 71:7, 94:6
**claims** [132] - 5:4, 5:7, 5:21, 10:4, 13:9, 15:17, 16:2, 16:7, 16:11, 18:1, 20:8, 20:18, 21:8, 21:16, 21:21, 22:2, 22:10, 23:1, 23:15, 23:20, 24:7, 24:10, 24:12, 25:20, 28:3, 28:16, 30:18, 31:4, 31:6, 34:22, 35:11, 36:8, 39:14, 40:9, 40:14, 41:12, 41:20, 41:23, 42:9, 42:12, 42:15, 42:23, 43:8, 46:6, 47:1, 49:9, 49:12, 49:13, 50:2, 50:9, 50:15, 51:16, 51:17, 51:21, 52:7, 52:12, 52:24, 53:4, 53:16, 54:8, 56:7, 56:8, 56:21, 56:22, 57:15, 59:11, 59:23, 60:10, 61:15, 61:17, 62:17, 64:6, 65:5, 65:7, 65:9, 65:11, 66:6, 67:19, 67:25, 68:2, 68:3, 68:5, 68:21, 69:14, 69:18, 70:11, 71:3, 71:7, 71:8,

71:10, 71:15, 72:4, 74:7, 77:2, 79:11, 79:14, 79:18, 79:19, 79:20, 79:22, 79:23, 80:13, 80:14, 80:18, 80:19, 81:1, 81:3, 81:4, 81:11, 81:12, 81:17, 82:7, 82:17, 82:22, 83:17, 83:22, 85:21, 86:2, 87:23, 88:3, 89:7, 90:25, 91:17, 91:25, 94:10
**claims-in-suit** [1] - 10:4
**clarification** [2] - 64:21, 94:18
**clarifies** [1] - 73:6
**Clarkson** [1] - 1:10
**clause** [1] - 14:22
**clear** [61] - 5:19, 5:20, 7:5, 12:15, 12:20, 16:11, 16:18, 18:1, 19:14, 21:11, 22:16, 24:5, 25:9, 25:13, 27:18, 28:1, 28:7, 28:23, 30:7, 33:14, 33:19, 34:3, 34:19, 35:10, 37:20, 43:7, 47:6, 47:24, 48:7, 48:9, 48:24, 51:8, 57:3, 57:11, 66:17, 66:19, 68:13, 68:16, 70:2, 70:13, 71:20, 72:9, 72:18, 73:24, 75:18, 77:16, 78:3, 79:4, 82:5, 82:14, 84:20, 87:17, 88:2, 88:7, 89:6, 89:15, 90:18, 94:21, 95:1
**clear..** [1] - 8:14
**clearer** [7] - 87:21, 88:3, 89:1, 89:7, 90:5, 90:20, 91:25
**clearly** [9] - 9:19, 10:5, 10:17, 16:3, 22:7, 32:7, 36:11, 83:14, 85:7
**clerk** [1] - 88:21
**clinical** [4] - 33:5, 33:10, 58:22, 74:10
**closer** [1] - 67:20
**colleagues** [1] - 3:10
**combination** [1] - 51:5
**coming** [2] - 91:4, 95:8
**comments** [2] - 9:24, 56:3
**common** [3] - 15:18, 15:25, 19:3
**compare** [2] - 40:9, 52:11
**comparing** [3] - 69:8, 69:9, 91:19
**comparison** [4] - 33:3, 64:17, 72:21, 72:25
**complete** [6] - 45:8, 45:19, 45:21, 47:2, 54:11, 62:22
**completely** [1] - 95:8
**components** [1] - 19:4
**composition** [25] - 56:8, 64:6, 79:19, 79:20, 79:23, 80:2, 80:6, 80:8, 80:18, 81:11, 81:12, 83:25, 84:1,

92:3, 92:12, 92:13, 92:15, 92:19, 93:8, 93:21, 94:4, 94:7, 94:10, 94:13

**compound** [1] - 44:22
**compounds** [2] - 8:10, 8:21
**comprising** [1] - 56:17
**computer** [7] - 25:2, 25:9, 25:12, 25:17, 78:10, 78:11, 78:21
**concede** [2] - 15:8, 17:2
**concentration** [1] - 30:18
**concentrations** [6] - 38:20, 40:13, 51:6, 58:18, 69:1, 76:22
**concept** [1] - 87:15
**concerned** [1] - 12:16
**concerning** [1] - 5:1
**concise** [3] - 50:8, 77:1, 89:11
**concluded** [1] - 95:10
**concluding** [1] - 13:16
**condition** [5] - 7:19, 8:1, 86:6, 91:6, 91:7
**conditions** [1] - 32:2
**confer** [2] - 13:14, 13:16
**confused** [1] - 43:6
**connotes** [2] - 53:10, 53:11
**considerations** [1] - 15:21
**considered** [2] - 24:6, 92:12
**considering** [2] - 37:19, 77:14
**consistent** [3] - 41:15, 41:18, 54:14
**consisting** [2] - 14:22, 93:23
**consolidated** [1] - 4:9
**constitutes** [1] - 25:11
**construction** [8] - 4:9, 5:2, 7:2, 12:10, 13:3, 13:17, 33:16, 39:5
**construe** [1] - 19:22
**construed** [3] - 11:8, 43:22
**contain** [1] - 8:11
**contained** [1] - 33:12
**contend** [3] - 10:14, 42:17, 43:6
**contest** [1] - 16:18
**contested** [1] - 61:19
**context** [10] - 32:15, 37:23, 43:18, 65:15, 65:18, 71:9, 72:1, 74:7, 85:10, 91:3
**continue** [2] - 6:8, 7:15
**continues** [3] - 8:8, 9:25, 45:14
**contrary** [2] - 42:17, 76:2
**contrast** [1] - 44:23
**controlling** [5] - 47:10, 55:3, 67:1, 79:4, 81:20
**convenient** [1] - 23:12

**convey** [1] - 16:23
**conveys** [2] - 20:6, 30:19
**Coolsavings** [1] - 44:12
**COOPER** [1] - 1:12
**copied** [1] - 94:14
**copies** [1] - 4:22
**core** [6] - 39:12, 39:13, 39:16, 39:18, 45:20, 45:25
**Correct** [2] - 1:23, 4:16
**correct** [16] - 4:11, 7:25, 9:3, 13:11, 21:2, 25:7, 27:6, 28:15, 28:20, 43:5, 43:23, 52:9, 69:11, 73:9, 75:10, 76:13
**correctly** [1] - 83:3
**counsel** [10] - 4:6, 36:23, 38:1, 40:6, 49:4, 67:5, 67:18, 77:23, 90:22, 93:15
**couple** [1] - 79:6, 85:14, 88:13
**coupons..** [2] - 47:11, 81:21
**course** [4] - 25:22, 35:12, 66:2, 74:8
**court** [2] - 3:2, 26:18
**Court** [8] - 4:5, 11:6, 25:14, 36:21, 42:24, 43:24, 47:18, 82:6
**COURT** [176] - 1:1, 3:3, 3:16, 4:7, 4:12, 4:17, 4:20, 4:23, 5:8, 5:17, 6:18, 6:21, 7:23, 8:3, 8:15, 8:17, 10:21, 10:23, 11:4, 11:6, 11:10, 11:14, 12:2, 12:6, 12:22, 14:21, 15:24, 17:20, 17:23, 18:5, 18:7, 20:25, 21:3, 21:17, 22:23, 23:9, 24:1, 24:3, 26:15, 26:18, 26:23, 27:23, 29:2, 29:6, 29:10, 30:23, 31:12, 31:16, 31:23, 32:10, 32:23, 33:3, 33:9, 34:4, 34:10, 35:2, 35:8, 35:25, 36:16, 36:20, 39:15, 39:24, 40:2, 40:19, 43:1, 43:21, 46:8, 46:10, 46:14, 46:18, 47:21, 48:2, 48:5, 48:7, 48:13, 48:19, 49:15, 49:18, 50:13, 50:17, 50:20, 51:19, 52:1, 52:17, 53:6, 53:23, 54:2, 54:4, 54:17, 55:14, 55:24, 56:10, 57:7, 57:13, 57:16, 57:25, 58:14, 58:24, 59:3, 59:14, 60:14, 60:17, 60:22, 61:8, 61:10, 61:12, 61:20, 62:3, 62:8, 62:12, 63:2, 63:8, 64:2, 65:1, 66:7, 66:13, 66:20, 68:9, 69:3, 69:17, 70:5, 70:15, 70:19, 71:17, 72:11, 72:17,

73:4, 74:21, 75:4, 75:9, 75:20, 75:24, 76:10, 76:12, 76:14, 77:4, 77:7, 77:12, 80:3, 80:8, 80:20, 80:25, 81:4, 82:9, 83:24, 84:4, 84:13, 85:4, 86:15, 86:24, 88:4, 89:3, 89:16, 89:25, 90:3, 90:11, 90:16, 91:4, 91:11, 91:13, 91:18, 92:1, 92:8, 92:22, 93:6, 93:10, 93:20, 94:16, 94:19, 95:2, 95:4, 95:7
**Courthouse** [1] - 1:10
**courtroom** [1] - 4:6
**cover** [4] - 6:16, 6:18, 10:25, 43:23
**covered** [5] - 79:14, 92:4, 92:16, 93:18, 94:10
**credibly** [1] - 52:5
**critical** [2] - 6:7, 71:11
**CRR** [1] - 1:25
**crystal** [4] - 21:11, 25:9, 87:17, 89:15
**cumbersome** [1] - 87:14
**curing** [1] - 74:8
**curiosity** [1] - 75:24
**current** [5] - 32:12, 42:22, 55:2, 68:2, 69:9
**customarily** [1] - 86:1
**customary** [1] - 86:8

# D

**D'Amore** [1] - 4:2
**D'AMORE** [3] - 2:10, 4:1, 95:6
**data** [4] - 34:16, 59:8, 69:4, 74:10
**date** [1] - 67:12
**deal** [2] - 14:19, 42:18
**dealing** [2] - 81:10, 81:11
**deals** [1] - 44:4
**dealt** [1] - 76:20
**debatable** [1] - 18:17
**decide** [1] - 66:1
**decided** [1] - 43:3
**decides** [1] - 43:24
**decision** [1] - 88:16
**decisions** [1] - 88:16
**decoded** [1] - 34:16
**decoding** [1] - 34:18
**decreased** [1] - 69:6
**defendant** [1] - 31:18
**Defendant** [5] - 2:7, 2:9, 2:11, 2:13, 2:15
**defendant's** [5] - 25:17, 28:6, 82:15, 85:22, 92:9
**Defendants** [1] - 1:9
**defendants** [40] - 3:18, 3:25, 4:8, 6:23, 11:3, 11:18,

11:22, 11:24, 12:14, 13:6, 13:13, 13:24, 14:2, 14:16, 16:18, 17:1, 19:9, 19:12, 20:1, 21:15, 22:16, 24:23, 25:7, 25:11, 25:23, 26:4, 26:6, 33:17, 34:19, 36:24, 39:10, 42:18, 82:5, 84:8, 85:2, 85:18, 89:10, 90:22, 91:18, 94:22
**defendants's** [14] - 13:22, 15:7, 15:14, 17:10, 17:13, 18:21, 18:25, 19:7, 21:24, 22:12, 26:25, 27:16, 28:14, 86:10
**defense** [8] - 11:25, 12:9, 13:15, 33:18, 59:10, 59:20, 94:23, 95:1
**defenses** [4] - 42:19, 43:3, 43:15, 59:16
**define** [4] - 44:25, 45:19, 46:1, 57:2
**defined** [2] - 50:8, 56:13
**definite** [1] - 88:12
**definitely** [1] - 62:18
**definition** [2] - 61:2, 61:4
**delete** [2] - 25:25, 73:21
**deleted** [2] - 73:17, 74:2
**deletion** [2] - 45:9, 76:4
**delivered** [1] - 93:4
**DeLuca** [3] - 17:13, 18:11, 19:1
**demonstrate** [1] - 74:17
**denied** [2] - 88:23
**deny** [1] - 32:6
**DePalma** [2] - 2:8, 3:20
**dependent** [2] - 12:10, 87:5
**depression** [1] - 36:5
**describe** [1] - 51:3
**described** [3] - 20:21, 69:18, 77:2
**describes** [5] - 14:14, 15:2, 45:8, 65:4, 86:22
**describing** [4] - 10:17, 10:20, 31:9, 79:21
**description** [20] - 11:25, 12:4, 12:6, 23:1, 33:15, 33:18, 33:21, 59:10, 59:16, 63:20, 82:16, 88:8, 88:9, 89:19, 90:12, 90:15, 94:20, 94:22, 95:1
**despite** [1] - 49:4
**details** [1] - 9:17
**determination** [1] - 48:18
**determine** [1] - 45:3
**develop** [1] - 19:3
**dialogue** [1] - 70:17
**dicta** [1] - 78:9
**differ** [1] - 30:14
**difference** [9] - 17:9, 19:9, 27:2, 51:24, 53:3, 53:14,

64:10, 70:23, 72:21

**differences** [2] - 6:16, 69:25

**different** [25] - 19:5, 19:11, 20:11, 21:5, 25:11, 27:1, 27:4, 27:10, 30:4, 31:11, 32:3, 35:12, 36:6, 40:6, 52:24, 62:8, 65:4, 69:14, 69:16, 80:23, 83:9, 87:15

**differently** [5] - 17:11, 51:22, 53:4, 53:21, 64:1

**dimly** [1] - 35:2

**diptheria** [1] - 80:21

**direct** [1] - 60:9

**directed** [7] - 5:23, 24:12, 28:17, 32:24, 32:25, 89:8, 89:15

**directly** [2] - 15:19, 63:7

**disagree** [3] - 66:2, 79:9, 91:18

**disagreement** [1] - 5:15

**discarded** [2] - 14:6, 85:25

**disclosed** [1] - 18:15

**discloses** [2] - 18:13, 32:16

**disclosing** [1] - 10:5

**disclosure** [9] - 6:23, 9:22, 22:25, 23:2, 32:22, 33:25, 59:11, 65:4, 78:19

**disclosures** [4] - 7:16, 9:16, 9:17, 35:20

**discovered** [3] - 8:9, 8:19, 59:9

**discoveries** [1] - 8:6

**discovery** [6] - 8:23, 38:13, 42:21, 42:22, 61:7, 64:25

**discuss** [4] - 16:10, 67:24, 91:3, 93:15

**discussed** [7] - 7:17, 8:5, 28:13, 29:1, 29:18, 30:1, 30:25, 31:1, 39:4, 67:4, 67:25, 68:4, 68:21, 77:23, 87:20, 90:14

**discussing** [4] - 71:24, 71:25, 89:14, 90:6

**discussion** [10] - 5:1, 6:15, 9:8, 69:13, 70:25, 71:23, 76:19, 86:7, 91:19, 91:21

**dispensing** [2] - 47:10, 81:20

**dispositive** [2] - 49:3, 52:4

**dispute** [18] - 5:2, 7:2, 10:11, 11:18, 12:13, 15:6, 20:5, 33:16, 41:7, 43:2, 53:13, 54:14, 60:10, 61:4, 79:18, 83:18, 83:25, 84:11

**disputed** [34] - 5:3, 5:11, 10:9, 10:15, 11:7, 37:7, 37:21, 37:25, 38:8, 39:6, 42:3, 42:15, 45:23, 46:23, 46:24, 49:1, 49:17, 52:3,

55:5, 55:8, 57:18, 58:5, 59:22, 64:24, 64:25, 65:23, 67:10, 71:22, 72:6, 72:9, 79:8, 81:23, 82:6, 94:23

**disputes** [2] - 17:20, 20:19

**disputing** [2] - 10:11, 41:12

**distilling** [1] - 93:25

**distinction** [6] - 15:13, 32:23, 53:9, 68:24, 71:13, 75:4

**distinctions** [1] - 66:9

**distinguish** [19] - 22:8, 22:20, 31:22, 32:11, 66:18, 66:24, 67:1, 68:15, 68:17, 70:3, 70:14, 71:8, 72:5, 73:20, 78:4, 83:5, 88:6, 88:18, 90:9

**distinguishable** [5] - 53:7, 70:22, 70:23, 77:24, 78:25

**distinguished** [4] - 16:7, 16:16, 55:1, 67:8

**distinguishes** [4] - 21:21, 68:21, 68:25, 73:12

**distinguishing** [7] - 20:23, 21:6, 22:19, 76:14, 91:6, 91:13, 91:14

**DISTRICT** [3] - 1:1, 1:2, 1:13

**DITTMAN** [1] - 91:12

**DITTMANN** [84] - 2:3, 3:12, 4:16, 4:19, 4:21, 4:24, 5:13, 5:18, 6:20, 6:22, 7:25, 8:4, 8:16, 9:1, 10:22, 10:24, 11:5, 11:9, 11:12, 11:15, 12:4, 12:8, 13:6, 14:24, 16:4, 17:22, 17:25, 18:6, 18:8, 21:2, 21:4, 21:19, 22:25, 23:11, 24:2, 24:5, 26:17, 26:21, 26:24, 27:24, 29:5, 29:9, 29:11, 29:15, 29:22, 29:25, 30:15, 30:24, 31:14, 31:17, 32:2, 32:14, 33:2, 33:4, 33:14, 34:8, 34:12, 35:7, 35:10, 36:3, 36:18, 82:11, 84:3, 84:8, 84:16, 85:5, 86:21, 87:7, 88:13, 89:4, 89:21, 90:2, 90:4, 90:13, 90:18, 91:9, 91:14, 91:21, 92:6, 92:21, 92:24, 93:8, 93:12, 94:8

**Dittmann** [4] - 3:13, 4:17, 36:17, 46:20

**divided** [1] - 60:5

**document** [1] - 21:20

**done** [5] - 10:9, 14:16, 37:19, 67:2, 69:2

**dosage** [18] - 17:15, 31:12, 31:15, 32:5, 33:1, 58:14, 69:8, 69:12, 70:24, 71:24, 71:25, 72:3, 91:6, 91:8,

91:19, 91:20, 91:22, 93:3

**dosages** [4] - 10:1, 30:20, 70:20, 72:2

**dose** [40] - 13:19, 14:1, 18:15, 30:16, 31:9, 32:6, 32:20, 33:6, 33:8, 38:3, 38:18, 41:6, 45:14, 45:18, 52:25, 58:23, 60:7, 60:11, 60:24, 61:5, 61:8, 61:17, 63:22, 69:5, 69:18, 69:19, 69:22, 71:7, 71:12, 85:2, 85:9, 85:13, 85:20, 85:25, 86:7, 86:12, 86:14, 86:17, 87:12

**dose-ranging** [1] - 31:9

**doses** [2] - 58:18, 59:1

**doubt** [2] - 33:21, 33:24

**down** [9] - 23:8, 26:17, 26:19, 26:21, 34:8, 44:12, 57:23, 75:1, 89:18

**Dr** [10] - 2:15, 3:4, 3:23, 17:13, 18:11, 18:19, 18:20, 18:25, 85:21, 86:7

**DR** [1] - 1:7

**drafted** [1] - 53:15

**drafter** [1] - 35:5

**drafting** [2] - 51:24, 53:14

**drive** [1] - 19:22

**driving** [5] - 19:20, 56:16, 56:18, 56:19, 57:7

**DRL** [2] - 3:25, 36:25

**drug** [2] - 30:13, 69:21

**during** [11] - 5:20, 13:13, 22:7, 22:17, 30:24, 49:3, 64:23, 64:24, 66:17, 66:21, 75:14

## E

**early** [2] - 76:5, 77:15

**East** [1] - 1:10

**EDTA** [2] - 38:21, 76:21

**effect** [4] - 15:23, 33:11, 71:2, 94:6

**effective** [7] - 8:7, 10:6, 33:6, 39:24, 58:23, 59:1, 59:6

**effectively** [1] - 81:25

**efficacy** [6] - 6:25, 9:15, 9:20, 9:23, 32:17, 32:19

**efficacy-relating** [1] - 6:25

**egg** [1] - 80:6

**either** [7] - 19:23, 21:16, 27:14, 43:12, 68:11, 74:5, 74:19

**element** [1] - 89:14

**embodied** [1] - 52:8

**emesis** [40] - 5:24, 7:10, 7:14, 7:22, 8:7, 8:12, 9:7, 9:12, 9:25, 10:6, 23:16,

23:25, 24:12, 24:13, 25:21, 25:22, 26:9, 26:10, 26:14, 27:8, 27:20, 27:22, 28:9, 28:19, 31:11, 32:1, 35:22, 38:25, 41:13, 41:14, 51:12, 51:13, 52:15, 52:16, 52:20, 52:21, 74:15, 77:11, 89:8, 89:9

**enablement** [5] - 12:2, 23:4, 76:4, 88:8, 90:15

**enabling** [2] - 23:2, 23:18

**end** [7] - 29:11, 38:21, 45:24, 63:25, 76:23, 78:11, 79:3

**ended** [1] - 94:14

**Engineering** [1] - 44:3

**ensuring** [1] - 6:8

**entire** [8] - 13:14, 25:9, 25:13, 50:24, 51:1, 67:21, 67:23, 78:7

**entitled** [1] - 50:25

**enumerated** [1] - 84:2

**equates** [1] - 18:21

**equating** [1] - 26:10

**erase** [2] - 61:20, 62:4

**erased** [2] - 61:21, 62:4

**Eric** [2] - 3:12, 4:3

**ERIC** [2] - 2:3, 2:12

**especially** [1] - 56:8

**ESQUIRE** [9] - 2:2, 2:3, 2:4, 2:4, 2:6, 2:8, 2:12, 2:14, 2:15

**ESQURIE** [1] - 2:10

**essence** [1] - 38:23

**essential** [16] - 16:23, 16:24, 41:1, 41:7, 44:6, 45:4, 46:5, 49:2, 60:12, 62:19, 62:21, 65:15, 65:18, 81:6, 81:8, 81:9

**essentially** [1] - 17:17

**established** [1] - 88:17

**estoppel** [1] - 66:22

**et** [1] - 1:8

**eventually** [1] - 51:3

**evidence** [10] - 5:19, 31:19, 37:19, 55:9, 55:11, 55:21, 65:22, 66:4, 66:14, 75:18

**EWING** [1] - 2:3

**Ewing** [1] - 3:9

**exact** [6] - 24:18, 24:19, 26:7, 61:2, 83:21, 84:20

**exactly** [22] - 8:3, 10:3, 19:23, 21:19, 25:21, 30:21, 39:4, 43:5, 45:11, 48:21, 50:19, 51:21, 59:17, 62:11, 73:5, 77:13, 79:17, 80:7, 80:10, 89:5

**examination** [1] - 67:20

**examiner** [35] - 23:17, 23:19, 23:22, 24:3, 24:5,

24:6, 24:21, 28:24, 28:25, 30:24, 30:25, 31:8, 31:20, 32:8, 67:6, 67:17, 67:21, 67:25, 68:4, 72:14, 74:16, 74:19, 75:2, 75:6, 76:7, 76:9, 76:18, 78:18, 87:20, 88:10, 89:22, 90:3, 90:4, 90:8

**Examiner's** [1] - 75:21
**examiner's** [1] - 28:11
**example** [15] - 10:2, 10:3, 13:8, 17:1, 17:13, 19:16, 19:19, 19:22, 22:18, 56:14, 57:12, 63:18, 79:9, 82:17, 88:1

**except** [1] - 25:22
**exception** [23] - 22:14, 47:14, 47:24, 48:8, 48:9, 48:11, 48:25, 53:25, 56:11, 56:12, 56:14, 58:10, 62:10, 64:16, 65:21, 66:3, 66:11, 66:12, 72:24, 73:25, 75:13, 78:3, 79:5

**exceptions** [5] - 37:20, 42:1, 55:15, 55:17, 55:18
**excerpt** [1] - 50:21
**excerpts** [1] - 43:16
**exchange** [1] - 29:7
**excipients** [2] - 38:21, 40:13
**exclude** [1] - 80:1
**exercise** [1] - 13:3
**expect** [2] - 12:9, 74:24
**expert** [12] - 11:19, 17:14, 18:25, 42:21, 42:22, 43:8, 43:17, 43:19, 61:1, 61:3, 61:7, 85:21
**experts** [14] - 12:13, 15:14, 17:10, 17:13, 18:21, 41:18, 42:20, 43:8, 61:1, 61:2, 61:5, 61:18, 64:25, 85:22
**expert's's** [1] - 43:20
**explain** [13] - 5:15, 13:25, 15:2, 15:10, 15:17, 27:17, 37:9, 41:20, 47:25, 56:3, 85:18, 86:23, 87:15
**explained** [4] - 6:7, 27:6, 38:1, 40:6
**explanation** [2] - 50:8, 50:15
**expressly** [3] - 25:14, 32:8, 40:15
**extent** [1] - 94:24

**F**

**facets** [1] - 30:8
**fact** [23] - 7:19, 8:5, 10:19, 11:23, 14:1, 14:3, 14:5, 15:13, 26:1, 41:20, 54:10, 54:11, 54:17, 58:21, 60:21,

60:23, 61:15, 63:17, 71:14, 74:2, 74:16, 74:18, 77:15
**facts** [4] - 13:25, 36:10, 36:11
**failed** [1] - 49:10
**fails** [1] - 86:11
**fairly** [1] - 30:19
**familiar** [2] - 10:13, 39:3
**family** [1] - 16:14
**Fantasy** [12] - 24:16, 25:1, 25:8, 77:22, 77:25, 78:6, 78:16, 78:25, 88:20, 88:21, 89:1
**fantasy** [1] - 88:22
**far** [4] - 66:3, 71:6, 71:16, 79:16
**fast** [4] - 5:9, 26:16, 39:15, 48:2
**favor** [1] - 43:24
**FDA** [2] - 92:8, 93:10
**featured** [1] - 54:20
**features** [6] - 27:21, 51:10, 51:11, 51:17, 77:9
**Federal** [46] - 19:13, 25:14, 34:17, 37:10, 41:24, 43:25, 44:3, 44:4, 44:5, 44:10, 44:11, 44:14, 45:5, 45:6, 46:6, 47:5, 47:13, 47:14, 49:8, 53:3, 53:20, 54:9, 54:14, 55:19, 56:3, 56:15, 57:3, 60:5, 62:24, 63:14, 63:16, 63:23, 63:25, 64:16, 65:13, 66:16, 68:18, 70:1, 72:8, 77:25, 80:17, 81:12, 81:15, 81:21, 82:5, 88:25
**fever** [1] - 20:10
**file** [3] - 29:14, 29:21, 50:6
**filed** [1] - 23:15
**filing** [1] - 67:12
**final** [1] - 79:6
**finally** [1] - 58:7
**fine** [6] - 3:16, 5:10, 36:16, 63:23, 84:10, 84:11
**finished** [1] - 94:2
**firm** [1] - 3:9
**first** [18] - 8:5, 15:4, 15:7, 16:12, 25:4, 26:24, 47:21, 55:23, 56:11, 57:21, 60:6, 60:19, 67:24, 67:25, 74:6, 76:6, 77:24, 85:6
**First** [1] - 23:19
**Fisher** [1] - 1:10
**five** [3] - 34:5, 36:16, 93:24
**five-minute** [2] - 34:5, 36:16
**flashed** [1] - 43:16
**focused** [2] - 9:23, 90:1
**focuses** [1] - 78:10
**focusing** [3] - 6:12, 16:7, 70:25

**Foerster** [1] - 4:2
**FOERSTER** [1] - 2:10
**follow** [3] - 55:14, 66:7
**followed** [1] - 94:10
**following** [3] - 5:17, 51:9, 93:24
**follows** [3] - 44:24, 45:15, 60:6
**football** [8] - 25:3, 25:10, 78:14, 78:17
**footnote** [2] - 12:5, 78:8, 78:9
**Footnote** [2] - 12:7, 78:8
**FOR** [2] - 1:2, 53:24
**forget** [1] - 36:10
**form** [9] - 6:9, 17:15, 31:11, 32:11, 35:21, 63:9, 75:1, 75:2, 76:9
**forms** [1] - 30:12
**formulate** [1] - 8:24
**formulating** [1] - 93:25
**formulation** [100] - 4:14, 5:7, 5:10, 5:12, 6:4, 6:17, 7:20, 7:24, 7:25, 10:18, 10:20, 13:19, 14:14, 15:1, 15:2, 15:3, 15:17, 17:5, 17:6, 18:23, 20:7, 22:9, 27:21, 30:5, 33:22, 34:24, 34:25, 35:10, 36:6, 36:8, 37:8, 38:3, 38:14, 38:18, 38:22, 39:12, 40:11, 40:12, 40:15, 41:6, 41:7, 44:22, 45:2, 45:14, 45:16, 45:18, 45:20, 45:25, 46:2, 51:5, 51:9, 52:25, 53:16, 53:18, 54:10, 58:13, 58:16, 60:8, 60:9, 60:13, 60:25, 61:5, 61:6, 62:23, 63:7, 63:9, 63:18, 63:21, 63:22, 65:9, 69:1, 69:24, 73:12, 76:20, 79:10, 79:11, 79:13, 79:19, 80:14, 82:3, 83:18, 83:22, 84:9, 85:8, 85:10, 86:18, 86:22, 86:25, 87:1, 87:4, 87:6, 93:1, 93:14, 93:17
**formulations** [31] - 6:1, 7:6, 7:13, 7:18, 8:19, 14:5, 15:22, 16:6, 20:14, 20:22, 20:24, 21:6, 21:10, 21:23, 21:24, 28:18, 30:9, 34:21, 35:11, 38:12, 38:16, 39:19, 40:5, 40:7, 50:1, 65:4, 70:11, 73:13, 73:18, 80:11, 84:19
**forth** [8] - 10:8, 11:1, 11:22, 19:1, 23:7, 66:4, 76:18, 78:18
**four** [6] - 6:11, 6:13, 6:18, 16:13, 30:11, 39:20
**frame** [1] - 18:19
**frank** [1] - 59:13

**frankly** [4] - 12:16, 15:5, 17:10, 28:14
**free** [4] - 20:9, 20:11, 26:21, 37:3
**frequently** [1] - 29:6
**frivolous** [1] - 22:1
**front** [2] - 14:16, 86:25
**fry** [1] - 80:6
**full** [1] - 65:4
**function** [5] - 19:21, 34:15, 34:16, 63:6, 87:17
**functional** [1] - 63:8
**functions** [1] - 87:9
**fundamental** [8] - 5:5, 9:13, 14:7, 22:9, 33:17, 35:17, 35:22, 84:24

**G**

**games** [3] - 25:3, 25:10, 78:15
**games..** [1] - 78:18
**general** [18] - 13:23, 14:8, 22:12, 36:10, 37:10, 37:15, 40:4, 41:24, 42:1, 44:10, 44:11, 44:20, 54:15, 55:25, 56:4, 56:6, 81:7, 85:16
**generally** [14] - 13:8, 14:9, 22:13, 31:13, 31:14, 44:2, 45:7, 47:6, 56:20, 75:16, 75:17, 79:22, 81:3, 92:12
**GEV** [1] - 47:19
**gist** [2] - 44:21, 81:7
**given** [2] - 9:16, 29:13
**grammar** [5] - 63:10, 83:4, 83:19, 87:8, 87:10
**grammatically** [1] - 86:16
**grants** [1] - 79:25
**great** [3] - 5:18, 82:13, 95:4
**green** [2] - 60:7, 81:19
**GREENBERG** [1] - 2:8
**Greenberg** [1] - 3:20
**grounded** [2] - 60:4
**grounds** [1] - 91:15

**H**

**hand** [1] - 9:20
**handbook** [1] - 75:20
**Handbook** [1] - 75:21
**handed** [1] - 44:12
**handle** [1] - 20:14
**happy** [1] - 89:23
**hard** [1] - 6:9
**harmed** [1] - 15:20
**Hastings** [3] - 3:10, 3:13, 3:15
**HASTINGS** [1] - 2:2
**heads** [1] - 11:17
**HEALTHCARE** [1] - 1:4

**hear** [4] - 9:12, 46:20, 85:15, 91:9
**heard** [1] - 12:22
**hearing** [6] - 4:10, 5:23, 7:8, 12:24, 30:11, 60:19
**HEARING** [1] - 1:7
**heavily** [1] - 49:6
**Hello** [1] - 4:3
**help** [1] - 37:25
**helpful** [2] - 7:2, 13:24
**HELSINN** [1] - 1:4
**Helsinn** [3] - 3:4, 3:13, 3:15
**Helsinn's** [1] - 33:5
**herring** [1] - 50:12
**high** [3] - 5:4, 55:21, 69:5
**high-dose** [1] - 69:5
**higher** [7] - 31:12, 31:14, 33:8, 69:20, 71:13, 91:8, 91:20
**highlight** [1] - 88:6
**highlighted** [6] - 10:10, 31:4, 38:7, 68:6, 87:22, 91:2
**highlighting** [3] - 10:12, 11:2, 88:5
**highway** [8] - 56:17, 56:18, 56:19, 56:23, 56:25, 57:7, 57:14, 57:15
**Hill** [1] - 4:3
**HILL** [1] - 2:12
**histories** [2] - 16:13, 29:20
**history** [31] - 16:10, 29:3, 29:14, 48:20, 48:22, 49:6, 50:4, 54:21, 54:22, 66:12, 66:21, 67:3, 67:13, 67:21, 69:2, 70:3, 71:20, 72:19, 72:20, 72:24, 73:25, 75:11, 75:13, 75:18, 76:6, 77:17, 78:3, 79:5, 83:15, 84:17, 87:19
**hitherto** [1] - 91:7
**hold** [3] - 5:8, 81:24, 93:23
**holder** [4] - 80:4, 80:5, 92:2, 92:14
**honest** [1] - 43:17
**honestly** [1] - 53:6
**honesty** [1] - 12:8
**Honor** [99] - 3:8, 3:12, 3:14, 3:17, 3:19, 3:22, 4:1, 4:11, 4:19, 4:21, 4:24, 5:22, 9:10, 10:13, 12:8, 14:25, 16:4, 17:22, 20:16, 21:23, 23:7, 31:10, 32:4, 33:14, 33:19, 34:9, 36:15, 36:21, 36:22, 37:1, 37:24, 39:3, 39:13, 42:4, 42:16, 43:17, 44:1, 44:13, 44:15, 45:10, 45:22, 46:4, 47:25, 49:4, 49:9, 50:12, 51:11, 51:18, 52:12, 53:3, 53:19, 54:7, 54:24, 55:9, 55:21, 57:4, 57:22,

58:16, 59:4, 60:3, 60:18, 64:15, 65:5, 65:25, 66:11, 67:20, 70:1, 70:9, 72:23, 73:23, 74:1, 74:4, 74:7, 75:10, 76:3, 76:20, 76:23, 77:3, 77:15, 78:24, 79:6, 79:16, 82:2, 82:11, 82:14, 83:3, 83:12, 84:17, 85:12, 87:21, 87:24, 89:7, 89:12, 90:13, 91:1, 91:9, 94:9, 94:17, 95:6
**HONORABLE** [1] - 1:12
**hope** [1] - 39:3
**hopefully** [1] - 5:15
**host** [1] - 36:4
**hour** [1] - 57:8
**house** [1] - 4:5
**huge** [2] - 29:22, 71:1
**human** [13] - 15:5, 17:6, 17:16, 17:21, 18:2, 20:6, 38:5, 46:11, 58:6, 58:7, 61:10, 61:16, 80:21
**humans** [2] - 35:1, 61:14
**hypothetical** [5] - 56:16, 70:10, 79:9, 92:25, 94:8

# I

**i.e** [2] - 38:7, 63:20
**I.V** [3] - 16:8, 83:2
**idea** [3] - 35:21, 80:5, 86:8
**identical** [6] - 6:14, 23:23, 24:10, 24:15, 39:21, 49:20, 51:18, 52:2
**identifies** [1] - 29:1
**identify** [2] - 3:11, 32:7
**idle** [1] - 75:24
**ignores** [1] - 21:7
**illustrate** [1] - 9:19
**imagine** [1] - 25:7
**IMBACUAN** [2] - 2:15, 3:24
**Imbacuan** [1] - 3:24
**immediately** [1] - 87:2
**implied** [1] - 21:18
**important** [11] - 9:6, 20:17, 25:16, 25:19, 39:12, 41:21, 49:10, 58:18, 74:6, 77:25, 87:21
**importantly** [3] - 24:9, 27:16, 83:1
**impose** [3] - 81:25, 82:3, 82:21
**imposing** [1] - 82:16
**impossible** [1] - 74:11
**improper** [1] - 82:4
**improved** [2] - 39:11, 39:19, 40:7
**in-house** [1] - 4:5
**incidence** [1] - 69:6
**incidentally** [1] - 34:4

**include** [5] - 8:19, 27:19, 27:20, 50:7
**included** [1] - 77:10
**includes** [1] - 30:1
**including** [12] - 5:20, 7:10, 10:7, 13:8, 22:7, 31:5, 38:19, 47:16, 48:21, 65:23, 68:8
**inconsistency** [1] - 27:13
**inconsistent** [3] - 26:12, 40:23, 62:14
**increased** [1] - 7:21
**independent** [5] - 5:18, 16:2, 16:9, 28:21, 50:9
**indicated** [1] - 69:5
**indication** [2] - 71:21, 93:2
**indistinguishable** [1] - 17:2
**individually** [1] - 46:23
**induced** [13] - 6:6, 7:11, 7:14, 18:3, 31:7, 31:21, 32:1, 38:6, 46:15, 86:9, 87:23, 91:2, 91:5
**inducing** [1] - 87:13
**inexorably** [1] - 65:1
**infringe** [6] - 34:22, 80:13, 94:3, 94:7, 94:11, 94:13
**infringed** [1] - 80:9
**infringement** [3] - 34:25, 35:4, 88:1
**infringer** [1] - 92:17
**infringes** [1] - 93:4
**infringing** [4] - 21:25, 92:5, 92:18, 92:19
**ingesting** [1] - 20:12
**ingredient** [5] - 8:20, 51:6, 69:6, 71:4, 86:1
**ingredients** [9] - 45:2, 51:6, 51:20, 69:1, 79:10, 82:24, 84:2, 93:24, 94:2
**initial** [1] - 76:16
**injection** [1] - 17:16
**inquiry** [2] - 19:14, 36:7
**inside** [2] - 17:4, 17:6
**instances** [1] - 8:20
**instead** [3] - 67:10, 68:25, 72:18
**instruction** [1] - 42:24
**instructive** [2] - 34:13, 73:6
**insufficient** [2] - 55:22, 65:22
**intended** [85] - 34:15, 37:11, 38:4, 38:7, 41:10, 41:11, 41:14, 41:16, 41:21, 41:22, 42:14, 43:10, 45:15, 45:22, 46:4, 47:2, 47:3, 47:4, 47:8, 47:12, 47:15, 47:18, 47:23, 48:6, 48:10, 48:16, 48:17, 48:23, 49:14, 49:17, 49:20, 49:23, 49:24, 50:3, 51:12, 51:15, 51:18, 52:2, 52:15, 52:20, 53:2, 53:5,

53:15, 53:20, 54:10, 54:15, 55:20, 56:4, 56:7, 56:8, 56:19, 57:21, 59:12, 59:14, 59:23, 61:16, 62:1, 62:20, 62:22, 63:6, 63:15, 63:20, 63:24, 64:1, 64:6, 68:24, 69:15, 71:16, 77:10, 77:18, 78:14, 78:22, 79:2, 79:12, 80:15, 80:18, 81:1, 81:12, 81:18, 81:19, 82:18, 83:25, 85:17, 94:24
**intent** [1] - 90:21
**intention** [1] - 62:22
**intents** [1] - 61:13
**interpret** [2] - 42:23, 94:23
**interpretation** [3] - 42:10, 44:14, 54:7
**interpreted** [2] - 14:23, 54:8
**interpreting** [1] - 49:9
**interview** [10] - 28:25, 29:6, 30:24, 67:17, 67:22, 67:23, 68:12, 90:3, 90:5, 91:23
**intestinal** [1] - 20:13
**intracellular** [1] - 84:13
**intramuscular** [1] - 84:14
**intravenous** [101] - 6:4, 6:17, 6:18, 15:5, 15:8, 15:11, 15:12, 15:15, 15:22, 16:1, 16:3, 16:11, 16:17, 16:19, 16:23, 17:4, 17:7, 17:8, 17:14, 17:18, 17:23, 18:13, 18:22, 18:23, 19:3, 19:4, 19:5, 19:10, 19:11, 20:6, 20:22, 21:10, 21:12, 21:17, 21:22, 22:1, 22:6, 26:6, 26:25, 27:1, 27:2, 27:4, 27:5, 28:18, 30:12, 38:5, 38:15, 39:9, 40:3, 41:2, 46:8, 46:11, 51:19, 52:8, 52:14, 52:19, 52:23, 52:25, 53:1, 53:7, 53:8, 53:10, 53:16, 55:6, 57:22, 57:24, 58:2, 62:16, 64:10, 64:12, 64:18, 65:2, 65:7, 65:8, 65:11, 65:17, 66:1, 72:21, 72:22, 73:1, 73:3, 73:7, 73:11, 73:14, 73:16, 73:19, 73:22, 83:17, 83:19, 83:21, 84:1, 84:5, 84:9, 84:19, 87:8, 87:13
**intravenously** [3] - 10:2, 17:19, 18:17
**intrinsic** [1] - 5:19
**introduce** [3] - 4:5, 73:7, 84:14
**introductory** [1] - 44:20
**invalid** [2] - 42:23, 43:9
**invalidated** [1] - 42:9
**invention** [35] - 7:12, 7:20, 8:4, 8:5, 8:13, 8:22, 9:19, 9:23, 23:2, 35:17, 35:23,

38:24, 39:13, 39:16, 39:18, 44:6, 44:21, 44:25, 45:8, 45:10, 45:20, 45:21, 45:25, 47:2, 56:13, 57:2, 66:18, 67:8, 68:17, 70:3, 70:14, 70:22, 72:14, 79:21

**inventor** [3] - 8:17, 44:25, 51:4

**inventors** [16] - 8:8, 8:19, 38:13, 39:21, 49:22, 51:2, 51:14, 52:10, 52:13, 54:12, 57:1, 67:10, 69:1, 76:18, 76:24

**inventors's** [1] - 49:2
**investigated** [1] - 36:5
**involved** [10] - 28:3, 28:5, 28:7, 50:9, 50:13, 50:18, 50:20, 51:2, 89:14, 91:21
**involves** [1] - 60:21
**irrelevant** [2] - 77:23, 90:23
**irrespective** [1] - 83:22
**irritations** [1] - 15:21
**isotonic** [26] - 16:20, 18:15, 20:8, 20:17, 20:19, 20:21, 21:18, 62:16, 64:12, 64:13, 64:19, 64:21, 64:23, 64:25, 65:6, 65:10, 65:17, 65:18, 65:19, 83:14, 83:17, 83:20, 84:1, 84:10, 84:14, 84:19
**isotonicity** [4] - 21:8, 21:14, 21:21, 21:22
**issuance** [1] - 29:7
**issue** [22] - 4:12, 5:2, 12:14, 16:25, 19:7, 28:10, 30:15, 31:18, 38:4, 39:6, 39:20, 43:9, 47:8, 48:17, 49:4, 50:11, 71:18, 74:23, 82:16, 83:23, 90:15, 94:21
**issued** [6] - 28:24, 30:7, 76:7, 77:25, 78:1, 88:24
**issues** [2] - 37:6, 85:14
**items** [1] - 5:1
**iterations** [1] - 40:6
**itself** [1] - 28:23

# J

**JERSEY** [2] - 1:2, 3:1
**Jersey** [1] - 1:11
**joint** [1] - 13:17
**JOSEPHINE** [1] - 2:16
**Josephine** [1] - 4:5
**JOVIAL** [1] - 2:6
**Jovial** [2] - 3:17, 36:23
**judge** [1] - 62:3
**JUDGE** [1] - 1:13
**Judge** [1] - 4:3
**jump** [1] - 5:2
**justification** [2] - 82:1, 82:4

# K

**keep** [3] - 7:16, 20:17, 58:4
**kind** [7] - 12:22, 54:15, 55:4, 56:23, 57:2, 64:2, 68:7
**kinds** [2] - 64:4, 65:4
**Kirsch** [1] - 18:21
**known** [8] - 5:24, 5:25, 8:10, 8:21, 9:3, 38:15, 39:2, 59:5
**knows** [1] - 52:1

# L

**lab** [2] - 33:11, 59:3
**LABORATORIES** [1] - 1:7
**lack** [4] - 12:6, 68:5, 68:9, 90:7
**laid** [1] - 94:11
**language** [91] - 4:14, 5:4, 5:5, 5:11, 5:16, 5:21, 7:4, 10:9, 10:10, 10:12, 10:16, 10:25, 11:2, 11:16, 12:15, 12:20, 13:18, 14:1, 15:8, 19:12, 19:23, 22:17, 22:21, 22:22, 23:16, 23:22, 23:23, 24:9, 24:11, 24:15, 24:19, 24:24, 25:18, 25:24, 25:25, 26:2, 26:7, 26:9, 27:4, 27:8, 27:10, 27:11, 27:15, 28:9, 28:22, 31:19, 31:22, 32:9, 34:17, 34:20, 35:16, 37:7, 37:22, 38:11, 38:8, 40:24, 41:22, 42:3, 45:23, 46:25, 49:2, 52:3, 54:13, 54:19, 55:5, 57:19, 58:5, 59:22, 59:23, 61:21, 65:23, 67:10, 71:18, 71:22, 72:10, 74:20, 75:5, 75:22, 76:23, 79:8, 79:15, 81:23, 82:7, 83:2, 84:20, 86:11, 88:19, 89:18, 94:23
**Larner** [2] - 3:23, 3:25
**LARNER** [1] - 2:14
**last** [17] - 5:22, 7:8, 11:20, 16:9, 18:25, 20:16, 22:4, 29:2, 29:6, 39:4, 42:7, 64:23, 77:3, 77:5, 81:23, 85:23, 92:9
**late** [2] - 12:19, 67:12
**Latin** [1] - 17:4
**latter** [1] - 55:11
**law** [17] - 19:13, 27:6, 33:17, 37:9, 42:17, 53:21, 54:7, 54:9, 54:15, 55:3, 57:10, 75:9, 79:4, 79:17, 88:17, 88:21, 88:24
**lead** [1] - 3:5
**least** [9] - 13:1, 14:11, 18:8, 22:2, 32:16, 32:18, 33:11,

36:13, 71:10
**leaves** [2] - 29:14, 29:17
**led** [2] - 16:14, 23:14
**legal** [1] - 13:7
**legitimate** [1] - 20:5
**length** [1] - 7:7
**less** [1] - 31:15
**level** [1] - 5:4
**life** [1] - 44:7
**likelihood** [28] - 22:4, 23:24, 24:13, 24:16, 25:21, 26:9, 26:10, 26:11, 26:14, 27:8, 27:20, 27:22, 28:9, 28:19, 38:6, 41:14, 46:14, 51:13, 52:15, 52:20, 54:20, 55:7, 58:8, 58:9, 58:20, 66:5, 74:15, 89:8
**limit** [9] - 13:9, 14:11, 23:21, 24:6, 44:2, 79:22, 81:24, 85:1, 85:17
**limitation** [86] - 5:21, 11:7, 14:14, 14:23, 16:11, 19:15, 20:18, 21:16, 22:3, 25:11, 25:12, 26:3, 27:13, 27:22, 28:12, 36:11, 37:7, 37:22, 40:20, 41:8, 41:23, 42:8, 42:15, 42:18, 42:24, 43:9, 43:11, 43:13, 43:14, 43:19, 43:22, 47:13, 52:3, 53:22, 54:2, 56:20, 56:21, 56:25, 57:15, 59:15, 59:18, 59:19, 59:23, 60:8, 61:2, 61:16, 62:2, 62:7, 62:25, 65:5, 65:23, 66:6, 67:19, 68:2, 68:3, 68:5, 68:10, 69:23, 72:5, 73:17, 74:18, 75:12, 78:11, 78:12, 81:25, 82:3, 82:16, 82:21, 83:11, 83:15, 84:5, 85:2, 85:4, 85:21, 87:25, 88:20, 89:5, 90:10, 91:2, 92:19, 92:24, 93:12, 93:19, 94:24, 94:25
**limitations** [27] - 16:21, 25:5, 31:4, 31:6, 32:8, 41:3, 43:10, 48:16, 49:25, 50:24, 51:1, 51:7, 51:16, 62:14, 62:15, 62:17, 62:18, 63:24, 68:8, 72:12, 72:13, 81:13, 82:18, 87:18, 87:22, 91:24, 92:13
**limited** [4] - 30:20, 51:9, 55:18, 77:18
**limiting** [89] - 4:15, 5:6, 5:11, 5:16, 7:4, 10:16, 11:1, 11:3, 11:16, 11:16, 12:15, 12:20, 13:14, 13:15, 13:19, 13:21, 13:23, 14:9, 14:17, 15:10, 17:2, 20:19, 21:13, 22:13, 22:18, 22:22, 24:8, 24:16, 24:25, 25:2, 25:6, 25:14,

25:19, 28:22, 37:11, 37:12, 37:15, 41:16, 41:17, 42:16, 44:10, 44:18, 45:7, 45:19, 46:7, 46:25, 47:6, 47:19, 47:23, 47:25, 48:11, 48:12, 48:18, 48:23, 48:24, 53:18, 54:14, 54:16, 55:8, 55:10, 55:12, 55:20, 56:5, 56:9, 56:20, 57:11, 60:1, 60:2, 64:7, 64:8, 66:2, 71:22, 74:20, 74:24, 75:5, 75:15, 75:16, 75:17, 75:19, 75:22, 78:12, 78:23, 79:2, 81:2, 81:3, 81:22, 82:7, 86:11
**limits** [2] - 5:4, 44:6
**line** [3] - 50:14, 50:16, 80:17
**liquid** [2] - 7:13, 17:15
**list** [5] - 14:25, 27:19, 40:12, 51:11, 77:8
**listed** [3] - 30:11, 40:15, 77:9
**listing** [2] - 51:20, 84:2
**lists** [3] - 27:17, 38:18, 45:15
**LITE** [1] - 2:8
**Lite** [1] - 3:20
**literal** [2] - 54:4, 54:6
**literally** [2] - 65:7, 80:13
**Liu** [1] - 4:5
**LIU** [1] - 2:16
**live** [1] - 92:22
**LIZZA** [2] - 2:4, 3:8
**Lizza** [1] - 3:9
**LLC** [2] - 1:4, 2:8
**logic** [1] - 44:18
**look** [14] - 13:25, 16:25, 32:18, 43:25, 45:5, 45:22, 52:23, 57:22, 73:15, 83:19, 83:20, 87:9, 88:22, 91:4
**looking** [3] - 49:1, 65:9, 86:15
**looks** [2] - 4:8, 4:17
**lost** [2] - 26:15, 26:20
**low** [9] - 9:2, 9:5, 9:10, 20:13, 33:6, 58:17, 58:18, 59:1, 91:6
**low-dose** [1] - 33:6
**lower** [4] - 8:12, 9:24, 10:1, 69:19
**LTD** [1] - 1:7
**lumping** [1] - 46:19

# M

**M.P.E.P** [1] - 28:1
**magic** [2] - 73:4, 83:4
**making...selling...the** [1] - 80:1
**mannitol** [3] - 38:21, 39:25,

76:21
  manufacturing [2] - 94:9, 94:15
  market [1] - 92:7
  marketed [1] - 6:3
  Marketing [20] - 44:12, 44:17, 45:6, 47:7, 54:25, 55:25, 56:2, 56:12, 66:16, 66:25, 77:19, 77:22, 78:1, 78:2, 79:20, 81:14, 81:16, 81:18, 88:15, 92:11
  Markman [8] - 5:23, 7:8, 12:17, 12:23, 28:14, 39:5, 42:8, 43:2
  MARKMAN [1] - 1:7
  Marrin [1] - 62:25
  MARY [1] - 1:12
  Masco [1] - 19:18
  match [1] - 64:20
  matches [1] - 85:1
  matching [2] - 85:7, 86:10
  matter [20] - 20:11, 24:8, 26:8, 28:2, 28:3, 28:4, 33:20, 42:3, 50:7, 50:8, 50:23, 64:2, 64:5, 74:8, 80:18, 88:1
  matters [7] - 12:13, 12:14, 13:2, 42:16, 66:23, 83:6
  Matthew [1] - 4:1
  MATTHEW [1] - 2:10
  Mayra [1] - 3:19
  MAYRA [1] - 2:8
  mean [13] - 5:8, 17:23, 20:21, 21:17, 23:20, 42:11, 46:10, 53:8, 53:23, 63:19, 64:3, 69:3, 84:21
  meaning [13] - 6:24, 7:1, 11:11, 11:13, 15:12, 19:9, 39:7, 44:8, 45:4, 64:24, 64:25, 65:16, 83:5
  means [7] - 18:18, 19:20, 34:20, 65:1, 79:25, 85:25, 90:14
  Medical [1] - 65:13
  medical [1] - 35:13
  medicament [1] - 8:1
  medication [1] - 18:15
  medicine [1] - 17:21
  medicines [3] - 6:9, 35:23, 36:3
  meet [6] - 13:13, 13:15, 37:20, 66:14, 72:8, 73:23
  meets [1] - 68:12
  mention [2] - 89:11, 90:6
  mentioned [5] - 5:3, 8:10, 14:13, 16:24, 22:18
  mentions [1] - 16:1
  mere [1] - 63:17
  merits [1] - 11:15
  met [4] - 20:15, 57:4, 80:14,

80:15
  metes [1] - 44:25
  method [26] - 44:22, 64:4, 80:19, 80:20, 80:25, 81:1, 81:3, 81:4, 81:7, 81:9, 81:11, 81:25, 82:3, 82:16, 82:21, 93:20, 93:22, 94:1, 94:3, 94:5, 94:7, 94:9, 94:12, 94:14
  methods [1] - 64:7
  MICHAEL [1] - 2:15
  Michael [1] - 3:24
  middle [2] - 11:19, 69:3
  might [6] - 42:5, 65:3, 65:9, 66:8, 71:9, 84:15
  miles [3] - 56:23, 57:8, 57:14
  milligram [1] - 69:18
  milligrams [15] - 10:3, 10:5, 30:16, 30:19, 32:16, 32:18, 32:19, 32:21, 38:20, 58:20, 58:23, 69:13, 72:5, 86:3, 86:4
  milliliter [5] - 30:17, 30:19, 30:22, 38:19, 86:4
  milliliters [1] - 86:4
  mind [2] - 7:16, 20:17
  minuscule [2] - 71:3, 71:7
  minute [8] - 10:11, 34:5, 36:16, 37:23, 43:1, 53:23, 85:5, 90:9
  mischief - 12:16
  miscite [1] - 24:25
  misconception [1] - 82:15
  misread [1] - 31:16
  misunderstanding - 13:12, 33:17
  mixed [1] - 88:8
  modifies [1] - 7:23, 63:2, 63:4
  modify [4] - 41:1, 63:7, 86:17, 87:2
  modifying [2] - 7:24, 10:17
  molecule [1] - 9:4
  moment [3] - 22:19, 26:6, 83:13
  month [2] - 18:25, 85:23
  months [4] - 38:23, 40:16, 42:11, 46:2
  moon [1] - 80:8
  moreover [2] - 68:20, 83:7
  Morrison [1] - 4:2
  MORRISON [1] - 2:10
  most [3] - 48:22, 49:10, 77:24
  mostly [1] - 83:2
  moving [1] - 41:21
  MR [179] - 3:8, 3:12, 3:17, 3:22, 3:24, 4:1, 4:3, 4:11, 4:16, 4:19, 4:21, 4:24, 5:13,

5:18, 6:20, 6:22, 7:25, 8:4, 8:16, 9:1, 10:22, 10:24, 11:5, 11:9, 11:12, 11:15, 12:4, 12:8, 13:6, 14:24, 16:4, 17:22, 17:25, 18:6, 18:8, 21:2, 21:4, 21:19, 22:25, 23:11, 24:2, 24:5, 26:17, 26:21, 26:24, 27:24, 29:5, 29:9, 29:11, 29:15, 29:22, 29:25, 30:15, 30:24, 31:14, 31:17, 32:2, 32:14, 33:2, 33:4, 33:14, 34:8, 34:12, 35:7, 35:10, 36:3, 36:18, 36:21, 39:16, 40:1, 40:4, 40:22, 43:5, 43:23, 46:9, 46:13, 46:17, 46:22, 47:22, 48:4, 48:6, 48:8, 48:15, 48:21, 49:16, 49:19, 50:14, 50:19, 50:21, 51:21, 52:2, 52:18, 53:13, 54:1, 54:3, 54:6, 54:22, 55:15, 56:2, 56:11, 57:9, 57:14, 57:17, 58:1, 58:15, 59:2, 59:4, 59:17, 60:16, 60:18, 60:23, 61:9, 61:11, 61:13, 61:25, 62:6, 62:11, 62:13, 63:5, 63:14, 64:5, 65:3, 66:11, 66:14, 66:23, 68:11, 69:11, 69:22, 70:8, 70:18, 71:6, 72:1, 72:16, 72:18, 73:5, 74:23, 75:8, 75:10, 75:23, 76:1, 76:11, 76:13, 76:16, 77:5, 77:8, 77:13, 80:7, 80:10, 80:24, 81:1, 81:6, 82:11, 84:3, 84:8, 84:16, 85:5, 86:21, 87:7, 88:13, 89:4, 89:21, 90:2, 90:4, 90:13, 90:18, 91:9, 91:12, 91:14, 91:21, 92:6, 92:21, 92:24, 93:8, 93:12, 94:8, 94:17, 94:20, 95:3, 95:6
  MS [2] - 3:14, 3:19
  multiple [2] - 24:21, 50:1
  must [3] - 34:18, 46:11, 82:10

**N**

  name [3] - 6:4, 36:23, 44:19
  narrow [5] - 42:10, 47:13, 47:14, 72:24, 73:10
  nausea [13] - 5:25, 6:6, 7:11, 18:3, 31:7, 31:10, 31:22, 38:6, 46:15, 86:9, 87:23, 91:3, 91:17
  nearly [5] - 6:14, 24:10, 24:15, 39:20, 39:21
  necessarily [2] - 21:17, 70:15
  necessary [7] - 7:1, 14:1,

18:25, 44:7, 47:3, 68:13, 69:8
  need [16] - 9:17, 11:8, 28:11, 32:16, 32:18, 33:8, 34:10, 46:1, 64:17, 64:18, 64:19, 64:21, 65:6, 67:1, 84:10
  needed [3] - 65:19, 77:2, 86:6
  needs [1] - 18:2
  never [7] - 30:7, 44:16, 52:1, 67:2, 73:19, 74:21, 93:23
  nevertheless [3] - 12:9, 12:14, 18:10
  NEW [2] - 1:2, 3:1
  new [4] - 12:18, 23:9, 71:3, 88:17
  New [1] - 1:11
  next [4] - 45:24, 58:5, 73:5, 92:9
  Ni [1] - 3:14
  NI [2] - 2:2, 3:14
  nicer [1] - 23:11
  Nintendo [1] - 47:19
  nobody [2] - 17:20, 83:24
  non [1] - 75:17
  non-limiting [1] - 75:17
  none [6] - 51:11, 57:13, 65:18, 72:23, 76:22, 77:10
  nonetheless [1] - 79:14
  nonsensical [3] - 79:8, 79:16
  noted [1] - 83:3
  nothing [12] - 11:20, 11:21, 46:1, 53:8, 58:6, 58:8, 58:9, 58:22, 75:12, 76:14, 78:13, 86:12
  notice [2] - 15:24, 29:7
  notion [4] - 12:24, 13:11, 14:22, 70:16
  noun [6] - 63:2, 63:10, 63:18, 86:17, 86:25, 87:1
  nouns [1] - 87:2
  novel [2] - 72:12, 72:15
  NUMBER [1] - 1:5
  Number [1] - 78:8
  number [12] - 3:5, 12:12, 19:6, 25:15, 35:20, 54:11, 86:10, 86:14, 89:12, 90:19, 90:20, 91:15

**O**

  object [1] - 86:18
  objected [1] - 76:7
  objecting [1] - 84:4
  objection [2] - 28:12, 89:20
  objectives [1] - 7:6
  objects [1] - 7:19

**obviate** [1] - 25:25
**obvious** [5] - 19:3, 32:20, 32:22, 43:12
**obviously** [1] - 79:9
**obviousness** [5] - 42:13, 42:19, 43:4, 76:12, 90:11
**odd** [1] - 61:20
**OF** [1] - 1:2
**office** [1] - 76:6
**Office** [14] - 20:25, 21:21, 32:17, 44:24, 50:5, 50:6, 50:15, 52:11, 54:12, 73:12, 74:9, 74:12, 75:16, 75:19
**once** [7] - 10:4, 14:6, 20:23, 60:17, 62:4, 85:25, 86:5
**one** [54] - 4:7, 4:12, 5:6, 6:12, 7:6, 7:19, 8:13, 8:17, 8:23, 9:20, 10:14, 10:15, 10:24, 13:8, 14:13, 15:7, 17:13, 18:12, 18:21, 19:6, 19:19, 19:22, 20:16, 20:18, 24:14, 25:15, 27:21, 31:7, 32:5, 46:12, 47:21, 49:25, 51:12, 52:1, 52:9, 53:8, 55:5, 59:7, 62:6, 62:9, 72:6, 72:10, 72:25, 77:9, 84:24, 85:22, 86:10, 89:12, 90:19, 91:15, 94:12, 94:17
**one-tenth** [1] - 8:23
**ones** [1] - 30:11
**op** [3] - 31:24, 36:1, 91:7
**open** [1] - 3:2
**opening** [3] - 16:5, 19:18, 49:21
**operative** [2] - 31:10, 31:24
**opinion** [1] - 25:12
**opinions** [1] - 19:2
**opportunity** [1] - 42:8
**oral** [9] - 16:1, 16:6, 16:16, 20:24, 21:6, 21:22, 21:24, 73:13, 73:18
**orally** [1] - 20:12
**oranges** [3] - 64:17, 72:20, 72:25
**order** [5] - 3:6, 26:8, 34:21, 64:20, 66:21
**ordinary** [2] - 11:10, 39:6
**original** [5] - 15:8, 23:14, 28:16, 30:3, 78:16
**originally** [1] - 23:15
**otherwise** [4] - 5:25, 24:6, 37:14, 81:24
**overcame** [2] - 67:10, 78:20
**overcome** [12] - 24:14, 24:22, 24:24, 25:6, 26:3, 28:10, 55:1, 66:24, 71:14, 73:18, 89:2, 89:23
**overcoming** [2] - 78:4, 90:19
**overinclusiveness** [1] -

89:19
**own** [3] - 12:11, 13:22, 49:3

## P

**p.m** [1] - 95:10
**P.M** [1] - 3:1
**packaged** [2] - 60:25, 61:7
**packaging** [1] - 61:6
**Page** [1] - 12:6
**PALO** [1] - 1:4
**palonosetron** [48] - 5:25, 6:3, 7:13, 7:20, 8:8, 8:11, 8:12, 8:20, 8:24, 9:5, 9:7, 9:11, 9:16, 9:18, 9:25, 10:3, 10:6, 18:9, 18:14, 18:16, 28:18, 30:13, 30:18, 33:6, 35:25, 37:8, 38:12, 38:14, 38:16, 38:20, 39:1, 40:5, 45:2, 45:20, 45:25, 49:25, 51:5, 58:13, 58:16, 58:18, 59:6, 69:6, 70:11, 76:22, 79:10, 79:20, 80:11, 93:1
**paper** [1] - 29:16
**papers** [3] - 6:24, 23:7, 39:11
**parameter** [1] - 53:11
**parent** [14] - 19:17, 19:19, 20:20, 20:23, 23:4, 23:13, 23:14, 26:5, 26:8, 27:14, 54:23, 83:7, 83:10, 83:16
**parenteral** [1] - 17:15
**parsed** [1] - 59:24
**part** [36] - 11:7, 13:15, 14:11, 14:17, 19:20, 20:2, 22:5, 25:18, 28:6, 44:20, 47:11, 48:22, 52:14, 53:2, 53:15, 53:20, 54:18, 55:5, 55:6, 55:10, 55:11, 57:21, 58:5, 63:18, 63:20, 65:24, 65:25, 67:9, 67:19, 68:17, 77:1, 78:12, 79:2, 82:14
**partial** [2] - 32:16, 32:19
**particular** [5] - 18:14, 28:13, 30:16, 35:13, 35:23
**particulate** [1] - 20:11
**parties** [11] - 10:10, 11:20, 12:24, 29:7, 29:19, 37:5, 37:7, 39:10, 41:6, 64:22, 91:10
**parties's** [2] - 11:2, 12:13
**partner** [1] - 3:9
**parts** [6] - 14:15, 14:19, 25:11, 55:4, 55:7, 65:24
**passing** [1] - 78:9
**Patent** [15] - 20:25, 21:20, 32:17, 44:24, 50:5, 50:15, 52:10, 54:12, 73:12, 74:9, 74:12, 75:6, 75:15, 75:19
**patent** [116] - 4:6, 4:15,

6:12, 6:23, 6:25, 7:15, 8:11, 10:5, 15:9, 16:3, 16:14, 16:15, 17:1, 17:3, 19:1, 20:20, 21:9, 23:13, 23:15, 30:15, 30:20, 31:18, 32:11, 32:24, 33:12, 35:3, 35:4, 35:5, 37:24, 38:2, 38:11, 38:24, 39:8, 39:14, 39:18, 39:25, 40:10, 40:11, 40:14, 40:16, 41:3, 41:5, 41:9, 41:10, 41:11, 41:12, 45:12, 49:7, 49:9, 49:13, 49:23, 50:21, 51:4, 51:15, 51:22, 52:8, 52:12, 52:13, 52:22, 52:24, 53:14, 54:21, 54:23, 57:18, 61:22, 61:25, 62:5, 62:17, 64:2, 65:12, 66:22, 67:3, 67:5, 67:18, 72:4, 72:14, 73:10, 74:4, 75:6, 75:21, 79:17, 79:19, 79:25, 80:4, 80:5, 80:23, 80:25, 81:17, 82:7, 87:19, 92:1, 92:5, 92:12, 92:14, 92:16, 92:17, 92:20, 93:13, 93:20, 94:1, 94:3, 94:4, 94:7, 94:9, 94:15
**patent-at-issue** [2] - 30:15, 31:18
**patentability** [2] - 56:6, 79:22
**patentable** [1] - 76:19
**patentee** [2] - 87:25, 90:24
**patentees** [2] - 16:15, 84:21
**patents** [33] - 5:23, 6:2, 6:11, 6:13, 6:19, 7:5, 15:9, 15:11, 15:25, 16:7, 16:20, 28:16, 28:17, 30:3, 30:7, 30:11, 30:14, 39:17, 39:20, 41:13, 41:17, 49:7, 50:2, 50:4, 50:23, 51:22, 54:23, 64:3, 64:4, 64:6, 74:3
**patents-in-suit** [3] - 6:2, 6:11, 15:9
**patience** [1] - 36:14
**patient** [3] - 14:6, 82:21, 93:22
**patients** [3] - 6:8, 15:20, 61:11
**PAUL** [1] - 2:2
**Paul** [3] - 3:10, 3:13, 3:15
**pause** [2] - 11:16, 26:5
**penalize** [1] - 80:5
**pending** [2] - 69:9, 72:4
**people** [2] - 74:12, 87:14
**per** [3] - 30:19, 41:24, 44:10
**percent** [2] - 74:11, 74:12
**perfectly** [1] - 26:19
**performing** [1] - 63:6
**period** [1] - 93:25

**person** [2] - 20:5, 33:23
**perspective** [2] - 5:4, 76:4
**pertinent** [1] - 29:20
**petition** [1] - 88:23
**pH** [8] - 20:13, 68:1, 68:2, 68:5, 68:9, 88:10, 90:8, 90:10
**pharmaceutical** [17] - 7:21, 13:19, 30:9, 38:3, 38:17, 41:5, 45:13, 45:17, 52:24, 60:7, 60:11, 60:23, 61:17, 63:22, 86:1, 92:3, 93:21
**pharmaceutically** [11] - 7:6, 28:17, 39:7, 39:9, 40:17, 40:19, 41:2, 42:5, 42:10, 52:19, 62:16
**phase** [1] - 42:22
**phrase** [19] - 14:19, 15:4, 15:11, 17:7, 19:22, 21:12, 22:5, 22:7, 22:8, 25:9, 25:10, 25:13, 45:9, 46:12, 46:16, 46:19, 47:8, 47:9, 87:9
**phrased** [1] - 84:7
**phraseology** [1] - 84:6
**phrases** [13] - 14:22, 14:25, 15:13, 46:10, 46:23, 46:24, 56:4, 66:9, 74:13, 83:5, 87:5, 87:16, 92:11
**physical** [1] - 51:6
**pick** [2] - 87:1, 87:4
**place** [1] - 13:6
**plain** [3] - 11:12, 39:6, 64:24
**plaintiff** [1] - 92:2
**plaintiff's** [1] - 14:13
**Plaintiffs** [2] - 1:5, 2:5
**plaintiffs** [40] - 10:14, 11:3, 31:2, 37:13, 39:10, 40:22, 41:25, 42:2, 42:7, 42:17, 43:1, 43:6, 43:16, 47:16, 49:6, 49:19, 50:10, 51:23, 52:5, 55:9, 55:16, 59:24, 60:20, 62:13, 64:22, 66:3, 66:19, 67:16, 67:22, 67:24, 72:24, 73:9, 74:2, 74:16, 76:2, 77:21, 79:7, 79:13, 79:15, 82:2
**plaintiffs's** [13] - 11:25, 12:10, 37:20, 42:25, 43:24, 44:16, 49:4, 55:21, 65:22, 67:5, 72:19, 77:23, 78:7
**plan** [1] - 4:25
**play** [1] - 12:25
**playing** [4] - 25:3, 25:9, 78:14, 78:17
**plus** [2] - 19:20, 45:17
**point** [39] - 14:8, 15:15, 16:12, 18:20, 19:25, 20:16, 21:11, 21:15, 22:11, 22:15, 23:19, 25:8, 25:15, 25:16,

26:24, 27:7, 37:13, 40:8, 46:4, 47:1, 48:6, 51:25, 52:7, 52:9, 55:4, 60:19, 63:7, 68:24, 69:16, 72:23, 77:6, 83:4, 85:23, 86:10, 88:14, 89:6, 89:10, 91:1, 94:17

**pointed** [1] - 79:15
**pointing** [1] - 69:4
**points** [5] - 18:10, 22:5, 60:14, 62:5, 79:6
**poised** [1] - 4:18
**PONV** [15] - 18:14, 31:9, 31:15, 32:2, 32:12, 32:17, 32:18, 32:24, 69:25, 71:10, 71:15, 91:3, 91:16
**portion** [2] - 61:17, 67:23
**portions** [3] - 29:13, 29:20, 43:18
**posit** [1] - 11:17
**posited** [1] - 79:9
**position** [15] - 11:23, 11:25, 13:13, 13:18, 14:13, 41:19, 44:17, 46:24, 48:10, 53:19, 54:1, 55:7, 62:11, 78:5, 79:7
**positions** [5] - 11:2, 27:13, 42:21, 43:7, 43:11
**positively** [1] - 19:20
**possible** [1] - 83:9
**possibly** [1] - 32:22
**post** [6] - 31:10, 31:24, 36:1, 91:7
**post-op** [3] - 31:24, 36:1, 91:7
**post-operative** [2] - 31:10, 31:24
**post-surgical** [1] - 36:1
**potential** [2] - 35:25, 90:21
**practicing** [2] - 35:5, 94:5
**preamble** [151] - 4:13, 5:3, 5:10, 5:11, 5:12, 10:9, 10:15, 10:16, 13:9, 13:14, 13:21, 13:23, 14:3, 14:10, 14:13, 14:17, 14:19, 15:8, 15:11, 16:21, 16:22, 20:3, 21:12, 21:15, 22:5, 22:14, 22:17, 22:20, 23:23, 24:1, 24:2, 24:4, 24:6, 24:8, 24:24, 25:13, 25:24, 25:25, 26:7, 27:8, 27:10, 27:11, 28:9, 34:14, 35:16, 37:6, 37:10, 37:16, 37:21, 38:1, 38:2, 38:4, 38:8, 40:2, 40:20, 40:23, 40:24, 41:10, 41:15, 41:23, 42:3, 42:23, 44:1, 44:2, 44:6, 44:9, 44:13, 44:19, 44:24, 45:3, 45:7, 45:9, 45:13, 45:17, 45:23, 46:5, 46:23, 46:24, 47:5, 47:8, 48:14, 48:16, 49:2, 49:14, 50:3, 50:10, 51:16,

52:3, 54:13, 54:18, 55:5, 55:8, 56:4, 56:13, 56:18, 56:25, 57:1, 57:10, 57:19, 58:5, 59:22, 59:25, 60:1, 60:4, 60:5, 62:14, 63:15, 63:17, 64:13, 64:20, 65:15, 65:23, 66:17, 67:10, 70:5, 71:21, 72:7, 72:9, 74:3, 74:17, 74:19, 74:24, 75:5, 75:14, 76:23, 76:25, 78:4, 78:10, 78:12, 79:2, 79:8, 79:15, 81:2, 81:5, 81:17, 81:23, 82:6, 83:18, 83:23, 84:5, 84:11, 85:1, 85:11, 86:20, 86:21, 86:22, 87:4, 88:19, 89:2, 92:11, 94:23
**preamble's** [1] - 63:19
**preambles** [10] - 14:9, 37:12, 37:15, 44:5, 44:18, 47:22, 48:17, 49:23, 75:22, 79:21
**precedence** [2] - 60:5, 82:5
**preceding** [1] - 68:3
**precise** [2] - 7:1, 84:2
**precisely** [4] - 62:3, 66:23, 76:16, 82:2
**preconceived** [1] - 70:16
**premise** [1] - 85:11
**preposition** [1] - 53:24
**prepositional** [4] - 17:7, 87:9, 87:16
**present** [5] - 4:6, 4:18, 7:12, 68:10, 71:15
**PRESENT** [1] - 2:16
**presentation** [1] - 13:5
**pretty** [3] - 54:12, 69:5, 83:2
**prevailed** [1] - 21:15
**prevailing** [1] - 11:22
**prevent** [2] - 54:19, 75:3
**preventing** [11] - 7:21, 23:16, 23:18, 74:2, 74:8, 74:14, 74:17, 76:5, 76:8, 77:15, 89:17
**prevention** [1] - 8:7
**preview** [2] - 33:16, 37:1
**previous** [7] - 27:25, 30:17, 39:16, 41:17, 73:1, 74:3, 88:16
**previously** [4] - 6:7, 8:10, 8:21, 87:2
**principle** [1] - 24:24
**principles** [6] - 13:7, 13:24, 14:8, 22:12, 36:10, 85:16
**priority** [2] - 6:14, 39:22
**problem** [1] - 68:10
**proceedings** [1] - 39:6
**Proceedings** [1] - 95:10
**process** [3] - 13:14, 13:16, 44:22

**produced** [1] - 33:3
**product** [7] - 47:10, 64:3, 64:6, 81:21, 92:7, 94:2, 94:15
**products** [1] - 9:3
**program** [1] - 34:16
**progresses** [1] - 9:13
**proper** [3] - 14:15, 19:14, 37:23
**proposition** [1] - 79:1
**prosecuting** [1] - 31:2
**prosecution** [60] - 5:20, 16:6, 16:10, 16:13, 19:10, 21:20, 22:7, 22:15, 22:17, 26:8, 27:3, 27:9, 27:14, 28:23, 29:3, 29:12, 30:2, 30:3, 31:18, 48:20, 48:22, 49:3, 49:6, 50:3, 54:21, 54:22, 66:12, 66:17, 66:21, 66:22, 67:2, 67:13, 67:20, 69:2, 70:3, 71:20, 72:19, 72:20, 72:24, 73:2, 73:25, 74:3, 75:11, 75:13, 75:14, 75:18, 76:5, 76:17, 77:16, 77:17, 78:2, 79:5, 83:7, 83:11, 83:15, 83:20, 84:17, 87:18, 87:19, 88:18
**prosecution's** [1] - 35:18
**protect** [1] - 42:12
**proves** [3] - 26:3, 27:12, 27:21
**provide** [12] - 4:25, 7:3, 7:20, 20:1, 23:1, 41:4, 58:2, 62:18, 62:20, 65:15, 65:18, 85:13
**provided** [5] - 10:2, 15:14, 28:2, 59:21, 78:13
**provides** [10] - 5:6, 15:16, 19:19, 33:21, 44:20, 47:2, 53:17, 60:9, 81:8, 81:9
**providing** [2] - 34:16, 64:11
**provisional** [1] - 39:22
**publication** [2] - 67:14, 67:15
**published** [1] - 67:12
**purely** [1] - 83:19
**purpose** [4] - 35:24, 59:1, 63:19, 79:24
**purposes** [10] - 6:15, 23:3, 24:8, 25:19, 26:16, 35:13, 36:6, 61:14, 84:16, 88:6
**put** [13] - 12:12, 23:23, 24:1, 24:2, 24:9, 25:4, 25:6, 35:3, 61:1, 70:10, 74:6, 76:3, 78:18
**puts** [1] - 19:7
**putting** [9] - 13:3, 14:7, 15:18, 17:5, 23:21, 26:12, 27:25, 83:18, 89:1
**pyrogens** [1] - 20:9

**Q**

**qualify** [1] - 67:14
**questions** [1] - 37:2
**quibble** [1] - 24:23
**quibbling** [1] - 24:3
**quickly** [3] - 22:11, 23:6, 33:16
**quite** [2] - 37:9, 90:1
**quote** [2] - 25:12, 81:23
**quoted** [1] - 28:6

**R**

**radiotherapy** [1] - 7:14
**radiotherapy-induced** [1] - 7:14
**raise** [4] - 20:10, 67:16, 74:25, 88:14
**raised** [4] - 11:18, 12:14, 67:6, 74:25
**ranging** [1] - 31:9
**rare** [1] - 85:16
**rather** [4] - 70:6, 71:18, 80:4, 89:17
**rational** [2] - 59:25, 60:4
**rationale** [1] - 81:22
**Re** [2] - 47:19, 47:22
**read** [4] - 58:21, 62:10, 75:11, 88:15
**readily** [2] - 20:15, 41:3
**reading** [5] - 8:18, 33:24, 42:6, 60:3, 79:14
**really** [22] - 5:5, 7:16, 9:13, 13:24, 17:20, 20:4, 24:23, 37:9, 44:24, 46:10, 71:11, 72:20, 73:6, 74:20, 74:23, 76:8, 77:14, 78:8, 80:3, 80:18, 83:3, 83:6
**reason** [13] - 10:12, 12:19, 21:5, 22:2, 24:7, 24:14, 51:17, 55:24, 60:20, 62:6, 73:23, 92:10
**reasons** [5] - 5:5, 15:6, 24:22, 36:4, 77:24
**rebuttal** [1] - 36:14
**received** [1] - 11:19
**Recess** [1] - 36:19
**recess** [2] - 34:5, 36:16
**recitation** [1] - 30:16
**recite** [1] - 41:13
**recited** [1] - 81:2
**recites** [4] - 16:22, 39:8, 44:6, 45:3
**record** [3] - 26:16, 90:7, 91:23
**red** [3] - 6:13, 38:8, 50:12
**Reddy** [3] - 2:15, 3:4, 3:23
**REDDY'S** [1] - 1:7
**reduce** [9] - 22:4, 24:15,

38:5, 46:14, 54:20, 55:6,
58:7, 58:20, 63:9

**reducing** [35] - 7:13, 7:22,
23:18, 23:24, 24:12, 25:21,
26:9, 26:10, 26:11, 26:14,
27:8, 27:20, 27:22, 28:8,
28:9, 28:19, 35:21, 41:13,
51:12, 52:15, 52:20, 55:11,
66:4, 74:13, 74:14, 77:10,
89:8, 89:17, 89:18

**reduction** [1] - 58:9

**refer** [3] - 7:10, 20:21,
35:19

**reference** [16] - 18:12,
18:20, 32:15, 42:25, 56:24,
57:23, 58:6, 64:18, 67:2,
67:7, 67:8, 68:22, 69:10,
84:25, 91:15

**references** [3] - 57:10,
58:9, 67:6

**referred** [2] - 30:18, 62:15

**referring** [2] - 14:4, 25:12

**refers** [2] - 14:5, 85:9

**reflected** [2] - 38:16, 91:22

**regard** [3] - 42:4, 65:10,
67:15

**regarding** [3] - 9:18, 19:21,
58:22

**regardless** [1] - 92:17

**Regina** [1] - 1:25

**rehearing** [1] - 88:23

**reject** [1] - 24:7

**rejected** [3] - 23:16, 74:9

**rejecting** [1] - 23:20

**rejection** [20] - 22:21,
24:14, 25:6, 25:24, 26:3,
28:11, 55:2, 66:25, 75:1,
75:2, 76:4, 76:9, 76:12,
76:16, 78:5, 78:18, 78:21,
89:2, 89:23

**relate** [3] - 15:1, 40:5, 60:24

**related** [5] - 6:13, 24:19,
31:11, 32:3, 32:4

**relates** [5] - 7:12, 15:2,
28:3, 60:25, 71:25

**relating** [4] - 6:25, 26:4,
27:3, 27:9

**relation** [1] - 32:5

**relative** [2] - 9:5, 91:19

**relatively** [2] - 23:6, 30:2

**relented** [1] - 24:21

**relevant** [8] - 5:1, 6:16, 7:9,
16:10, 27:14, 28:12, 31:6,
72:8

**reliance** [24] - 5:20, 13:7,
16:18, 22:15, 22:17, 27:16,
37:20, 55:20, 56:12, 66:17,
68:13, 68:16, 70:2, 70:13,
71:11, 72:9, 72:19, 73:24,
75:13, 77:16, 77:17, 78:3,

89:2

**relied** [3] - 22:7, 31:19,
71:13

**relies** [1] - 78:7

**rely** [12] - 22:12, 22:20,
26:12, 27:3, 29:19, 41:25,
44:16, 49:6, 68:23, 74:2,
77:22, 83:10

**relying** [5] - 31:21, 67:9,
71:12, 72:18, 88:18

**remain** [1] - 8:2

**remember** [2] - 26:25,
83:13

**remembering** [1] - 22:23

**remove** [3] - 45:22, 45:23,
74:17

**removed** [1] - 23:22

**render** [1] - 22:17

**renders** [1] - 41:8

**replace** [1] - 73:21

**replaced** [3] - 54:20, 74:14,
78:21

**reply** [2] - 12:7, 49:22

**report** [2] - 85:21, 85:23

**reporter** [1] - 26:18

**reports** [9] - 11:19, 11:21,
17:14, 43:8, 43:17, 43:19,
43:20, 61:1, 61:3

**representation** [4] - 67:15,
88:2, 90:25

**require** [9] - 8:20, 20:9,
21:21, 34:22, 55:19, 57:4,
61:15, 70:1, 78:2

**required** [6] - 1:23, 50:5,
58:12, 66:16, 73:24, 77:8,
77:18, 83:22, 91:8

**requirement** [2] - 21:9,
21:10, 21:13, 21:22, 22:2,
59:10, 66:15, 69:7, 69:13

**requirements** [8] - 15:20,
20:7, 21:8, 22:25, 23:3,
37:21, 66:15, 77:21

**requires** [11] - 32:20, 34:17,
50:15, 54:25, 56:12, 58:11,
68:18, 72:8, 75:13, 79:17,
83:17

**requiring** [1] - 82:18

**rescue** [1] - 69:7

**resolve** [1] - 7:2

**resort** [2] - 13:23, 48:19

**respect** [10] - 15:4, 18:20,
33:18, 42:19, 47:4, 53:9,
55:15, 58:17, 69:15, 88:25

**respectfully** [4] - 53:19,
64:15, 70:1, 82:6

**respond** [1] - 82:10

**response** [3] - 31:3, 68:6,
83:12

**responsive** [1] - 15:7

**rest** [9] - 12:25, 13:20, 25:2,

57:23, 58:7, 58:8, 59:7,
77:19, 87:10

**result** [2] - 38:22, 94:4

**resulted** [1] - 31:25

**results** [3] - 33:5, 33:11,
69:19

**review** [1] - 12:21

**reviewed** [2] - 11:21, 53:5

**rightfully** [1] - 52:10

**RMR** [1] - 1:25

**ROCHE** [1] - 1:4

**room** [5] - 34:7, 38:23,
40:16, 42:11, 46:2

**roughly** [2] - 49:15, 49:16

**round** [2] - 11:19, 64:23

**routinely** [1] - 74:8

**rule** [12] - 37:15, 37:16,
37:18, 41:24, 42:1, 44:10,
44:11, 44:18, 54:15, 55:25,
88:17, 95:8

**rules** [4] - 50:6, 63:10, 83:3,
87:7

**ruling** [1] - 12:17

**run** [1] - 14:22

**run-on** [1] - 14:22

---

## S

**S.A** [1] - 1:4

**Sandoz** [7] - 2:11, 2:13,
3:4, 4:2, 4:4, 4:6, 36:25

**satisfy** [2] - 82:22, 89:18

**Saul** [1] - 3:9

**SAUL** [1] - 2:3

**save** [3] - 36:14, 42:9,
42:12

**saw** [3] - 11:3, 22:6, 48:14

**scenario** [1] - 12:23

**scope** [1] - 19:15

**scratching** [1] - 11:17

**seated** [1] - 3:7

**second** [10] - 5:18, 7:9,
8:15, 11:19, 15:15, 46:15,
66:11, 68:20, 76:3, 78:6

**Section** [4] - 1:24, 74:10,
76:10, 88:7

**section** [1] - 51:2

**see** [24] - 7:11, 9:24, 11:21,
11:23, 12:9, 12:12, 13:9,
14:3, 15:5, 29:13, 36:22,
38:17, 39:7, 39:24, 46:10,
49:1, 51:19, 52:18, 53:9,
68:3, 68:23, 71:22, 81:15,
85:6

**seek** [2] - 61:20, 92:18

**seem** [2] - 12:13, 25:4

**sees** [1] - 20:5

**selection** [2] - 47:10, 81:20

**self** [2] - 68:7, 90:23

**self-serving** [2] - 68:7,

90:23

**selling** [2] - 93:1, 93:2

**semantics** [1] - 51:23

**seminal** [1] - 44:13

**SENDER** [2] - 2:14, 3:22

**Sender** [1] - 3:23

**sense** [6] - 15:18, 39:19,
44:19, 66:8, 70:16, 71:9

**sent** [1] - 29:8

**sentence** [6] - 63:3, 86:18,
86:19, 86:20, 86:21

**separate** [3] - 16:13, 26:4,
27:7

**separately** [1] - 18:11

**SEPTEMBER** [1] - 3:1

**September** [1] - 1:11

**series** [2] - 8:6, 87:11

**serve** [1] - 7:6

**serves** [1] - 5:21

**serving** [3] - 36:11, 68:7,
90:23

**session** [2] - 26:16, 42:21

**set** [3] - 23:7, 37:23, 39:21

**setron** [2] - 6:1, 9:3

**setrons** [4] - 5:24, 8:10,
9:6, 36:4

**sets** [3] - 11:21, 18:18, 19:1

**setting** [2] - 10:8, 11:1

**several** [2] - 14:22, 38:18

**share** [1] - 39:20

**shelf** [3] - 7:12, 7:18, 8:2

**short** [1] - 35:6

**shorthand** [1] - 25:13

**show** [16] - 5:14, 20:20,
20:22, 37:14, 38:8, 46:25,
47:9, 55:12, 55:16, 55:20,
57:5, 57:19, 59:8, 66:4,
74:11, 75:14

**showed** [3] - 67:22, 83:13,
83:15

**showing** [3] - 33:6, 35:21,
58:23

**shown** [5] - 45:24, 52:5,
55:9, 62:21, 67:13

**shows** [6] - 26:3, 47:3,
54:13, 56:25, 67:21, 76:8

**side** [4] - 5:9, 77:21, 87:5,
95:7

**sides** [1] - 34:11

**significant** [2] - 70:23,
73:19

**significantly** [1] - 69:6

**similar** [5] - 18:19, 27:14,
30:8, 30:14, 40:10

**similarities** [1] - 49:12

**similarly** [1] - 41:5

**simple** [2] - 37:9, 56:14

**simply** [2] - 27:7, 85:9

**single** [32] - 13:19, 14:1,

14:4, 14:5, 14:23, 26:19, 28:4, 38:3, 38:17, 41:6, 45:14, 45:18, 52:25, 60:7, 60:11, 60:15, 60:24, 61:4, 61:17, 63:22, 77:22, 78:8, 85:2, 85:8, 85:12, 85:20, 85:24, 86:12, 86:14, 86:16, 87:12, 89:13

**single-use** [26] - 13:19, 14:1, 14:4, 14:5, 38:3, 38:17, 41:6, 45:14, 45:18, 52:25, 60:7, 60:11, 60:15, 60:24, 61:4, 61:17, 63:22, 85:2, 85:8, 85:12, 85:20, 85:24, 86:12, 86:14, 86:16, 87:12

**sit** [1] - 8:2
**sitting** [1] - 84:15
**situation** [4] - 13:21, 31:17, 34:13, 78:25
**six** [2] - 51:12, 77:10
**skill** [2] - 20:5, 33:23
**slide** [6] - 11:4, 12:5, 40:24, 56:5, 73:5, 82:12
**Slide** [1] - 45:24
**slides** [7] - 4:22, 34:5, 38:9, 52:11, 54:24, 85:13, 85:14
**slight** [1] - 19:8
**slightly** [1] - 83:9
**slow** [3] - 26:17, 26:21, 34:8
**small** [1] - 30:2
**smaller** [1] - 9:2
**so..** [1] - 48:4
**sodium** [1] - 18:16
**sold** [1] - 92:7
**solution** [29] - 16:19, 16:20, 17:14, 17:15, 17:18, 17:24, 18:14, 18:16, 19:3, 19:4, 30:17, 30:22, 38:19, 39:9, 40:12, 41:1, 52:8, 52:14, 52:19, 52:22, 52:23, 53:8, 53:10, 64:20, 65:7, 73:8, 73:22, 86:5
**solutions** [4] - 16:16, 18:9, 40:5, 73:11
**someone** [1] - 92:25
**sometimes** [2] - 26:19, 87:14
**sort** [7] - 14:8, 14:16, 15:18, 18:9, 21:25, 36:8, 84:22
**sounds** [2] - 39:3, 54:4
**sparse** [1] - 68:12
**special** [2] - 15:19, 15:21
**specific** [16] - 6:1, 25:23, 30:16, 30:21, 45:1, 51:1, 55:19, 61:22, 62:1, 62:5, 64:18, 69:12, 69:23, 70:7, 71:7, 72:3
**specifically** [14] - 5:14, 6:5, 37:11, 38:12, 40:9, 44:5,

47:4, 47:15, 59:5, 59:17, 66:18, 68:17, 81:10, 81:16
**specification** [14] - 9:21, 15:24, 33:12, 33:20, 33:24, 35:20, 58:17, 58:21, 58:22, 58:25, 59:7, 59:12, 61:14, 65:3
**specifications** [2] - 6:15, 39:21
**specifics** [7] - 14:12, 38:19, 40:13, 45:16, 76:21, 79:11, 80:14
**specified** [1] - 10:4
**speeds** [1] - 57:7
**Spilker** [1] - 85:22
**Spilker's** [1] - 86:7
**Sports** [24] - 24:16, 25:1, 25:8, 77:22, 77:25, 78:6, 78:16, 78:25, 88:20, 88:21, 88:22, 89:1
**stability** [13] - 7:21, 7:24, 9:8, 9:11, 9:14, 9:20, 39:11, 39:19, 40:8, 40:14, 58:12, 58:19, 59:8
**stable** [23] - 7:7, 7:13, 7:18, 8:2, 28:17, 38:14, 38:22, 39:7, 39:9, 40:15, 40:17, 40:19, 41:2, 42:5, 42:11, 45:2, 45:20, 45:25, 46:2, 52:19, 58:13, 58:19, 62:16
**stage** [2] - 12:19, 29:18
**stand** [4] - 37:5, 64:24, 65:19, 79:1
**stand-alone** [2] - 64:24, 65:19
**start** [4] - 7:5, 13:11, 67:4, 85:11
**started** [1] - 77:12
**starting** [2] - 34:7, 37:13
**starts** [2] - 38:2, 45:13
**state** [1] - 32:7
**State** [1] - 1:10
**statement** [11] - 22:13, 27:25, 56:23, 56:24, 59:7, 63:19, 68:7, 77:1, 90:20, 90:23, 91:24
**statements** [14] - 6:24, 6:25, 7:1, 19:21, 27:3, 27:9, 35:18, 49:3, 49:11, 67:18, 72:19, 83:21, 84:22, 85:16
**states** [1] - 17:14
**STATES** [2] - 1:1, 1:13
**States** [2] - 1:10, 6:3
**stating** [3] - 11:24, 18:11, 31:20
**stem** [1] - 6:13
**Stencil** [2] - 47:19, 47:22
**step** [5] - 38:11, 57:18, 57:19, 77:21
**step-by-step** [1] - 57:19

**steps** [5] - 44:7, 45:10, 81:9, 94:2, 94:11
**sterile** [1] - 20:8
**Stewart** [1] - 3:22
**still** [15] - 8:24, 11:8, 11:17, 21:13, 21:16, 30:10, 46:1, 51:19, 52:5, 59:1, 59:15, 70:8, 80:13, 83:10, 92:18
**stipulate** [1] - 84:8
**stomach** [1] - 20:14
**stop** [5] - 5:8, 8:15, 30:6
**stops** [1] - 35:6
**stored** [2] - 38:23, 46:2
**strange** [1] - 68:1
**strategy** [1] - 12:25
**STRAWN** [1] - 2:6
**Strawn** [2] - 3:18, 36:23
**Street** [1] - 1:10
**stripped** [1] - 86:25
**structural** [16] - 14:2, 15:16, 20:2, 20:7, 25:5, 45:17, 53:4, 60:6, 60:12, 61:18, 63:3, 63:17, 63:21, 64:1, 85:4
**structurally** [6] - 45:8, 45:19, 45:21, 47:2, 54:11, 62:21
**structure** [26] - 16:23, 16:24, 40:25, 41:1, 41:4, 41:7, 44:7, 45:4, 45:10, 47:11, 49:2, 53:11, 53:18, 56:7, 62:19, 62:21, 78:13, 79:24, 81:8, 81:18, 81:19, 82:19, 82:23, 82:24, 93:16
**structures** [1] - 60:12
**STUART** [1] - 2:14
**stuck** [1] - 90:24
**study** [4] - 33:4, 33:6, 55:25, 91:16
**stuff** [2] - 71:2, 88:11
**subject** [13] - 18:2, 28:2, 28:3, 28:4, 50:7, 50:8, 50:23, 50:25, 51:4, 63:3, 63:10, 63:18, 86:18
**submit** [5] - 22:2, 24:14, 86:22, 87:16, 91:23
**submitted** [5] - 11:20, 24:20, 76:24, 77:6, 85:22
**submitting** [1] - 13:17
**subparagraphs** [1] - 23:10
**subsections** [1] - 22:24
**subsequent** [1] - 19:16
**substances** [1] - 20:9
**substantially** [2] - 19:15, 19:24
**substantive** [1] - 76:17
**subsume** [1] - 65:9
**succeed** [1] - 8:25
**sudden** [1] - 12:17
**sued** [1] - 35:4

**suffering** [1] - 95:5
**sufficient** [1] - 73:18
**sufficiently** [3] - 62:5, 88:7, 88:12
**suggest** [5] - 32:21, 50:10, 51:23, 67:18, 67:19
**suggested** [6] - 33:8, 34:20, 49:5, 64:22, 67:5, 79:7
**suggests** [1] - 44:19
**suit** [4] - 6:2, 6:11, 10:4, 15:9
**Sullivan** [11] - 31:2, 32:9, 67:18, 68:5, 68:6, 68:21, 68:23, 70:10, 71:8, 71:11, 90:22
**Sullivan's** [1] - 68:14
**summarized** [1] - 28:5
**summarizes** [1] - 19:2, 30:25
**summarizing** [2] - 18:12, 87:20
**summary** [15] - 8:4, 8:18, 16:5, 16:13, 28:1, 28:25, 31:20, 50:6, 50:23, 67:17, 68:12, 88:16, 89:11, 90:7, 91:23
**Summary** [1] - 50:25
**supplied** [3] - 59:8, 61:1, 61:7
**support** [9] - 7:3, 8:6, 33:22, 44:17, 59:12, 59:18, 59:19, 78:19
**supported** [2] - 62:7, 70:9
**supportive** [1] - 70:9
**suppose** [2] - 33:5, 92:1
**supposedly** [1] - 94:1
**surely** [1] - 88:19
**surgical** [1] - 36:1
**surprised** [2] - 43:6, 63:11
**surprises** [1] - 33:3
**surprising** [6] - 8:23, 9:4, 9:14, 9:15, 33:7, 58:11
**surprisingly** [2] - 8:6, 58:25
**switching** [1] - 34:4
**system** [3] - 20:13, 47:9, 81:19
**Systems** [1] - 65:13

**T**

**tablet** [1] - 93:25
**tacitly** [1] - 13:2
**talks** [4] - 9:25, 31:8, 75:21, 78:10
**Tang** [23] - 18:12, 18:13, 18:14, 30:1, 31:1, 31:9, 31:23, 32:11, 32:15, 32:21, 32:22, 33:4, 33:7, 33:8, 68:22, 69:10, 71:10, 71:13,

71:14, 89:25, 91:3, 91:7,
91:14

**Tang's** [3] - 69:4, 69:19,
91:20

**Tarantino** [1] - 3:20

**TARANTINO** [2] - 2:8, 3:19

**taught** [1] - 33:7

**technical** [2] - 53:13, 62:9

**technicality** [1] - 67:11

**temperature** [5] - 20:10,
38:23, 40:16, 42:12, 46:3

**tenth** [1] - 8:23

**term** [25] - 11:7, 19:11,
19:20, 19:21, 20:21, 26:7,
37:16, 39:7, 40:17, 42:6,
42:10, 44:9, 47:8, 50:18,
54:25, 57:10, 63:17, 64:12,
64:19, 65:10, 65:15, 65:16,
65:19, 73:2, 83:21

**terms** [25] - 10:13, 33:7,
37:10, 37:11, 40:25, 42:16,
45:17, 47:4, 47:5, 53:4,
54:16, 58:12, 60:1, 60:6,
60:11, 60:12, 63:21, 64:1,
72:7, 72:10, 73:1, 74:7, 83:8,
86:16

**territory** [1] - 92:16

**test** [6] - 20:1, 20:15, 25:17,
25:20, 86:10, 90:21

**testimony** [2] - 15:14,
17:12

**tests** [2] - 59:3, 85:7

**Teva** [6] - 2:7, 2:9, 3:5,
3:18, 3:21, 36:24

**that...only** [1] - 8:9

**THE** [177] - 1:2, 1:12, 3:3,
3:16, 4:7, 4:12, 4:17, 4:20,
4:23, 5:8, 5:17, 6:18, 6:21,
7:23, 8:3, 8:15, 8:17, 10:21,
10:23, 11:4, 11:6, 11:10,
11:14, 12:2, 12:6, 12:22,
14:21, 15:24, 17:20, 17:23,
18:5, 18:7, 20:25, 21:3,
21:17, 22:23, 23:9, 24:1,
24:3, 26:15, 26:18, 26:23,
27:23, 29:2, 29:6, 29:10,
29:13, 29:17, 29:24, 30:6,
30:23, 31:12, 31:16, 31:23,
32:10, 32:23, 33:3, 33:9,
34:4, 34:10, 35:2, 35:8,
35:25, 36:16, 36:20, 39:15,
39:24, 40:2, 40:19, 43:1,
43:21, 46:8, 46:10, 46:14,
46:18, 47:21, 48:2, 48:5,
48:7, 48:13, 48:19, 49:15,
49:18, 50:13, 50:17, 50:20,
51:19, 52:1, 52:17, 53:6,
53:23, 54:2, 54:4, 54:17,
55:14, 55:24, 56:10, 57:7,
57:13, 57:16, 57:25, 58:14,

58:24, 59:3, 59:14, 60:14,
60:17, 60:22, 61:8, 61:10,
61:12, 61:20, 62:3, 62:8,
62:12, 63:2, 63:8, 64:2, 65:1,
66:7, 66:13, 66:20, 68:9,
69:3, 69:17, 70:5, 70:15,
70:19, 71:17, 72:11, 72:17,
73:4, 74:21, 75:4, 75:9,
75:20, 75:24, 76:10, 76:12,
76:14, 77:4, 77:7, 77:12,
80:3, 80:8, 80:20, 80:25,
81:4, 82:9, 83:24, 84:4,
84:13, 85:4, 86:15, 86:24,
88:4, 89:3, 89:16, 89:25,
90:3, 90:11, 90:16, 91:4,
91:11, 91:13, 91:18, 92:1,
92:8, 92:22, 93:6, 93:10,
93:20, 94:16, 94:19, 95:2,
95:4, 95:7

**them..** [1] - 14:20

**themselves** [2] - 3:11,
67:25

**therapeutic** [4] - 33:11,
58:14, 59:1, 94:6

**therapy** [1] - 32:24

**therefore** [2] - 15:22, 82:5

**thinks** [1] - 55:9

**third** [1] - 68:20

**three** [4] - 50:4, 67:23,
76:17, 93:24

**throughout** [2] - 13:10,
69:2

**ties** [2] - 86:7, 86:12

**timeline** [1] - 77:14

**tired** [1] - 22:23

**Title** [1] - 1:23

**today** [10] - 6:12, 7:8, 7:9,
23:3, 23:24, 30:15, 30:21,
37:2, 43:2, 85:24

**today's** [2] - 6:15, 7:2

**together** [3] - 45:19, 46:20,
88:9

**tonicifying** [1] - 39:24

**took** [3] - 13:13, 42:10,
54:19

**top** [1] - 67:22

**topic** [1] - 67:24

**topics** [2] - 67:24, 68:20

**touch** [1] - 78:22

**towards** [3] - 24:12, 89:8,
89:15

**transform** [3] - 65:22,
88:19, 89:4

**transforms** [1] - 37:21

**treat** [23] - 5:24, 6:5, 7:10,
7:18, 8:1, 8:12, 9:12, 9:25,
10:6, 18:14, 35:1, 38:25,
49:22, 63:15, 69:25, 70:12,
75:17, 79:13, 82:21, 86:6,
86:9, 93:4

**treated** [1] - 75:19

**treating** [18] - 9:6, 33:23,
35:14, 62:14, 68:24, 69:16,
70:11, 74:13, 80:12, 80:15,
80:16, 80:21, 81:10, 82:20,
82:25, 87:13, 93:17, 93:22

**treatment** [5] - 6:8, 8:7,
8:25, 18:3, 40:24

**treats** [6] - 44:1, 53:4,
53:21, 63:25, 75:16

**TRENTON** [1] - 3:1

**Trenton** [1] - 1:11

**trial** [6] - 12:9, 30:10, 31:9,
43:14, 59:20, 91:10

**trials** [1] - 58:22

**trouble** [1] - 26:10

**True** [1] - 1:23

**true** [2] - 26:1, 57:25

**try** [5] - 23:6, 35:3, 37:6,
42:9, 51:23

**trying** [5] - 25:4, 32:10,
42:14, 46:20, 70:15

**TUESDAY** [1] - 3:1

**turn** [1] - 92:9

**turns** [1] - 9:10

**two** [34] - 5:5, 7:6, 7:7, 7:17,
10:13, 14:19, 15:13, 16:2,
18:18, 22:5, 24:19, 37:20,
39:14, 41:25, 46:10, 47:16,
47:17, 48:9, 48:13, 48:15,
48:20, 48:23, 48:25, 52:11,
54:11, 55:4, 55:15, 55:16,
66:16, 67:6, 83:5, 86:14,
86:24, 90:20

**type** [3] - 25:23, 35:16,
82:18

**typically** [1] - 32:20

## U

**U.S** [1] - 6:5

**U.S.C** [1] - 1:23

**ultimately** [1] - 23:14

**under** [17] - 6:4, 24:16,
27:6, 36:9, 36:11, 54:7,
54:24, 55:2, 64:16, 65:7,
65:11, 66:25, 74:9, 79:8,
79:14, 82:4, 91:7

**undergo** [1] - 18:4

**understood** [1] - 65:20

**uneasy** [1] - 34:7

**unfortunately** [1] - 74:22

**unit** [25] - 13:19, 14:1, 38:3,
38:18, 41:6, 45:14, 45:18,
52:25, 60:7, 60:11, 60:24,
61:5, 61:8, 61:17, 63:22,
85:2, 85:9, 85:13, 85:20,
85:25, 86:7, 86:12, 86:14,
86:17, 87:12

**unit-dose** [24] - 13:19, 14:1,

38:3, 38:18, 41:6, 45:14,
45:18, 52:25, 60:7, 60:11,
60:24, 61:5, 61:17, 63:22,
85:2, 85:9, 85:13, 85:20,
85:25, 86:7, 86:12, 86:14,
86:17, 87:12

**UNITED** [1] - 1:1

**United** [2] - 1:10, 6:3

**uNITED** [1] - 1:13

**unless** [6] - 22:14, 23:20,
53:24, 57:9, 62:10, 84:3

**unmistakable** [8] - 55:19,
68:13, 68:16, 70:2, 70:13,
72:9, 73:24, 77:17

**unnecessary** [1] - 46:5

**unrebutted** [1] - 61:7

**unsupported** [1] - 59:4

**unsure** [1] - 29:18

**untimely** [1] - 12:19

**up** [30] - 4:13, 5:9, 8:22,
14:15, 17:10, 34:6, 35:4,
37:4, 38:8, 38:13, 45:24,
48:17, 50:4, 51:13, 54:9,
57:8, 60:20, 64:10, 64:20,
66:20, 74:1, 79:6, 82:12,
85:15, 87:2, 87:4, 87:10,
88:8, 90:17, 94:14

**uphill** [1] - 37:14

**usage** [2] - 70:21, 92:11

**use-type** [1] - 82:18

**users** [1] - 35:3

**uses** [27] - 30:9, 36:1,
43:10, 47:4, 47:18, 47:23,
48:6, 48:14, 48:17, 48:23,
49:17, 49:21, 52:2, 53:5,
55:20, 56:4, 63:15, 63:24,
64:1, 64:6, 71:1, 71:16, 80:6,
80:18, 81:1, 81:12

## V

**vacuum** [1] - 71:24

**vague** [1] - 78:20

**variance** [1] - 13:9

**various** [2] - 16:20, 38:20

**vein** [5] - 17:4, 17:6, 17:16,
17:19, 53:12

**verb** [1] - 63:9

**version** [1] - 23:9

**versus** [1] - 3:4

**veterinary** [1] - 17:24

**view** [2] - 33:20, 37:9

**virtually** [5] - 23:23, 49:20,
51:18, 52:2, 74:11

**vitality** [1] - 44:8

**Vizio** [4] - 34:12, 35:15,
82:17, 93:14

**volume** [1] - 29:15

**volumes** [1] - 30:20

**vomiting** [14] - 5:25, 6:6,

7:11, 18:3, 31:8, 31:10, 31:22, 38:6, 46:15, 69:7, 86:9, 87:23, 91:3, 91:17
**vs** [1] - 1:6

## W

**wait** [3] - 13:18, 43:1, 90:9
**waiting** [1] - 42:24
**walk** [1] - 17:12
**Wallack** [1] - 4:4
**WALLACK** [1] - 2:12
**wants** [2] - 44:24, 92:3
**watering** [1] - 89:18
**watermark** [1] - 88:16
**ways** [1] - 87:15
**week** [1] - 11:20
**welcome** [3] - 3:3, 4:7
**whereas** [5] - 30:17, 31:24, 32:12, 63:9, 91:16
**wherein** [1] - 56:22
**whole** [10] - 10:17, 11:7, 29:21, 36:4, 41:15, 43:7, 72:14, 77:14, 86:19, 86:20
**WILLIAM** [1] - 2:4
**William** [1] - 3:10
**willing** [2] - 84:8, 92:22
**wind** [1] - 35:4
**Winston** [2] - 3:18, 36:23
**WINSTON** [1] - 2:6
**wiped** [1] - 53:24
**wipes** [1] - 54:2
**withstand** [1] - 6:10
**wonder** [1] - 55:24
**wondering** [2] - 42:5, 90:8
**WONG** [90] - 2:6, 3:17, 4:11, 36:21, 39:16, 40:1, 40:4, 40:22, 43:5, 43:23, 46:9, 46:13, 46:17, 46:22, 47:22, 48:4, 48:6, 48:8, 48:15, 48:21, 49:16, 49:19, 50:14, 50:19, 50:21, 51:21, 52:2, 52:18, 53:13, 54:1, 54:3, 54:6, 54:22, 55:15, 56:2, 56:11, 57:9, 57:14, 57:17, 58:1, 58:15, 59:2, 59:4, 59:17, 60:16, 60:18, 60:23, 61:9, 61:11, 61:13, 61:25, 62:6, 62:11, 62:13, 63:5, 63:14, 64:5, 65:3, 66:11, 66:14, 66:23, 68:11, 69:11, 69:22, 70:8, 70:18, 71:6, 72:1, 72:16, 72:18, 73:5, 74:23, 75:8, 75:10, 75:23, 76:1, 76:11, 76:13, 76:16, 77:5, 77:8, 77:13, 80:7, 80:10, 80:24, 81:1, 81:6, 94:17, 94:20, 95:3
**Wong** [4] - 3:17, 36:20, 36:23, 95:7

**wooden** [1] - 32:23
**word** [34] - 4:14, 5:9, 5:12, 7:23, 7:24, 10:18, 14:3, 19:10, 20:17, 21:14, 21:18, 25:2, 26:19, 27:1, 51:19, 53:6, 54:19, 60:22, 63:8, 71:22, 73:4, 75:3, 76:7, 83:14, 83:20, 84:1, 84:5, 84:9, 84:18, 84:21, 87:3, 87:6, 88:7, 90:16
**worded** [1] - 51:22
**words** [12] - 5:7, 10:18, 18:18, 19:8, 32:10, 58:2, 69:19, 83:4, 89:11, 91:4, 92:9, 94:6
**works** [3] - 57:2, 64:16, 74:11
**world's** [1] - 26:18
**wrap** [1] - 79:6
**wrapper** [1] - 29:21
**wrapping** [1] - 54:9
**writes** [1] - 32:8
**writing** [1] - 28:25
**written** [20] - 11:25, 12:4, 12:6, 23:1, 33:15, 33:18, 33:21, 59:9, 59:10, 59:15, 82:15, 87:12, 88:8, 88:9, 89:19, 90:12, 90:15, 94:20, 94:22, 95:1

## Y

**years** [2] - 7:7, 76:17